UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SAWTOOTH MOUNTAIN RANCH LLC, LYNN ARNONE, and DAVID BOREN, | Case No. 1:19-cv-0118-CWD |
| Plaintiffs, | **MEMORANDUM DECISION AND ORDER RE: PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (DKT. 11)** |
| v. | |
| UNITED STATES FOREST SERVICE; SAWTOOTH NATIONAL FOREST; JIM DEMAAGD, Forest Supervisor; SAWTOOTH NATIONAL RECREATION AREA; KIRK FLANNIGAN, Area Ranger, | |
| Defendants. | |

## INTRODUCTION

Pending before the Court is an expedited motion for a preliminary injunction filed

by Plaintiffs Sawtooth Mountain Ranch LLC, Lynn Arnone, and David Boren against

Defendants United States Forest Service, Sawtooth National Forest, Sawtooth National

Recreation Area, Forest Supervisor Jim DeMaagd, and Area Ranger Kirk Flannigan.

(Dkt. 11.) Plaintiffs challenge the approval of and any actions associated with the

proposed Stanley to Redfish Trail ("Stanley/Redfish Trail"), as described in the Decision

Memo signed by Mr. Flannigan on June 6, 2017.[1] The proposed Stanley/Redfish Trail will include a segment of over one mile that crosses private property owned by Plaintiffs. In their motion, Plaintiffs ask the Court to halt construction of the trail, which is currently set to begin on June 17, 2019.

The parties had a full and fair opportunity to provide briefing supported by affidavits. (Dkt. 6, 7.) Defendants submitted also the Administrative Record (AR). (Dkt. 14.) And, the Idaho Conservation League submitted an Amicus Curiae brief and the accompanying declaration of John Robison in support of the U.S. Forest Service's proposal for the Stanley/Redfish Trial. (Dkt. 18.)

The Court conducted a hearing on June 3, 2019, at which the parties appeared and presented their arguments.[2] After carefully considering the parties' arguments, written memoranda, exhibits, the Administrative Record, and relevant case law, and for the reasons that follow, the Court will deny the motion for preliminary injunction.

## FACTUAL BACKGROUND

Plaintiffs own or have ownership-related interests in real property in Custer County, Idaho, adjacent to the southern end of the town of Stanley, and westward of State Highway 75, in a contiguous parcel including all or part of Sections 4, 5, 8, 9, 10, 15, 16

---

[1] Project documents and a map depicting the proposed Stanley to Redfish Lake Trail can be found on the United States Forest Service's website: https://www.fs.usda.gov/project/?project=43434 (last visited June 13, 2019).

[2] The undersigned Magistrate Judge has jurisdiction over this matter by virtue of all parties' express written consent. 28 U.S.C. § 636(c); *see also* D. Idaho Loc. Civ. R. 72.1(a)(1) (authorization to decide civil cases with the parties' consent). (Dkt. 10.)

and 17 of T.10 N., R. 13 E., Boise Meridian ("Property"). The Property is located within the Sawtooth National Recreation Area (SNRA), and consists of approximately 1,781.07 acres. Decl. of Boren ¶ 3. (Dkt. 11-2.)

The SNRA is located in south-central Idaho, covering more than 756,000 acres. (AR 1127.) The SNRA is a Congressionally-designated special area, created in 1972 "to assure the preservation and protection of the natural, scenic, historic, pastoral, and fish and wildlife values and to provide for the enhancement of the recreational values associated therewith …." 16 U.S.C. § 460aa. Redfish Lake and Little Redfish Lake are popular summer destinations located within the SNRA six miles south of the town of Stanley. (AR 1127.) State Highway 75 connects Redfish Lake to Stanley, with high speed traffic and heavy summer traffic volumes. (AR 1128.) There currently is no alternative transportation route connecting Stanley and Redfish Lake. (AR 1128.)

In the early to mid-1990's, SNRA staff began discussing the idea of constructing a trail connecting Stanley and Redfish Lake to provide an alternate means of travel between the two areas. (AR 1126.) At that time, the Forest Service envisioned a trail that would provide non-motorized travel, and serve pedestrians, bicyclists, and equestrians. (AR 0938.) In 2005, the Forest Service purchased a 30-foot-wide "Public Trail

Easement" from the prior owners of the Property to connect the proposed trail route between Stanley and Redfish Lake. (AR 0698.)[3]

The Public Trail Easement, which is part of a comprehensive Conservation Easement Deed, states:

> K. Nothing herein contained shall be construed as affording the public access to any portion of the Property except that the United States is hereby granted the right to permit public use of the following:
>
> (1) A strip of land to be utilized as a trail in that portion of the Easement area within Secs. 9, 15, and 16, as shown on Exhibit D, attached hereto and made a part hereof. The total right-of-way width of the trail easement shall be 30 feet. The following uses are allowed on the trail: snowmobile, snow grooming equipment, bicycle, horse, and foot travel. The Grantee may erect appropriate signs to delineate the public use areas where needed.
>
> (2) A strip of land along Valley Creek, to be utilized for foot travel only, extending from the centerline of Valley Creek to point parallel and being 20 feet distant beyond each mean high water line of Valley Creek. The Grantee may erect appropriate signs to delineate the public use areas where needed.

Decl. of Boren Ex. A. (Dkt. 11-2 at 22.) (AR 0833.)

In 2012, the Forest Service initiated internal scoping to review the potential trail connecting Stanley and Redfish Lake (*see*, e.g., AR 1126), and in early 2014, began external scoping to solicit feedback on the proposed project. (AR 0921.) As part of this

---

[3] According to the Conservation Easement Deed, the United States on July 28, 1983, had acquired a Scenic Easement that encumbered the Property. Boren Decl. Ex. A. (Dkt. 11-2 at 13.) The parties later desired to expand the restrictions imposed by the original easement, and on May 10, 2005, entered into a Conservation Easement Deed, which is the deed at issue here. *Id.*

process, a survey was conducted, confirming that "overall public opinion is greatly in support of a trail between Stanley and The Redfish Lake area." (AR 1048.)

As part of the scoping process, the Forest Service released a Notice of Proposed Action ("Proposed Action") for the Stanley/Redfish Trail to the public in February of 2014. *See*, Boren Decl. at ¶¶ 17-19; Exhibits F-H. According to the Proposed Action, the Stanley/Redfish Trail would be about 4.4 miles long, of which about 1.5 miles would traverse the Property, and would "be a consistent 78″ (6′-6″) wide to accommodate passing bike traffic." Proposed Action (Boren Decl. Ex. G) at 2. A "natural surface" was proposed on about 1.2 miles of the trail, with the remainder to consist of "angular gravel" up to several inches "above adjacent grade," and the trail would be classified as a Trail Class 4 structure under the Forest Service trail classification system. *Id*.[4] The trail location and alignment were depicted in a map dated February 21, 2014. Boren Decl. Ex. H.

Plaintiffs acquired the Property[5] in the fall of 2016, and were aware of the May 10, 2005 Conservation Easement Deed when they purchased the Property. Decl. of Boren ¶

---

[4] Plaintiffs provided demonstrative exhibits describing and illustrating the five-level Forest Service Trail Classes at Exhibits E and F to the Declaration of Kathleen Donovan. (Dkt. 11-3.) The Forest Service Trail Class Photo Examples (September 2016) may be found also on the United States Forest Service's website: https://www.fs.fed.us/recreation/programs/trail-management/documents/trailfundamentals/02-TrailPhotosHandout_Sec508_01-24-17_150dpi.pdf (last visited June 13, 2019).

[5] Plaintiff David Boren is married to co-Plaintiff Lynn Arnone. Mr. Boren is the organizer and sole member of Sawtooth Mountain Ranch LLC, which holds legal title to the Property. Decl. of Boren ¶ 2. (Dkt. 11-2.)

8; Ex. A. Forest Service Area Ranger Kirk Flannigan contacted Mr. Boren by letter dated November 30, 2016, to ensure he was aware of the proposed construction. (AR 0001.)

After completing internal and external scoping, the Forest Service on June 6, 2017, authorized construction of the Stanley/Redfish Trail without further environmental analyses pursuant to a Categorical Exclusion. (AR 0296 - 0304.) SNRA Ranger Kirk Flannigan signed the June 6, 2017 Decision Memo on behalf of the Forest Service. The Decision Memo explains that public feedback on the Proposed Action was received in several ways, through surveys circulated by the City of Stanley and the Forest Service, at a public meeting attended by approximately 25 people, and through sixteen (16) written comments. Decision Memo at 9-10. (AR 0296 - 0304.) The Decision Memo approved construction of the Stanley/Redfish Trail, essentially as presented in the Proposed Action, including the location and alignment of the trail depicted in the Proposed Action released to the public in February of 2014. *Id*. at 2.

Plaintiffs did not comment on the Proposed Action, as they did not acquire the Property until the fall of 2016, and were not aware of the 2014 Proposed Action or associated documents. Defendants contend, however, that the Forest Service personally

informed Plaintiffs of the Proposed Action, and that it had been listed continuously in the

Sawtooth National Forest Schedule of Proposed Actions since January 1, 2014.[6]

On April 12, 2018, the Forest Service entered an intra-agency agreement with the

Western Federal Lands Highway Division of the United States Department of

Transportation to design the trail. Declaration of Matthew Phillips ("Phillips Decl.") ¶ 5.

(Dkt. 17-3.) In July of 2018, Western Federal Lands Highway Division solicited bids for

the project and project was awarded in September of 2018 to Hobble Creek Services,

LLC. *Id.* ¶ 6.

During the bid solicitation process, SNRA Landscape Architect Matthew Phillips

communicated with David Boren. The first communications between Phillips and Boren

regarding the Stanley/Redfish Trail occurred in mid-2018. The two met on the Property

in July, when they "walked part of the proposed route, [and] shared views about the best

location and manner of constructing the trail." Boren Decl. at ¶ 13. Boren expected that

the next step would be a revised proposal from the Forest Service that would be "less

damaging to the land, the wetlands, and the scenic beauty of the area, while providing a

better and more enjoyable trail for the allowed uses." *Id.* However, by letter dated

November 26, 2018, the Forest Service informed Boren that "[t]he Sawtooth NRA plans

---

[6] It is unclear from the record if Plaintiffs knew of the publication of the Proposed Action via the Forest Services' website or by other means. However, the November 30, 2016 letter to Mr. Boren from Area Ranger Kirk Flannigan notified Plaintiffs that "the Forest Service is currently planning to develop the Redfish to Stanley Trail, which directly affects your new property…Integral with the northern segment of the proposed route and the connection to Stanley is a portion of the trail that travels through your recently purchased property via a 30′ wide public trail easement." (AR 0001.)

to proceed with developing the trail, in its entirety as proposed." Boren Decl. at 15 and Ex. E at 2.

On March 19, 2019, the SNRA contacted Boren by email to discuss the SNRA's plans for beginning construction on the Stanley/Redfish Trail. Boren Decl. at ¶ 23. During a follow up telephone call with Phillips on April 2, 2019, Boren reiterated his concerns about the excessive construction of the trail, his view that the project involved activity beyond the scope of the easement, and noted that the alignment of the trail as presented to the public and approved in the Decision Memo deviated from the boundaries of the deeded easement and would trespass across the Property. *Id.* at ¶ 24. Area Ranger Kirk Flannigan, on behalf of the SNRA, responded in writing on April 9, 2019, characterizing the decision document maps as a "graphic," depicting the trail location as a "general illustration," and acknowledging that "[t]he illustration of the trail alignment in the [Decision Memo] does not exactly follow the easement, as stated in your letter." *Id.* at ¶ 27 and Ex. K. However, Flannigan assured Boren that the trail construction drawings provided by Phillips, the trail architect, "should further assuage your concern as it assures that the trail will <u>only</u> be located within the easement that crosses the private parcel." *Id.*

Construction of the Stanley/Redfish Trail is scheduled to begin on June 17, 2019, (Phillips Decl. ¶ 7), and must be completed by September 5, 2019, pursuant to the contract with Hobble Creek Services (Decl. of Michael Hurst ("Hurst Decl.") ¶ 3). (Dkt. 17-1.) The Stanley/Redfish Trail is supported by the community, including the City of Stanley, the Idaho Conservation League, the Sawtooth Association, the Stanley-Sawtooth

Chamber of Commerce, and the Idaho Department of Transportation. Phillips Decl. ¶¶ 8-12 and Exs. C-F. (Dkt. 17-2.) Brief of Amicus Curiae. (Dkt. 18.)

## PROCEDURAL BACKGROUND

Plaintiffs filed a complaint on April 9, 2019, seeking declaratory and injunctive relief under the Sawtooth National Recreation Area Act, 16 U.S.C. § 460aa *et. seq*. ("SNRA Act"); the National Forest Management Act, 16 U.S.C. § 1600 *et. seq*. ("NFMA"); the National Environmental Policy Act, 42 U.S.C. § 4331, *et. seq*. ("NEPA"); the Administrative Procedure Act, 5 U.S.C. § 551, et. seq. (the "APA"); and the Declaratory Judgment Act, 28 U.S.C. § 2201. Plaintiffs' primary avenue of review is under the APA.

In Count One, Plaintiffs allege Defendants' presentation and approval of the trail project violates the SNRA Act, because the trail as proposed is a "greenbelt," and therefore contrary to the strictures of the Act, which requires the Forest Service to preserve "natural, scenic, historic, pastoral, and fish and wildlife values…." In Count Two, Plaintiffs allege Defendants violated NEPA when they relied upon a "categorical exclusion" to approve the trail project, thereby circumventing NEPA's review process. In Count Three, Plaintiffs allege the trail project traverses multiple riparian conservation areas (RCAs) in violation of the NFMA. In Count Four, Plaintiffs contend the Conservation Easement provides limited authorization to Defendants to construct a right-of-way for the public to use as a trail, and that the project as proposed exceeds the scope of the grant and falls outside the boundary of the easement. In Count Five, Plaintiffs

assert Defendants' failures to comply with the SNRA Act, NEPA, NFMA, and the Conservation Easement restrictions are "arbitrary, capricious, or otherwise not in accordance with the law," in violation of the APA. And last, in Count Six, Plaintiffs seek declaratory relief.

Plaintiffs filed a motion for preliminary injunction on May 10, 2019, claiming they can demonstrate a likelihood of success on the merits on three of their claims – Counts Two, Three, and Four. Plaintiffs first address Count Four, claiming the SNRA's actions are contrary to the terms of the conservation easement deed. They ask for a declaration that, under Idaho law, the development of the Stanley/Redfish Trail as proposed, with features such as culverts, placement of off-site materials, and gravel trail surfaces, exceeds the scope of the easement grant. Second, Plaintiffs argue that extraordinary circumstances exist which preclude use of a categorical exclusion, and requires the preparation of a full Environmental Analysis (EA) or Environmental Impact Statement (EIS) under NEPA. Additionally, Plaintiffs contend the Decision Memo violates NEPA by failing to adequately disclose and analyze ground-disturbing actions, and by approving the wrong trail alignment. Third, Plaintiffs argue the Decision Memo violates NFMA because it is inconsistent with the Sawtooth Forest Plan, as it ignores development standards requiring mitigation to riparian conservation areas.

## STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). It is not an adjudication on the merits, "but a device for preserving the status quo and preventing irreparable loss of rights before a judgment." *Idaho Rivers United v. Probert*, No. 3:16-CV-00102-CWD, 2016 WL 2757690, at *6 (D. Idaho May 12, 2016). While courts are given considerable discretion in deciding whether a preliminary injunction should enter, injunctive relief is not obtained as a matter of right and it is considered to be an extraordinary remedy that should not be granted unless the movant, by a clear showing, carries the burden of persuasion. *See Sampson v. Murray*, 415 U.S. 61 (1974); *Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas R. Co.*, 363 U.S. 528 (1960); and *Stanley v. Univ. of S. California*, 13 F.3d 1313 (9th Cir. 1994), *cited in Idaho Rivers United*, 2016 WL 2757690 at *6.

A plaintiff seeking preliminary injunctive relief must establish (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary injunctive relief; (3) that the balance of equities is in plaintiff's favor; and (4) that the injunction is in the public interest. *Winter*, 555 U.S. at 7. The plaintiff must show suffering irreparable harm is likely, and not just a possibility. *Id*. A court must consider each factor and balance the parties' competing claims of injury by considering the potential effects of the injunction on each party. In the United States Court of Appeals for the Ninth Circuit, issuance of a preliminary injunction is favored when the merits analysis

and hardship balance both tip strongly toward the plaintiff, so long as the plaintiff shows

also that there is "a likelihood of irreparable injury and that the injunction is in the public

interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

## ANALYSIS

**1.      Merits of Plaintiffs' Claim That the Trail Project Exceeds the Scope of the Conservation Easement (Count Four)**

Plaintiffs purchased the Property in 2016 subject to a deed restriction granting a

conservation easement to the United States. Defendants assert that Plaintiffs fail to state a

claim upon which relief can be granted, because Count Four is not brought pursuant to

the Quiet Title Act ("QTA"), 28 U.S.C. § 2409a. Defendants explain that the QTA is the

"exclusive means by which adverse claimants can challenge the United States' claim to

real property." *Block v. North Dakota ex. Rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273,

286 (1983); *Robinson v. United States*, 586 F.3d 683, 686 (9th Cir. 2009) ("This court has

repeatedly held that both disputes over the right to an easement and suits seeking a

declaration as to the scope of an easement fall within the purview of the QTA."),

Defendants assert that, even if the complaint is amended to include a claim under the

QTA, Plaintiffs' request for a preliminary injunction is precluded by 28 U.S.C. §

2409a(c), which provides that, "[n]o preliminary injunction shall issue in any action

brought under this section." Defendants are correct, as explained below.

Prior to 1972, real property disputes could not be litigated against the United

States unless the government initiated suit. *Block*, 461 U.S. at 280. Congress waived

sovereign immunity in the QTA, thereby allowing real property owners to bring suits

against the government challenging the United States' interests. 28 U.S.C. § 1346(f) (providing that the district courts "shall have original jurisdiction of civil actions under section 2409a to quiet title to an estate or interest in real property in which an interest is claimed by the United States").

For the Court to have jurisdiction under the QTA, two prerequisites must be met: (1) the United States must claim an interest in the property at issue; and (2) there must be a disputed title to real property. *Leisnoi, Inc. v. United States*, 170 F.3d 1188, 1191 (9th Cir. 1999). If the Court finds the QTA applies, *Block* prohibits a party from seeking to "subvert the limitations in the QTA by basing preliminary injunctive relief on the APA…." *City of Tombstone v. United States,* No. CV11-845-TUC-FRZ, 2012 WL 12842257 (D. Az. May 14, 2012) (and cases cited). *See also McMaster v. United States*, 731 F.3d 881, 899 & n.13 (9th Cir. 2013) (explaining that the "QTA provides the exclusive remedy for claims involving adverse title disputes with the government," and rejecting the plaintiff's argument that the APA provided a basis to contest the government's claim to real property).

Plaintiffs urge the Court to find the QTA does not apply. Plaintiffs rely upon a statement in *Robinson v. United States,* wherein the Ninth Circuit stated that, when a suit does not "challenge title but instead concerns the use of land as to which title is not disputed [the matter] can sound in tort or contract and not come within the scope of the QTA." 586 F.3d at 688. They argue this dispute does not challenge the United States' title to the easement, but rather challenges the intended use of the land. While the quoted

statement taken out of context may support Plaintiffs' argument, the facts in *Robinson* do not.

The key factual distinction in *Robinson*, and the basis for its holding, lies in the type of claim asserted and the relationship of the landowners involved in the dispute. In that case, the Robinsons acquired 620 acres subject to an easement over Parcels 2, 3, and 4 of the same. A road was later built across Parcels 2, 3, and 4, which connected several other parcels with local roads. Parcels 2, 3, and 4 were then sold to the Maidu Indian Tribe. The Tribe thereafter conveyed the three parcels, subject to the easement, to the United States to hold in trust for the Tribe. The Tribe constructed homes and a casino on one of the two parcels. The Robinsons, who still owned the acreage, filed suit against the United States, alleging that an unshored slope caused subsidence and that a curb, concrete walkway, wrought iron fence, and fire hydrant encroached onto the easement. The complaint alleged disruption of lateral and subjacent support, negligence, and nuisance.

The government filed a motion to dismiss, alleging that the suit was governed by the QTA, which in turn would have precluded the Robinson's suit because the QTA precludes suits against the government involving land held in trust for Native American tribes. The Robinsons argued the QTA did not apply to their suit, because their action was not one to quiet title; rather, they alleged tort claims falling within the purview of the Federal Tort Claims Act.

The Ninth Circuit reiterated its longstanding precedent that "disputes over the right to an easement and suits seeking a declaration as to the scope of an easement fall

within the purview of the QTA." *Id.* at 686. But, it left room for the Robinsons' suit outside of the QTA, holding:

> We adopt a pragmatic approach and conclude that a suit that actually challenges the federal government's title, however denominated, falls within the scope of the QTA regardless of the remedy sought. To hold otherwise would merely allow parties to avoid the limitations of the QTA by raising contract or tort claims. At the same time, a suit that does not challenge title but instead concerns the use of land as to which title is not disputed can sound in tort or contract and not come within the scope of the QTA.

*Id.* at 688.

Turning to the facts before it, the court concluded that the parties did not dispute "the intended use of the easement," but rather that the Tribe's use of the land interfered with the easement. *Id.* at 688. Accordingly, the court held that the suit did not result in adjudication of title to the easement, and the Robinsons' suit properly sounded in tort, as alleged. *Id.*[7]

In contrast to *Robinson*, it is clear that the QTA applies here. The United States owns an easement in land for which Plaintiffs own the servient estate, and the parties dispute the scope of that easement. *Id.* at 686; *Kootenai Canyon Ranch, Inc. v. U.S.*

---

[7] At the hearing, Plaintiffs contended that the United States Supreme Court in *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012), cast doubt upon the holding of the Ninth Circuit in *Robinson*. A careful review of *Pottawatomi* indicates that is not the case. The *Pottawatomi* matter involved a claim by an adjacent landholder objecting to the use of the neighboring parcel as a casino, which the United States held in trust for the tribe. The Supreme Court did not discuss *Robinson*, nor was the court resolving any conflict among the circuits regarding interpretation of the QTA. *See Fuqua v. United States*, No. 5:09-CV-212, 2010 WL 2801880, at *3 (W.D. Ky. July 14, 2010) (noting that the Ninth Circuit's analysis in *Robinson* "directly conflicts with the Sixth Circuit's statements in *Saylor* [*v. United States*, 315 F.3d 664, 670 (6th Cir. 2003)".]).

**MEMORANDUM DECISION AND ORDER – 15**

*Forest Serv.*, 338 F.Supp.2d 1129, 1133 (D. Mont. 2004) (recognizing that the QTA was the exclusive means by which a landowner could challenge the scope of the government's interest in an easement). Plaintiffs do not allege the Defendants' proposed use of the land interferes with the easement. Rather, Plaintiffs repeatedly assert that the type of trail, and the extent of construction described in the Decision Memo, was not contemplated by the easement. Plaintiffs' argument squarely concerns the scope of the easement, or the "bundle of sticks,"[8] conveyed to the United States.

Plaintiffs' attempt to differentiate their claim is unavailing. Contrary to Plaintiffs' assertions, they are challenging the scope of the easement, because trails can be of many different types. *See, e.g.*, Decl. of Donovan Ex. E, F. (Dkt. 11-3.)[9] For instance, a twelve-inch wide singletrack trail contemplates an entirely different use and scope than an asphalt paved greenbelt trail. Yet both fall within the broad definition of a trail. *Id.* Accordingly, because the claim directly affects the bundle of sticks conveyed to the United States, the claim falls within the parameters of the QTA.

District courts interpreting *Robinson* with facts similar to those before the Court are in accord with the above conclusion. For instance, in *Beasley v. United States*, the

---

[8] The description of property as a "bundle of sticks" comprising a collection of individual rights in property was first coined by Benjamin Cardozo in his book, The Paradoxes of Legal Science 129 (1928) (reprint 2000). *United States v. Craft*, 535 U.S. 274, 278 (2002); *see also Dickman v. Commissioner*, 465 U.S. 330, 336 (1984).

[9] The Declaration of Kathleen Donovan, supplied by Plaintiffs, depicts the five-level Forest Service Trail Classes. The photographs typifying each class range from a class 1 wilderness trail with intermittent and indistinct tread and many obstacles, up to a class 5 trail with wide, firm, stable tread hardened with asphalt or other material, and having no natural obstacles.

court distinguished the action before it from *Robinson.* No. CV-12-3136-LRS, 2013 WL 1832653, at \*3 (E.D. Wash. May 1, 2013).[10] There, the government owned an easement for use of a road across the plaintiff's property. The Forest Service operated the road during the winter as a recreation trail, allowing snow machines to travel across it from the trail head of one of the largest snow parks in the state, and therefore the Forest Service closed the road to other traffic during the winter. The plaintiffs contested the government's closure rules.

The court in *Beasley* held that the facts before it were distinguishable from *Robinson*, because the plaintiff maintained "not merely that the use of his land by the United States has interfered with his rights as reserved in the Easement, but that said use is beyond the scope of the 'intended use of the easement.'" 2013 WL 1832653, at \*3. Accordingly, the court concluded that, "because there is a dispute as to the scope of that Easement, the exclusive basis for subject matter jurisdiction is the QTA." 2013 WL 1832653, at \*4 (citing *Kootenai Canyon Ranch*, 338 F.Supp.2d at 113). *See also City of North Las Vegas v. Clark County, Nev.*, 2011 WL 3472481 at \*6 (D. Nev. 2011) (citing *Robinson*, the court noted that "[a] dispute over the existence or scope of an easement will satisfy the requirement that there be a dispute over title to real property."); *Larson v. United States*, No. 4:13CV3081, 2014 WL 12539647, at \*9 (D. Neb. July 28, 2014) (holding the QTA was the exclusive means by which the plaintiffs could challenge the

---

[10] The Court notes that *Beasley* was appealed to the United States Court of Appeals for the Ninth Circuit, Case No. 13-35569, on June 25, 2013. The docket reflects that, after mediation, the appeal was voluntarily dismissed on July 6, 2017. Thus, the district court's decision is final.

scope of the easement granted to the United States, denying the plaintiff's claims under the APA).

In another case following *Robinson* and cited by Defendants, the District Court in Arizona was faced with a motion for a preliminary injunction filed by the City of Tombstone against the Forest Service. In *City of Tombstone v. United States*, the City argued that officials were hindering its efforts to make necessary repairs to water sources located in the Huachuca Mountain Wilderness Area. No. CV-11-00845-TUC-FRZ, 2015 WL 11120851, at *2 (D. Ariz. Mar. 12, 2015). The City asserted its rights pursuant to an easement, or ownership of a right-of-way, on federal land, claiming it was entitled to relief under the APA, the Tenth Amendment, and the QTA. However, the City requested preliminary injunctive relief on the merits pursuant to the APA and Tenth Amendment only.

The court held that the City could not "make an end-run around the limitations of the QTA which prohibit preliminary injunctive relief." 2012 WL 12842257 at 2. The court included a laundry list of cases holding that the QTA provided the exclusive remedy to challenge the United States' title to real property. *Id.* at *3. Because the suit implicated questions of title, the court concluded that the City's claims under the APA and Tenth Amendment failed at the preliminary injunction stage, "as any such claims

must be brought under the QTA which precludes the preliminary relief Plaintiff seeks in this case." *Id.*[11]

And, although decided prior to *Robinson*, the holding by the District Court for the District of Montana in *Kootenai Canyon Ranch* is instructive. There, the plaintiff's predecessor in interest granted a right-of-way easement to the United States Forest Service in 1965. The plaintiff, who purchased the property in 1991, sued the Forest Service seeking a declaration that it had abandoned part of the easement, and that the government had no right to construct improvements on the easement property. The Forest Service had historically maintained a road, an animal loading ramp, parking area, hitching rail, bulletin board, and an outhouse on the property. But in 2000, the Forest Service notified the plaintiff it intended to improve the trailhead facilities, install a concrete outhouse, improve the parking area, and install fencing. The plaintiff argued that the easement was for a road only, and that the trailhead facilities were not permitted under the express terms of the easement. Important here is the court's finding that the dispute, which concerned the scope of the easement, fell within the purview of the QTA. 338 F.Supp.2d at 1133.

As discussed above, Plaintiffs similarly dispute the scope of the conservation easement held by the government. They argue the easement does not permit the Forest

_____

[11] Plaintiffs attempt to distinguish *City of Tombstone*, asserting that the roles of the parties are reversed, because the United States is the easement owner here. However, the Court finds the distinction irrelevant. *See Beasley*, 2013 WL 1832653 (E.D. Wash. May 1, 2013) (where the government owned the easement).

Service to construct the type of trail proposed, asserting that the language of the easement precludes certain construction activities, installation of culverts, placement of off-site materials, and the building of any particular type of trail. Mem. at 8. (Dkt. 11-1 at 8.) The crux of Plaintiffs' dispute with Defendants is the scope of the United States' interest in the easement property, which directly affects the property rights transferred to the United States.

Plaintiffs may not circumvent the QTA by relying upon the APA to challenge the United States' title to real property. *McMaster v. United States*, 731 F.3d. 881 (9th Cir. 2013). This matter is properly brought under the QTA, which precludes preliminary injunctive relief. It would be inappropriate, therefore, for the Court to consider the merits of Plaintiffs' quiet title claim under Count Four upon a motion for preliminary injunction. Accordingly, the motion in reliance on the claim as stated in Count Four will be denied. The Court will, however, address Plaintiffs' remaining claims under NEPA and the NFMA.

**2.      Merits of Plaintiffs' NEPA and NFMA Claims (Counts Two and Three)**

District courts are called upon to review final agency actions under the Administrative Procedure Act (APA), and to apply the "arbitrary and capricious" standard. *Metcalf v. Daley*, 214 F.3d 1135, 1141 (9th Cir. 2000). Under this standard, the Court must determine if the agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id*. (quoting *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998) (in turn quoting

the APA, 5 U.S.C. § 706(2)(A)). "The party challenging an agency's action as arbitrary and capricious bears the burden of proof." *W. Watersheds Project v. Ashe*, 948 F. Supp. 2d 1166, 1174 (D. Idaho 2013) (citing *WildEarth Guardians v. Salazar*, 741 F.Supp.2d 89, 97 (D.D.C. 2010)).

To determine whether an agency's action was arbitrary and capricious, the Court must conduct a "substantial inquiry" and "a thorough, probing, in-depth review," to conclude whether "the agency present[ed] a rational connection between the facts found and the conclusions made." *Siskiyou Reg'l Educ. Project v. U.S. Forest Serv.*, 565 F.3d 545, 554 (9th Cir. 2009) (internal citations omitted). In reviewing the agency's action, the Court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The Court may reverse the agency's decision as arbitrary and capricious "only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F.3d 1105, 1110 (9th Cir. 2015). Conversely, the agency's decision must be upheld if "there is a rational connection between the facts found and the conclusions made," and the determination was "not so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Lands Council v.*

*McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc) (*overruled in part on other grounds by Winter*, supra).

The standard of review "requires [the Court] to defer to an agency's determination in an area involving a 'high level of technical expertise.'" *Lands Council*, 537 F.3d at 996; *see also Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1185 (9th Cir. 2011) (holding that "Forest Service is entitled to rely on the reasoned opinions of its experts"). The Court may set aside only those conclusions that do not have a basis in fact, not those with which it disagrees. *Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229, 1236 (9th Cir. 2001).

The Forest Service's issuance of the 2017 Decision Memo is a final agency action reviewable under the APA. The merits of Plaintiffs' NEPA and NFMA claims will be analyzed accordingly.

### A. *National Environmental Policy Act*

NEPA was designed to set forth a "national policy [to] encourage productive and enjoyable harmony between man and his environment ... [and] promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." *Metcalf v. Daley*, 214 F.3d 1135, 1141–42 (9th Cir. 2000) (quoting 42 U.S.C.A. § 4321 (1994)). NEPA's requirements are not substantive. Instead, NEPA establishes "action-forcing" procedures requiring agencies to take a "hard look" at the environmental consequences of proposed actions. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989). These "hard look" assessments need to be

made "early enough" to practically serve as a meaningful contribution to the decision-making process. *W. Watersheds Project v. U.S. Forest Serv*., No. 1:17-CV-434-CWD, 2017 WL 5571574, at *2 (D. Idaho Nov. 20, 2017) (quoting 40 C.F.R. § 1502.5 (1987)). In other words, the agency must make a hard look assessment "at the earliest possible time to insure that planning and decisions reflect environmental values." *Andrus v. Sierra Club*, 442 U.S. 347, 351 (1979); *see also* 40 C.F.R. § 1501.2 (the NEPA process must be implemented at the earliest possible time "to insure planning and decisions reflect environmental values.").

NEPA and its accompanying regulations require agencies to complete an Environmental Impact Statement ("EIS") before making any irreversible or irretrievable commitment of resources. *W. Watersheds Project v. Bureau of Land Mgmt*., No. CV 09-0507-E-BLW, 2009 WL 3335365, at *6 (D. Idaho Oct. 14, 2009). This requirement is meant to prevent agencies from doing damage before considering the effects of their actions. *Id*. Alternatively, an Environmental Assessment ("EA") can be chosen to facilitate preparation of an EIS when one is necessary; aid an agency's compliance with NEPA when no EIS is necessary; or provide sufficient evidence and analysis for determining whether to prepare an EIS or make a finding of no significant impact. 40 C.F.R. § 1508.9(a). An EA is a "concise public document" that must include brief discussions of the need for the proposal, alternatives and environmental impacts of the proposed action and alternatives, and a list of agencies and persons consulted. 40 C.F.R.

§ 1508.9. Both an EA and an EIS are subject to public comment and review. 36 C.F.R. § 218.

However, under regulations issued by the Council on Environmental Policy and promulgated pursuant to NEPA, each agency is directed to adopt "categorical exclusions" for those actions "which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency…." 40 C.F.R. § 1508.4. "Application of a categorical exclusion is not an exemption from NEPA; rather, it is a form of NEPA compliance, albeit one that requires less than where an environmental impact statement or an environmental assessment is necessary." *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1096 (9th Cir. 2013) (citing 40 C.F.R. § 1508.4).

If an action does fall within a categorical exclusion (CE), an agency must have procedures for determining whether "extraordinary circumstances" exist, such that the action, though "normally excluded" from full NEPA analysis, "may have a significant environmental effect." *Salazar*, 706 F.3d at 1096 (citing 40 C.F.R. § 1508.4); *Alaska Ctr. For Env't v. U.S. Forest Serv.*, 189 F.3d 851, 858 (9th Cir. 1999). "An agency satisfies NEPA if it applies its categorical exclusions and determines that neither an EA nor an EIS is required, so long as the application of the [CE] to the facts of the particular action is not arbitrary and capricious." *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1456 n.5 (9th Cir. 1996).

Plaintiffs first argue that certain activities comprising the trail project fall outside the scope of the CE for construction of trails. Next, Plaintiffs contend that, even if application of the trail construction CE was proper, the Forest Service's conclusion in the Decision Memo that there were no extraordinary circumstances was deficient. Lastly, Plaintiffs argue that the conclusions set forth in the Decision Memo regarding the cumulative effects of ground disturbing activities, the impact on wetlands, and the potential for disruption to scenic values were not adequately explained or supported. Each issue will be discussed below, beginning with the scope of the CE, and following with an analysis of the Forest Service's conclusion after scoping that extraordinary circumstances did not exist, and therefore neither an EA or an EIS was required to comply with NEPA.

(1) *Application of the Forest Service's Categorical Exclusion for Trail Construction*

Under its regulations, the Forest Service has determined that the "construction and reconstruction of trails" is entitled to a categorical exclusion to full NEPA analysis. 36 C.F.R. § 220.6(e)(1). Examples of trail construction and reconstruction "include, but are not limited to: (i) constructing or reconstructing a trail to a scenic overlook, and (ii) reconstructing an existing trail to allow use by handicapped individuals." *Id.*, § 220.6(e)(1)(i), (ii). In the Decision Memo, the Forest Service concluded that the Stanley/Redfish Trail project constituted "trail construction," and therefore the Forest Service determined that the project fell within the CE for the same.

The Court must give the Forest Service's interpretation of the trail construction CE controlling weight, unless it is plainly erroneous or inconsistent with the terms used in the CE. *Salazar*, 706 F.3d at 1094. "An agency's determination that a particular action falls within one of its categorical exclusions is reviewed under the arbitrary and capricious standard." *Alaska Ctr. for Env't v. U.S. Forest Service*, 189 F.3d 851, 857 (9th Cir. 1999). Thus, the key when reviewing an agency's determination that an action falls within a CE is whether the decision was based on a consideration of relevant factors or whether the agency made a clear error of judgment. *See id.* at 858 (finding the agency's interpretation of its categorical exclusion was "not inconsistent or contrary to the language of the regulation").

Plaintiffs concede the Stanley/Redfish Trail falls within the "broad language" identifying a categorical exclusion for the "construction and reconstruction of trails." However, despite so conceding, Plaintiffs argue that certain ground disturbing actions are themselves distinct actions, and should not be encompassed within the basic concept of trail construction. Plaintiffs identified these activities as: (a) "close, and depending upon the segment, either obliterate or repurpose as a section of the new trail, a segment of the Stanley Administrative Site south access road"; (b) "relocate the Alpine Way trailhead and convert approximately ½ mile of trailhead access road (and trailhead) to single-track trail"; (c) "obliterate and rehabilitate approximately ¾ miles of sewer line access road." In essence, Plaintiffs argue that Defendants' decision to proceed via a categorical

exclusion was arbitrary and capricious, because the three identified actions are not activities that constitute "trail construction."

However, Plaintiffs did not explain why the three components of the trail project they identified are not within the scope of trail construction. In response to Plaintiffs' general argument, Defendants assert that the Forest Service's determination that the three activities constitute construction or reconstruction of sections of the trail was reasonable and consistent with the terms of the trail construction CE. (AR 0296, 0940 – 0941.) As part of the project, the 2014 Proposed Action explains that the secondary paved access road to the ranger station from State Highway 75 will become an Alpine Way trailhead access/egress only. (AR 0940.) The existing Alpine Way trailhead will be relocated, and that trailhead and access road will be "obliterated except for what's required for a single track trail along the same alignment." *Id.* The new trailhead "will be located within an existing disturbed area." *Id.* Additionally, two roads, which are currently two-track routes, will be obliterated and reclaimed. (AR 0941.) The project description set forth in the 2017 Decision Memo included these three components of the trail project. (AR 0296.)

A review of inter-agency regulations define a trail as a "linear route managed for human powered, stock, or OHV forms of transportation."[12] Deconstructing certain areas to create a linear route, and the construction of a trailhead, fall generally within the scope

_____

[12] USFS Official Trail Definitions, https://www.fs.fed.us/recreation/programs/trail-management/documents/trailfundamentals/USFS_Trail_Definitions_04_2007.pdf (last visited June 13, 2019). *See also* 36 C.F.R. § 212.1 (defining a trail as a "route 50 inches or less in width or a route over 50 inches wide that is identified and managed as a trail.").

of trail construction. For example, the USFS Trail Class Photo Examples Plaintiffs provided support the conclusion that trail construction involves building trailside amenities such as trailheads, and that a certain amount of land alteration involving ground disturbance is present during a given trail project. *See, e.g.*, Decl. of Donovan Ex. F, USFS Trail Class Photo Examples. (Dkt. 11-3.) Contrary to Plaintiffs' assertion, the Forest Service does not appear to have incorporated a host of other construction activities under the guise of trail construction. *See, e.g., Earth Island Institute v. Elliott*, 290 F.Supp.3d 1102, 1114-15 (E.D. Cal. 2017) (finding that the salvage of dead trees along roads fell within the scope of the road maintenance CE, and did not constitute logging activities).

Plaintiffs appear also to suggest that construction of new trail is an "aggressive application" of the CE, implying that the examples provided in the regulation are exclusive and preclude building new trails. However, the CE expressly states that the examples include, but are not limited to, the two that are given. In other words, the list is not exhaustive. Further, the CE itself utilizes the term "construction," which encompasses the building of new trails and attendant features. *Construction*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/construction (last visited June 13, 2019) ("the process, art, or manner of constructing something," such as a bridge); Decl. of Donovan Ex. F. (Dkt. 11-3.)

With reference to the Administrative Record, Defendants have presented a rational connection between the facts and the Forest Service's identification, in both the February

2014 Proposed Action and the June 2017 Decision Memo, that the construction of

trailheads and the conversion of existing roads or other rights of way to trail segments, as

well as the construction of a new trail, fit within the scope of the trail construction CE.

The Court finds, therefore, that Plaintiffs have not demonstrated a likelihood of success

on the merits of their claim that the Forest Service's decision to proceed utilizing the CE

process was arbitrary or capricious.

(2) <em>Extraordinary Circumstances</em>

Next, Plaintiffs assert that the Forest Service's decision violates NEPA with regard

to the extraordinary circumstances analysis in three respects. First, Plaintiffs argue the

Decision Memo did not adequately analyze the effects of ground disturbing actions and

the use of heavy equipment to construct the trial. Second, Plaintiffs assert the Decision

Memo did not explain sufficiently the Forest Service's conclusion that the effects upon

wetlands (RCAs) would be insignificant. And third, Plaintiffs contend that the Decision

Memo is devoid of both recognition and discussion of the potential effects upon SNRA

values. Plaintiffs assert that the decision to apply the trail construction CE appeared

"preordained" to avoid preparation of a full EA or EIS.[13]

The Forest Service may rely on one or more CEs "only if there are no

extraordinary circumstances related to the proposed action." 36 C.F.R. § 220.6(a).

---

[13] The Court notes that the Request for Project Input directed to the soils scientist dated April 22, 2013, anticipated that an EA may be needed. (AR 0148.) Further, it appears the project began with the contemplation that the trail construction CE would suffice as a starting point, but recognized that the scoping process might reveal the need for an EA. (AR 0148, 0176, noting a "CE as the initial level of analysis and see what the scoping brings up.").

Extraordinary circumstances are those circumstances "in which a normally excluded action may have significant environmental effect." 40 C.F.R. § 1508.4. The Forest Service has identified various "[r]esource conditions that should be considered in determining whether extraordinary circumstances related to a proposed action warrant further analysis and documentation in an EA or an EIS," 36 C.F.R. § 220.6(b)(1), including "[f]lood plains, wetlands, or municipal watersheds," and "Congressionally designated areas, such as wilderness, wilderness study areas, or national recreation areas," *id*. § 220.6(b)(1)(ii), (iii).

However, the "mere presence" of one or more of these resource conditions does not preclude the agency's use of a CE; rather, "[i]t is the existence of a cause-effect relationship between a proposed action and the potential effect on these resource conditions, and if such a relationship exists, the degree of the potential effect of a proposed action on these resource conditions that determines whether extraordinary circumstances exist." *Id*. § 220.6(b)(2). The agency is required to conduct "scoping" to determine whether a proposed action may have a significant effect on the environment, including whether such a cause-effect relationship exists. *Id.* § 220.6(c). The scoping process is used to "determine the scope of the issues to be addressed and for identifying the significant issues related to a proposed action." 40 C.F.R. § 1501.7.

"When an agency decides to proceed with an action in the absence of an EA or EIS, the agency must adequately explain its decision." *Alaska Ctr. For Env't v. U.S. Forest Serv*., 189 F.3d 851, 859 (9th Cir. 1999). "Once the agency considers the proper

factors and makes a factual determination on whether the impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference." *Id*.

The Decision Memo concludes that there are no extraordinary circumstances related to the decision "that may result in a significant individual or cumulative environmental effect," referencing the 2014 Proposed Action and the project record. (AR 0300.) While the Decision Memo indicates there "are resource conditions present, the record shows the effects from the proposed action do not warrant further analysis." (AR 0300.) The Decision Memo analyzes each of the seven resource conditions to be considered, 36 C.F.R. § 220.6(b), including the ground disturbing activities anticipated during construction. Because the Decision Memo relies upon the record in support of its conclusions, the Court may look to the underlying record as well. *See Ctr. for Biological Diversity v. Ilano*, 261 F. Supp. 3d 1063, 1069 (E.D. Cal. 2017) (considering not just the decision memo approving the project, but also the biological evaluation prepared as part of the approval process, in affirming the Forest Service's conclusion that no extraordinary circumstances existed).

(a)     *Ground Disturbances*

A review of the record indicates that the February 2014 Proposed Action described anticipated ground disturbing activities. (AR 0938 – 0942.) The May 2017 Wild & Scenic River Evaluation noted there would be trail clearing, installation of drainage systems and grading using a trail dozer, hand crews, or similar equipment, the felling of trees, and other construction features such as gates, fences, and signs, to build the trail.

(AR 0288 – 0293.) And the June 2017 Decision Memo authorizes the construction of a trail using a combination of hand tools and trail construction machinery. (AR 0294.)

According to the Administrative Record, the impact of ground disturbing activities upon native plants and animals and the scenic landscape was considered. As early as May 2013, a soils scientist provided a preliminary report discussing the anticipated ground disturbances and providing recommendations to minimize effects related to the introduction of non-native plant species. (AR 0148 – 0155.) The soils scientist reviewed the project scope, and recommended that ground disturbances in work areas not part of the primary trail system should be minimized, and such disturbances in work areas should be restored to pre-disturbance soil or ground cover to minimize erosion and susceptibility of occupancy by undesirable non-native or invasive plant species. (AR 0155.) Later in December of 2013, a weed mitigation plan was proposed and standards discussed for felling trees. (AR 0169 – 0170.)

On March 10, 2014, a botanical specialist finalized a report discussing the features of the affected environment, the consequences of the ground disturbing activities on threatened and native plant species, and the cumulative effects of the same. (AR 0178 – 0235.) The botanist's report addressed the obliteration and repurposing of existing roads or two track trails. (AR 0180.) Contained within the report is a section discussing the environmental consequences of the ground disturbing actions on vegetation, plant species, and plant and animal habitats, which include various soil and hydrological

disturbances and the potential introduction of noxious and non-native invasive plant species. (AR 0208 – 0209.)

Next, the botanist report analyzed the effects of the ground disturbing actions on all of the identified areas of concern. With respect to each identified plant species, and based upon the identified resource conditions, the botanist concluded that there would either be no impact, or that the ground disturbances "may impact" identified species of plants, but "will not likely contribute to a trend towards federal listing or cause a loss of viability to the population." (AR 0211 – 0221.) The botanist considered also the cumulative effects from the new trail, trailhead, road decommissioning, and associated facilities upon the same. (AR 0222.)

Other specialists considered also the ground disturbing effects upon terrestrial sensitive wildlife species, such as bats, rabbits, wolves, birds, and amphibians, finding the activities would not pose an unacceptable risk for various explained reasons. (AR 0246 – 0237.) The May 2017 Wild & Scenic River Evaluation noted there would be trail clearing, installation of drainage systems and grading using a trail dozer, hand crews, or similar equipment, the felling of trees, and the construction of other features such as gates, fences, and signs, to build the trail. (AR 0288 – 0293.) The evaluation indicated, however, that the proposed activities would not affect eligibility of river segments for wild and scenic status. (AR 0288.) And a hydrologist completed an assessment dated April 14, 2014, examining the effects of the ground disturbances, as well as the

cumulative effects of the action, on fish species and their habitat , finding "no effect" to Snake River sockeye, chinook, and steelhead. (AR 0238 – 0245.)

To minimize potential impacts of ground disturbing activities, the June 2017 Decision Memo explains that, if the soil becomes exposed by ground-disturbing activity, such areas will be revegetated, and that all earth-disturbing equipment will be cleaned to remove any visible plant parts, dirt, and material that may carry noxious weed seeds. (AR 0298.) Further, staging areas would be located in previously disturbed areas, and any hard edges left by construction equipment would be softened. (AR 0298 – 0299.) An archaeologist would be present to monitor work on or near cultural resources. (AR 0299.) Other roads will be decommissioned "without disturbing the original ground surface within the site." (AR 0299.) Sensitive plant species are considered as well, and the project requires consultation with a botanist if sensitive or other threatened plant species are encountered during construction. (AR 0297.)

Employing a deferential standard of review, the Court is not persuaded based upon the record before it that the Forest Service failed to adequately consider the relevant factors in determining that no extraordinary circumstances were present. The Administrative Record contains analyses provided by various experts concerning the effects of ground disturbing activities, which the 2017 Decision Memo referenced. During the scoping process, Defendants examined the ground disturbing effects upon various components of the natural landscape (botanical, fisheries, wildlife, scenic values, and cultural resources). Based upon the reports, the Forest Service concluded that the

effects of the proposed action did not warrant further analysis and documentation in an EIS or EA upon a finding of no extraordinary circumstances. (AR 0300.) The Forest Service provided a reasoned decision consistent with the analyses and findings during scoping, and considered the relevant factors. Accordingly, Plaintiffs have not shown that the Forest Service "offered an explanation that runs counter to the evidence before the agency," or is "so implausible that it could not be ascribed to a difference of view or the product of agency expertise." *Alliance for the Wild Rockies v. Brazell,* 2013 WL 6200199, *19 (D. Idaho 2013).

Measured against the record presently before the Court, Plaintiffs are not likely to succeed on the merits of their claim that Defendants' decision to proceed under the trail construction CE was arbitrary and capricious.[14]

(b)     *RCAs and Wetlands*

Next, Plaintiffs argue that the Decision Memo is deficient because it does not adequately explain the conclusion that the effects of trail construction on existing wetlands will be minimal. However, a review of the record, including the scoping conducted, indicates that the Forest Service considered the proper factors in making its

---

[14] Plaintiffs mention in footnote 4 of their memorandum (Dkt. 11-1) that the Decision Memo purports to "[r]elocate the current snow machine route from along Highway 75 at the base of the adjacent moraine to follow along an approximately 1,000′ section of new trail route," and questions the Sawtooth National Forest's ability to do so. (AR 0296.) The Court declines to address this issue, as it was not alleged in the Complaint, nor included as a basis for the motion for preliminary injunction.

determination that the effects of the trail project would not have a significant impact on existing wetlands and RCAs.

The Decision Memo indicates that three trail segments will intersect RCAs, and discusses the effects upon each of them. The first RCA, located within the easement, would cross a minor, isolated, and seasonally wet area, and this portion of trail would be "short."[15] The second would supplement an existing fill associated with a former roadway. And the third, at the confluence of Redfish Lake Creek and the Salmon River, would follow existing treads of a former roadway and cross Redfish Lake Creek on an existing footbridge. (AR 0301.) The Decision Memo identifies that there are alterations already in existence at two of the three RCA crossings, and indicates the proposed trail will utilize existing fill or bridge structures. These pre-existing conditions alone imply that there will be minimal effects upon RCAs based upon the circumstances currently present in the three locations.

Turning to the project documents upon which the conclusions were based, the record reflects the Forest Service hired a hydrologist to analyze the resource conditions present. The hydrologist thoroughly reviewed the anticipated effects upon the flood plain, including the impact upon native fish species, RCAs, the change in peak/base flows, sediment influence, and the potential for drainage network increases in his April 2014 final report. (AR 0242 - 0245.) He concluded that the trail project would not influence the

---

[15] It appears this segment would be approximately 100′ in length, and traverse a "broad wet swale at the base of the hill south of the [Property] land boundary and a similar section that would require turnpike construction on the private land easement section." (AR 0239.)

connection of streams; would not result in a measurable increase to peak or base flows in the area; and would have minimal impact upon the RCAs at the three crossings proposed. (AR 0243-0244.)

The hydrologist based his conclusion that influences would be minimal upon his determination that the "segments are isolated from critical habitat with minimal construction activities anticipated, or the crossings already exist." (AR 0244.) The hydrologist explained that his findings were based also in part upon the observation that the first RCA on private land would "cross a minor, essentially isolated, seasonally wet area via a short segment of constructed turnpike," and that the second segment south on NFS lands would utilize existing fill associated with a former roadway. Further, he explained the two "wet segments are non-forested, and are separated from critical habitat in the Salmon River by substantial distance, complex wetlands, and Highway 75. This isolation would preclude any measurable influence to the RCA of the Salmon River. These slight influences to wetlands would also be consistent with Executive Order 11990." (AR 0244.) With regard to the third segment, the hydrologist noted that the trail would utilize an existing roadway and footbridge, causing no disturbance and "negligible influence to RCA conditions," (AR 0244), specifically mentioning the "limited wetlands" at three sites within the project area.

The Decision Memo references the April 14, 2014 hydrologist report as support for its conclusion that the Stanley/Redfish Trail will have minimal impact upon floodplains, wetlands (including the three RCA crossings), and municipal watersheds.

(AR 0300 - 0301.) With regard to ground disturbing and other construction activities in or near the three RCA crossings, the Decision Memo specifies that tailored practices will be followed, such as avoiding fuel storage or refueling within RCAs, utilizing standard sediment prevention and retention practices, and ensuring that construction activities occur when site conditions are at their driest. (AR 0296.)

This is not a situation where the Forest Service failed to engage in a scoping process and failed to consider the trail project's effects on RCAs prior to concluding there were no extraordinary circumstances requiring the preparation of an EA or EIS. *See, Riverhawks v. Zepeda*, 228 F.Supp.2d 1173, 1190-91 (D. Or. 2002) (noting that, despite the presence of potential impacts of the project upon salmonids, turtles, and fish, there was no scoping process and no discussion of the effects of the project). After scoping and review by a hydrologist, the Forest Service identified the resource present, and assessed the degree of the potential environmental effects of the trail project upon RCAs, finding them to be "minimal" due to the short length of the segments and the preexisting conditions present.

In other words, as explained in the Decision Memo and supported by the underlying scoping documents, the Forest Service did not identify any likelihood of harm "significant enough to rise to the level of an extraordinary circumstance." *Ilano*, 261 F.Supp. 3d at 1069. The mere presence of some effect is insufficient to rise to the level of an extraordinary circumstance. *Id.* at 1070 (uncertainty about the effect of the project on the spotted owl was insufficient to conclude that the finding of no extraordinary

circumstances was arbitrary and capricious). And it appears that the proposed trail project utilized existing topographical alterations, where present, to ensure the least amount of disturbance to the three RCAs located within the project area.

Applying the appropriate legal standard, the Court finds that Plaintiffs have little success of prevailing on the merits of this aspect of their NEPA claim. Plaintiffs' criticism is that the Decision Memo provides brief conclusory statements without citation to data or meaningful analysis regarding its conclusion the trail project would have a negligible effect upon the three RCAs. However, a review of the record, and of the hydrologist's report referenced in the 2017 Decision Memo, does not support Plaintiffs' argument. Rather, the record shows that the Forest Service considered the opinions of the expert hired to evaluate the impact of the trail construction upon the watershed, including the three RCAs. The analysis of the conditions present, such as existing roadways and footbridges, and the minimal disruption to the RCAs, lends support to the conclusion that the Forest Service adequately and fully considered the relevant factors in determining the significance of the project's effect on the RCAs and wetlands in general.

For these reasons, the Court finds Plaintiffs have not raised serious questions on their claim that the Forest Service's conclusion that there were no extraordinary circumstances warranting preparation of an EA or EIS was arbitrary or capricious.

(c)    *SNRA Values*

Lastly, Plaintiffs contend the Decision Memo fails to adequately explain the effects of the trail project upon the SNRA, a Congressionally-designated area. 16 U.S.C. § 460aa states that the SNRA was established to "assure the preservation and protection of the natural, scenic, historic, pastoral, and fish and wildlife values and to provide for the enhancement of the recreational values associated therewith." The Decision Memo recognizes that the project occurs inside the SNRA, "but does not adversely affect the NRA." (AR 0301.)

Like their other arguments, Plaintiffs essentially ask the Court to ignore the evidence in the record indicating the basis for the Forest Service's conclusion stated in the Decision Memo. A review of the record presently before the Court indicates the Forest Service considered the seven SNRA values in approving the Stanley/Redfish trail project. A "compliance check" dated March 31, 2014, sets forth the resource conditions of the SNRA, and briefly summarizes that the trail project would not affect the purposes for which the SNRA was created. (AR 0236.) An undated checklist references earlier specialist reports for each of the seven resource values of the SNRA, and concludes that the trail project complies with the SNRA (Public Law 92-400). (AR 0273 – 0279.)

A review of the reports referenced in the checklist (AR 0273 – 0279) reveals the seven SNRA values were analyzed in detail. Matt Phillips, the trail architect, completed a "visual resource analysis" dated May 28, 2014, concluding that the project design elements "are not of a scale or type that would conflict with the characteristic landscape's

form, line, color, or texture…." (AR 0256 - 0257.) An evaluation of the trail project's impact upon the eligibility of river segments for Wild & Scenic River status was finalized in May of 2017. The report discusses in detail the effect the trail project would have upon the Salmon River and Redfish Lake Creek, concluding that the flows, river values, wildlife, and other resources would not be significantly adversely affected, and that ground disturbing activities would utilize mitigations to protect sediment flow. (AR 0288 – 0293.) The report concludes that the project "is in conformance with the Wild & Scenic River Act." (AR 0288.)

Turning to the impact upon wildlife and fisheries, the wildlife biologist concluded in his report, dated April 15, 2014, that the project would "not pose an unacceptable risk to terrestrial sensitive wildlife species. (AR 0246.) The April 14, 2014 hydrologist report concluded the project would have "no effect" on various species of fish or fish habitat. (AR 0245.) The Forest Service consulted with a cultural resource specialist to analyze the effect of the trail project upon identified historical sites in the area. The historical resource report, finalized on May 1, 2017, concluded that "there will be no adverse effect on historic properties." (AR 0280-0281.) And, as previously mentioned, the botanical specialist's report finalized March 10, 2014, analyzed the effect of the trail project on both plant and native wildlife species in the area, reviewing the effect of habitat disturbances. (AR 0178-0235.)

A later report dated April 16, 2014, reviewed the effects of the trail project upon terrestrial sensitive wildlife species such as bats, wolves, sheep, birds, and frogs, finding

low to moderate risk for each species identified, either because habitat did not exist in the area, or habitat would not be disturbed. (AR 0246 – 0250.) A May 19, 2014 letter from the U.S. Department of the Interior, Fish and Wildlife Service, "commend[s] the SNRA for considering potential effects to Greater sage-grouse,…a candidate for listing under the [Endangered Species] Act." (AR 0254.) The Service concurred also that the trail project would not likely adversely affect the Canada lynx, based upon recent trapping surveys. (AR 0254 – 0255.)

Recreational values were evaluated utilizing public outreach methods. User survey results were gathered between July 2 and July 8, 2013. (AR 1042 – 1123.) Based upon the results, the Decision Memo indicates the trail "would be a valuable additional recreational benefit to the area" and an "asset for the Stanley Basin and Sawtooth Valley." (AR 0303.)

Based upon the above, it is apparent that the Forest Service's conclusion in the 2017 Decision Memo was grounded in extensive analyses of the natural, scenic, pastoral, recreation, wildlife, fisheries and historic values for which the SNRA was established. Various specialists were consulted, and reports finalized, between 2013 and 2017, prior to the issuance of the June 2017 Decision Memo.[16] The decision that the trail project would not adversely affect the SNRA, and therefore that no extraordinary circumstances

---

[16] Plaintiffs suggested that the results were "preordained," and that the checklists contained in the record were not based upon scientific data. However, the timeline in the record does not support Plaintiffs' assertion, given that the Decision Memo prepared in June of 2017 references the specialists' reports, prepared earlier, in the various discussion sections of the memo.

were present, is based upon significant support in the record. Accordingly, Plaintiffs have not established a likelihood of success on the merits of their contention that the Forest Service's action was arbitrary and capricious because insufficient reasons supported its finding of no extraordinary circumstances with the trail project's location within the SNRA.

Plaintiffs have not pointed to any analysis that was required but was not performed, or to any analysis that was significantly deficient. Rather, the record shows that Defendants gathered information regarding the effect the trail project would have upon SNRA values during the scoping process, and the conclusions of the various experts support the determination by the Forest Service in the Decision Memo. For these reasons, the Court finds Plaintiffs have not raised serious questions on its claim that the Forest Service's action was arbitrary and capricious.

### (3) *Trail Illustration*

Plaintiffs argue that the Decision Memo does not approve the actual trail to be constructed, asserting that the trail alignment depicted on the maps runs a course outside the 30 feet of the deeded easement. Plaintiffs dispute that the assurances provided by the SNRA via its letter dated April 9, 2019, which indicated Defendants had no intention of deviating from the boundaries of the easement, are sufficient. In response, Defendants explain that the graphic included in the Decision Memo was intended as a general illustration, and that the construction drawings (Boren Decl. Ex. D, Dkt. 11-2), correctly depict the trail alignment within the easement.

NEPA requires disclosure "to the fullest extent possible." 42 U.S.C. § 4332. However, if the error did not materially impede NEPA's goals or otherwise materially affect the substance of the agency's decision, such an error is harmless. *Ground Zero Ctr. for Non-Violent Action v. United States Dep't of Navy*, 860 F.3d 1244, 1252 (9th Cir. 2017).

Plaintiffs have not demonstrated how a precise drawing of the map would have made a difference in agency decision making or public participation. Nor have Plaintiffs established how the error impacted the public's understanding of the project. *See id.* Further, as the Forest Service has explained, detailed construction drawings depict the trail alignment.[17] Plaintiffs therefore fall short on establishing the likelihood of success on proving this error, standing alone, materially affected the project and was anything other than harmless.

In sum, and based upon the record before the Court, Plaintiffs have not carried their burden of establishing a likelihood of success on the merits of their NEPA claim. Defendants' determination that the trail project fit within the categorical exclusion, and that there are no extraordinary circumstances that may result in a significant individual or cumulative environmental effect, appears reasonable and based upon the evidence before the Forest Service regarding the environmental effects analyzed as detailed above. Therefore, the Court concludes it is unlikely that Plaintiffs can prove the application of

---

[17] Presumably, Plaintiffs may have a claim under the QTA if the trial is built outside the boundaries of the easement. However, Plaintiffs did not bring such a claim.

the CE in the Decision Memo was arbitrary, capricious, or otherwise contrary to applicable law.

### B. *National Forest Management Act*

Plaintiffs contend the trail project violates the NFMA because it is not consistent with binding direction in the Sawtooth Forest Plan, which includes a standard for Developed Recreation that Plaintiffs claim was not adequately considered. Plaintiffs specifically reference Sawtooth National Forest Plan Standard REST02, applicable to trail projects located in Riparian Conservation Areas (RCAs).

The NFMA creates a management framework for national forests. The framework is divided into a two-step process. First, the Forest Service must develop a Land Resource Management Plan and an EIS for the entire forest. 36 C.F.R. § 219.10(a), (b); *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir. 1998). Second, once a forest plan is created, site-specific projects require assessment by the Forest Service. Any action taken by the Forest Service must be consistent with the applicable forest plan. NEPA overlays the NFMA requirements. For example, whether an EIS needs to be prepared, and the process by which an EIS is prepared, i.e. the "hard look" requirement, is dictated by NEPA. *See* 40 C.F.R. § 1501 *et seq*; *Cuddy*, 137 F.3d at 1376.

However, unlike NEPA, NFMA imposes substantive requirements at each step. These include requirements assuring biological diversity of plants and animals and managing for the viability of sensitive species within the forest. Sawtooth National Forest Plan Standard REST02 requires that:

When new recreation facilities and trails must be located in
RCAs, they shall be developed such that degrading effects to
RCAs are mitigated. When reasonable and practical location
alternatives exist, new recreation facilities and trails should be
located outside of RCAs. (AR 1318.)

Plaintiffs argue that there is no discussion in the Decision Memo regarding why it
was necessary for the trail route to traverse RCAs. They contend REST02 requires the
agency to explain why the route must be located in an RCA and some discussion whether
reasonable and practicable alternative routing was possible. Plaintiffs assert also that
Defendants failed to discuss the envisioned "turnpike trail construction" over the RCA
located within the easement, and whether other routes avoiding the RCA within the
easement were considered. (Dkt. 11-1 at 18.)

The Decision Memo (AR 0301) indicates that three segments of the proposed trail
will intersect RCAs. As mentioned previously, one on private land (The Property) will
"cross a minor, essentially isolated, seasonally wet area via a short segment of
constructed turnpike." The second trail segment "just south on NFS lands would be
similar, except that the short turnpike would only supplement an existing fill associated
with a former roadway." The third segment "passes through the RCA near the confluence
of Redfish Lake Creek and the Salmon River," and will follow "existing treads of a
former roadway and the Rock Shelter interpretive trail, and cross Redfish Lake Creek on
the existing footbridge."

Contrary to Plaintiffs' argument, the Administrative Record indicates that REST02
was considered during scoping between 2012 and before the June 2017 Decision Memo

was finalized. First, the project summary indicates several alternative routes were considered during the project's development in 2012 and 2013. (AR 1126.) The request for project input dated April 22, 2013, and the February 2014 Proposed Action, also indicate the involved parties recognized REST02 would be implicated. (AR 0153, 0941.) The need for the trail to cross several RCAs was discussed also in the Wild & Scenic River Evaluation finalized in May of 2017. (AR 0289.)

Matt Phillips, the project architect, indicated that, because of the trail's location in the "Salmon River corridor, it is not possible to avoid crossing river tributaries," or RCAs. Decl. of Phillips ¶ 4 (Dkt. 17-2 at 4.)[18] (*see also* AR 1947, which defines RCAs as including river corridors.) As the project review proceeded, the Forest Service acknowledged that the trail would traverse only "unavoidable crossings." (AR 0268.) In other words, the very location of the trail in a natural river corridor necessitates consideration of crossing RCAs, which are unavoidable. (*See* AR 0149, 0159 and 2183, depicting topography of proposed trail corridor, along with location of creeks, lakes, rivers, and other water features.)

Second, Defendants explain that the Forest Plan does not apply to the first RCA crossing the Property, which is privately owned. 16 U.S.C. § 1604(c) indicates that

---

[18] The Court may rely upon the Declaration of Phillips, which is not part of the Administrative Record, as the Forest Service explains it relied upon Phillip's knowledge of the Salmon River corridor and its topography. *Lands Council v. Powel,* 395 F.3d 1019, 1030 (9th Cir. 2005); *W. Watersheds Project v. U.S. Fish & Wildlife Serv.*, No. 4:13-CV-176-BLW, 2013 WL 3270363, at *7 (D. Idaho June 26, 2013) (relying upon extra record evidence demonstrating institutional knowledge by Forest Service experts of spawning activities near Wet Creek, which was considered by the Forest Service in its determination to allow grazing near the creek).

standards and guidelines would be incorporated in plans for "units of the National Forest System." 16 U.S.C. § 1609, in turn, defines the National Forest System as consisting of "units of federally owned forest…lands…withdrawn from the public domain…." The easement RCA does not meet the definition. Thus, it would appear that REST02 does not apply to the first RCA crossing.

With regard to the other two RCA crossings, it appears from the discussion in the Decision Memo and the Administrative Record that there are already land alterations present in the two locations that the trail would take advantage of. The discussion of segment two notes that an existing road has already altered the crossing in that area, while the third segment takes advantage of an existing roadway, interpretive trail, and footbridge.

Defendants have submitted evidence to demonstrate that they considered REST02, and had no alternative but to cross RCAs given the trail's location within a river corridor. The maps contained in the Administrative Record clearly show the presence of wetland areas and stream locations within the river corridor. The trail project incorporated REST02's guidelines, as supported by the documents in the Administrative Record predating the 2017 Decision Memo. Accordingly, the Court finds Plaintiffs have not met their burden of establishing a likelihood of success on the merits of their NFMA claim.

**3.** **Remaining Preliminary Injunction Factors**

In addition to success on the merits, Plaintiffs must also show a likelihood of irreparable harm in the absence of preliminary relief; that an injunction is in the public interest; and that the balance of equities tips in favor of Plaintiffs.

Each of the remaining *Winter* factors will be discussed below.

**A.** ***Irreparable Harm***

Because Plaintiffs have not demonstrated a likelihood of success on the merits, to obtain injunctive relief on the sliding scale discussed above, Plaintiffs must demonstrate a high degree of irreparable harm. Plaintiffs present two arguments. First, they argue that proceeding with the trail project as designed will result in significant damage to their ownership, use, and enjoyment of the Property given the nature of the trail as a multi-use, public right of way. Second, they contend that the trail project threatens irreparable harm to the environment, which cannot be remedied by money damages. Defendants argue Plaintiffs' first contention should be rejected under the QTA, and their second contention should be rejected based upon the evidence in the Administrative Record demonstrating no significant environmental effects.

A party may not obtain a preliminary injunction unless they can show irreparable harm is likely to result in the absence of the injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). While "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable," *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545

(1987), "this does not mean that any potential environmental injury warrants an injunction." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotations omitted). "But actual and irreparable injury...satisfies the likelihood of irreparable injury requirement articulated in Winter." *Id*. (internal quotations omitted).

With regard to Plaintiffs' first argument, the Court agrees with Defendants that Plaintiffs cannot rely upon the alleged damage to their property rights and their contentions regarding the scope of the easement to establish irreparable harm. These claims must be considered under the QTA, which prohibits preliminary relief. 29 U.S.C. § 2409a)(c); *Tombstone*, 2012 WL 12842257 at *2 (court lacks jurisdiction to grant a preliminary injunction to determine scope of property rights).

Turning to the second argument, Plaintiffs appear to concede that a preliminary injunction is not necessary to avert imminent irreparable harm. Plaintiffs state that they are not opposed to a trail, only specific aspects of this trail and its construction. In other words, it would appear construction could proceed as planned on June 17, 2019, and a preliminary injunction is not necessary to preserve the status quo.

Plaintiffs' delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm as well. *Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985). The proposed action was a matter of public record in 2014. Plaintiffs acquired the property fully aware of the easement in the fall of 2016. The Forest Service notified Plaintiffs by letter dated November 30, 2016, that it was planning to

develop the trail via the "30′ wide public trail easement" traveling through the Property. And the Decision Memo approving the trail project was published on June 6, 2017.

Despite knowledge of the project for several years, Plaintiffs waited until the eleventh hour before filing this action. "A preliminary injunction is sought upon the theory that there is an urgent need for speedy action to protect the plaintiff's rights. By sleeping on its rights a plaintiff demonstrates the lack of need for speedy action ...." *Lydo Enterprises, Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) (citing *Gillette Co. v. Ed Pinaud, Inc.*, 178 F.Supp. 618, 622 (S.D.N.Y.1959)); *All. for the Wild Rockies v. Brazell*, No. 3:12-CV-00466-MHW, 2014 WL 3732649, at *2 (D. Idaho July 25, 2014) ("A delay in seeking a preliminary injunction, while not dispositive, is an appropriate factor to be considered by a court in determining whether to grant the injunction."), (citing *Lydo Enterprises*, supra).

Plaintiffs' argument that they were misled into believing further discussion would follow the meetings beginning in July of 2018 between David Boren and Matthew Phillips is belied by the record itself. Scoping, which included public input, began in 2013. The Proposed Action was published in February 2014 for public comment. Scoping continued up through May of 2017, just prior to the issuance of the June 6, 2017 Decision Memo approving the project. On April 12, 2018, an agreement to proceed with trail design was executed. Construction drawings were prepared and finalized, and bids were solicited in July of 2018. The project was well underway by the time of Boren's first meeting with Phillips in July of 2018. Plaintiffs have not explained why they could not

have participated in the process before the project's momentum had gained steam to the point that bids were being solicited based upon final construction drawings.

Plaintiffs have not made a sufficient showing of irreparable injury sufficient to grant injunctive relief.

**B.**    *Public Interest*

Plaintiffs contend that the socioeconomic interests present here are insufficient to prevent injunctive relief, while Defendants argue (and cite to) the broad public support that the trail project has received during the scoping project, and in support of Defendants' opposition to the motion itself.

While the Court is mindful that damage to the environment, in the abstract, harms the public, here the public supports the project to enhance their enjoyment of the area. According to the project record, the Redfish Lake Recreation Complex is the "most popular destination within the Sawtooth National Recreation Area," and during peak summer use it may serve 2,200 people at one time. (AR 0150.) Having a non-vehicular access route connecting Stanley to the Redfish Lake complex adds options for travelers. *Id.* Defendants received endorsements of the project from the Idaho Transportation Department; the City of Stanley; the Stanley-Sawtooth Chamber of Commerce; the Sawtooth Interpretive & Historical Association; and the Idaho Conservation League, which has appeared here as *amicus curiae*. (*See* Dkt. 17-09 and 18.)

The Idaho Conservation League "finds the trail is in keeping" with its mission of protecting the environment, and the SNRA goal of "balancing scenic natural, historic,

pastoral, wildlife and other values," while also enhancing recreation opportunities for the public. (Dkt. 18.) Some of the public comments in the administrative record include support from long time residents (AR 0916), support for an ADA accessible trail to enjoy the Sawtooth experience (AR 0919), and support from people eager to use the trail with their families (AR 0920). Survey results overwhelmingly indicated public support for the trail by Stanley residents (82%), Challis residents (86%), Idaho residents (86%), and Custer County residents (82%). (AR 1130.)

This factor does not tip in favor of Plaintiffs based upon the record currently before the Court.

## C.    *Balance of Equities*

Plaintiffs contend that the balance of hardships, namely the disruption to the contract between the agency and Hobble Creek Services, LLC, has not forestalled other requests for injunctive relief. Defendants assert that they will suffer concrete harm if a preliminary injunction is ordered, because the project will be delayed for at least one year and the Forest Service will be required to pay contract damages of $510,000 if the contractor is not permitted to proceed with construction this summer. Defendants further argue that, if a preliminary injunction is granted, Plaintiffs should be required to post a compensatory security bond in that amount.

Here, the delay will cause immediate, and palpable, economic harm, unlike that considered in *Idaho Rivers*, 2016 WL 2757690 at *17.  The project is scheduled to begin on June 17, 2019, and has a fixed completion date of September 5, 2019, Hurst Decl. ¶3,

(Dkt. 17-1), in contrast to the five year long logging project at issue in *Idaho Rivers*. 2016 WL 2757690 at *17 (delay to timber harvesting project spanning five years did not outweigh the potential harm to the river system). Termination of the contract will result in alleged damages of approximately $510,000.00 in plan redesign, contract reprocurment costs, lost work opportunity, overhead, and unrecovered direct costs. Hurst Decl. ¶3. (Dkt. 17-1.) In other words, manpower, equipment, and government resources have been committed to this project, all of which would be lost if construction is halted.

## CONCLUSION

The Court concludes Plaintiffs have not demonstrated that they are likely to succeed on the merits of the three claims—Counts Two, Three, and Four of their Complaint—raised in their motion. Further, the balance of hardships does not tip decidedly in favor of Plaintiffs. Accordingly, the motion will be denied.

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)      Plaintiffs' Motion for Preliminary Injunction (Dkt. 11) is **DENIED**.

DATED: June 13, 2019

Honorable Candy W. Dale
United States Magistrate Judge