Paul A. Turcke, ID Bar No. 4759
MSBT Law, Chtd.
7699 West Riverside Drive
Boise, ID 83714
(208) 331-1800
pat@msbtlaw.com

Erika E. Malmen, Bar No. 6185
EMalmen@perkinscoie.com
Robert A. Maynard, Bar No. 5537
RMaynard@perkinscoie.com
PERKINS COIE LLP
1111 West Jefferson Street, Suite 500
Boise, ID 83702-5391
Telephone: 208.343.3434
Facsimile: 208.343.3232

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SAWTOOTH MOUNTAIN RANCH LLC, LYNN ARNONE, and DAVID BOREN,<br><br>*Plaintiffs,*<br><br>v.<br><br>UNITED STATES OF AMERICA; UNITED STATES DEPARTMENT OF AGRICULTURE; SONNY PERDUE, Secretary of Agriculture; UNITED STATES FOREST SERVICE; SAWTOOTH NATIONAL FOREST; JIM DEMAAGD, Forest Supervisor; SAWTOOTH NATIONAL RECREATION AREA; KIRK FLANNIGAN, Area Ranger; FEDERAL HIGHWAY ADMINISTRATION; DEAN A. UMATHUM, Contracting Officer,<br><br>*Defendants.* | Case No. 1:19-CV-0118-CWD<br><br><br>**FIRST AMENDED COMPLAINT** |

## <u>INTRODUCTION AND NATURE OF ACTION</u>

1.     The Plaintiffs, Sawtooth Mountain Ranch LLC, David Boren, and Lynn Arnone,

ask this Court to quiet title to a conservation easement as described herein, acquired by the

**FIRST AMENDED COMPLAINT - 1**

145047920.8

United States in 2005, administered by the U.S. Forest Service, and which traverses the private property of the Plaintiffs.  The Defendants have published a Decision Memo showing their intent to construct a highly developed, two-lane 6.5' wide commuter trail ("***Trail***") pursuant to a 2005 Conservation Easement Deed ("***Conservation Deed***") granted to the United States, which gave the United States a limited public access easement ("***Easement***") across a portion of the Plaintiffs' property.  As further alleged and described in this First Amended Complaint, the Trail as proposed violates the Conservation Deed and Easement in at least three ways—first, the Trail as proposed passes outside of the physical boundary of the trail corridor identified in the Easement granted to the United States; second, constructing a 6.5' wide developed Trail exceeds the scope and allowable uses of the Easement, which are limited to public access for "snowmobile, snow grooming equipment, bicycle, horse, and foot travel," and which does not provide for construction of a developed trail; and, finally, the Trail as proposed violates the Conservation Deed's purpose of conserving the unique landscape and ranching heritage of the area in accordance with the Sawtooth National Recreation Area Act.

2.     The Plaintiffs also seek declaratory and injunctive relief requiring Defendant United States Forest Service, Defendant Jim DeMaagd, Defendant Sawtooth National Recreation Area, and Defendant Kirk Flannigan (collectively the "***Forest Service***") to comply with applicable law while managing the Sawtooth National Recreation Area in relation to the Trail. As further alleged and described in this Complaint, the Forest Service's actions in approving and implementing the Decision Memo authorizing construction of the Redfish to Stanley Trail, which includes the Trail as proposed across Plaintiffs' private property, are unlawful for violating, in various ways, the Sawtooth National Recreation Area Act, 16 U.S.C. §§ 460aa through 460aa-14 ("***SNRA Act***"); the National Forest Management Act, 16 U.S.C. §§ 1600-1614

**FIRST AMENDED COMPLAINT - 2**

("*NFMA*"); the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* ("*NEPA*"); and the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("*APA*").

## JURISDICTION AND VENUE

3.      Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (when the United States is a defendant), the APA, 28 U.S.C. § 2201 (declaratory judgment), 28 U.S.C. § 2202 (injunctive relief), and 28 U.S.C. § 2409a and 28 U.S.C. § 1346(f) (Quiet Title Act), as the case involves the Plaintiffs' request to quiet title to confirm and limit the scope of the Easement granted to the United States and challenge Defendants' actions as unlawful under various federal statutes.

4.      Venue is proper in this Court under 28 U.S.C. § 1391(e) because the Conservation Deed, Easement and Trail at issue involve land within Custer County, Idaho, and the U.S. Forest Service issued its Decision Memo for the Redfish to Stanley Trail from the Area Ranger's office in Ketchum, Blaine County, Idaho.  The contract executed by the United States Department of Transportation, Federal Highway Administration contracting officer Dean A. Umathum for the construction of the Trail concerns real property located within Custer County, Idaho.

## PARTIES

5.      Plaintiff Sawtooth Mountain Ranch LLC is an Idaho Limited Liability Company formed and operated in accordance with Title 30, chapters 21 and 25, Idaho Code (the "*Ranch*"). The Certificate of Organization for the Ranch was filed with the Idaho Secretary of State on October 24, 2016.  The Ranch holds title to the real property at issue in this action, as well as various personal property, livestock, fixtures, grazing rights, and other interests associated with a livestock ranching operation conducted on the approximately 1781.07 acres in Custer County, Idaho (the "*Property*").

**FIRST AMENDED COMPLAINT - 3**

145047920.8

6.     Plaintiff David Boren is an individual residing in Boise, Idaho.  Mr. Boren is the organizer and sole member of Sawtooth Mountain Ranch LLC.  Mr. Boren oversees and is involved in the daily operations of the Ranch.  Mr. Boren has been the point of contact for the Ranch with the SNRA and Forest Service personnel involving Ranch operations, use/enjoyment of the Ranch property, compliance with the SNRA Act, and the Trail at issue herein.  Mr. Boren is married to Plaintiff Lynn Arnone.

7.     Plaintiff Lynn Arnone is an individual residing in Boise, Idaho, and married to Plaintiff David Boren.  Ms. Arnone is familiar with Ranch operations and spends meaningful time on the property at issue owned by the Ranch, but Ms. Arnone does not possess an ownership interest in the Ranch.

8.     Defendant United States of America owns legal title to the Conservation Deed and Easement, which traverses the Plaintiffs' Property and is at issue herein.

9.     Defendant United States Department of Agriculture ("*USDA*") is an agency within the United States executive branch that oversees food, agriculture, natural resources, rural development, nutrition, and related issues.

10.     Defendant Sonny Perdue is the Secretary of the United States Department of Agriculture.  Secretary Perdue has the ultimate authority for the procedures, actions, and decisions of the Department of Agriculture.  He is sued solely in his official capacity.

11.     Defendant United States Forest Service is a federal agency within the United States Department of Agriculture.  The Forest Service is charged with administering and overseeing United States National Forest System lands in accordance with applicable law.

**FIRST AMENDED COMPLAINT - 4**

12.     Defendant Sawtooth National Forest is a subunit of the United States Forest Service comprised of approximately 2.1 million acres of land located in south central Idaho and northern Utah.  The Forest's main office is located in Jerome, Idaho.

13.     Defendant Jim DeMaagd is the Forest Supervisor for the Sawtooth National Forest.  He is the supervisor for the Forest and has ultimate authority for the procedures, actions and decisions of the Forest and is charged with ensuring the Forest complies with applicable law. He is sued solely in his official capacity.

14.     Defendant Sawtooth National Recreation Area ("*SNRA*") is a subunit of the Sawtooth National Forest.  The SNRA contains approximately 756,000 acres, including more than 20,000 acres of private property as well as roughly 375,855 acres of Congressionally-designated wilderness in the Sawtooth, Hemingway-Boulders, and Cecil D. Andrus-White Clouds Wilderness Areas.  The SNRA's main office is located in Ketchum, Idaho.

15.     Defendant Kirk Flannigan is the SNRA Area Ranger.  He is the supervisor for the SNRA and has ultimate authority for the procedures, actions, and decisions of the SNRA and is ultimately charged with ensuring the SNRA complies with applicable law.  Mr. Flannigan signed the Decision Memo and has direct involvement in and oversight of all aspects of the Trail.  He is sued solely in his official capacity.

16.     Defendant Federal Highway Administration is a federal agency within the United States Department of Transportation.  The Federal Highway Administration is responsible for helping State and local governments in the design, construction, and maintenance of the Nation's highway system and various federally owned lands.  The Federal Highway Administration is in charge of the construction of the Trail at issue herein.

**FIRST AMENDED COMPLAINT - 5**

17.     Defendant Dean A. Umathum is the Federal Highway Administration's
Contracting Officer for the Trail.  He is sued solely in his official capacity.

## LEGAL FRAMEWORK

### *Quiet Title Act*

18.     The Quiet Title Act, 28 U.S.C. § 2409a, allows Plaintiffs to file a civil action
against the United States to "adjudicate a disputed title to real property in which the United
States claims an interest."

### *Sawtooth National Recreational Area Act*

19.     The SNRA Act was passed as Public Law 92-400 on August 22, 1972, and is
codified at 16 U.S.C. §§ 460aa through 460aa-14.  The SNRA Act's general purpose is "to
assure the preservation and protection of the natural, scenic, historic, pastoral, and fish and
wildlife values and to provide for the enhancement of the recreational values associated
therewith…." 16 U.S.C. § 460aa.

20.     The SNRA Act requires the USDA Secretary to "administer the recreation area in
accordance with the laws, rules and regulations applicable to the national forests in such manner
as will best provide… the conservation and development of scenic, natural, historic, pastoral,
wildlife, and other values, contributing to and available for public recreation and enjoyment,
including the preservation of sites associated with and typifying the economic and social history
of the American West…." 16 U.S.C. § 460aa-1(a).

21.     The SNRA Act allows the USDA Secretary to utilize condemnation proceedings
without the consent of the owner *only* when all reasonable efforts to acquire such lands or
interests therein by negotiation have failed and condemnation is reasonably necessary to
accomplish the objectives of the SNRA.  16 U.S.C. § 460aa-2.  Additionally, the Act provides
that no privately owned lands shall be acquired unless the Secretary determines that such lands
are being used, or are in imminent danger of being used, in a manner incompatible with the
regulations established pursuant to the SNRA Act.  *Id.* at § 460aa-3(b).

**FIRST AMENDED COMPLAINT - 6**

22.     One of Congress' goals in passing the SNRA Act was to preserve the ranching heritage in the Stanley area.  The Senate Conference Report states that "it is generally agreed that ranching, for example, is compatible with and, in fact, beneficial to the general setting of the recreation area.  Numerous ranching operations depend upon this area for summer and fall forage…." S. Rep. 92-797, 92nd Cong. (1972).  The USDA's Supplemental Statement on the legislation designating the SNRA indicates that livestock grazing is one of the unique visual aspects of the region.  *Id.*  "Travelers on U.S. Highway 93 view the jagged and imposing peaks of the Sawtooth Range across meadows on which sheep and cattle graze and on which an occasional rustic ranch house can be seen in the distance."  *Id.*  It goes on to state that the "authentic ranching atmosphere of the area can be preserved and would add to the enjoyment of visitors from the outside." *Id.*

23.     Congress wished to limit the change to the general landscape of the area, especially the areas readily visible from travel corridors.  The Senate Report notes that "[t]he beauty and western ranching character of the lands… is being encroached upon in increasing measure by subdivision and development of the meadows and fields immediately adjacent to the highway."  *Id.*  It goes on to warn against developing roads and recreational developments that would result in changes in the scenic environment.  *Id.*  It was advised that construction that "would mar or block the scenery" be avoided to "take greater advantage of the natural beauty of the area."  *Id.*

### *National Forest Management Act*

24.     NFMA provides the statutory framework for management of the National Forest System lands.  NFMA requires each Forest to prepare and revise a Land and Resource Management Plan ("***Forest Plan***").  16 U.S.C. § 1604.  A Forest Plan lays out broad guidelines to advance numerous goals and objectives, including to "insure consideration of the economic and environmental aspects of various systems of renewable resource management, including the related systems of silviculture and protection of forest resource, to provide for outdoor recreation (including wilderness), range, timber, watershed, wildlife, and fish…."  *Id.* at (g)(3)(A).

**FIRST AMENDED COMPLAINT - 7**

25.     Resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans. 16 U.S.C. 1604(i).

26.     The Sawtooth Forest Plan ("*SFP*") is the governing Forest Plan for the area at issue. The SFP is strategic and programmatic in nature and does not make commitments to selection or specifications of any particular project or daily activities. It identifies objectives, standards and guidelines to govern specific activities which are applied in more detailed project-level or site-specific planning. Any project-level decisions must be consistent with the overall Sawtooth Forest Plan.[1]

### *National Environmental Policy Act*

27.     NEPA represents "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1. NEPA's protections of the "environment" refer to the "human environment" which "shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment." 40 C.F.R. § 1508.14. Among its numerous purposes, NEPA procedures are designed to foster informed, transparent agency decision-making built upon informed public participation.

28.     NEPA's primary procedural mechanism is an "environmental impact statement" ("*EIS*") which must be prepared in advance of and circulated for public input on a proposed action that might "significantly affect[] the quality of the human environment…." 42 U.S.C. § 4332(2)(C). A less-stringent mechanism, an "environmental assessment" ("*EA*"), can be used to determine if an EIS is needed or aid in the agency's compliance with NEPA when no EIS is necessary. 40 C.F.R. § 1508.9(a)(2). At the lowest level of NEPA procedure is the "categorical exclusion" ("*CE*"). A CE allows for "a category of actions which do not individually or cumulatively have a significant effect on the human environment." 40 C.F.R. § 1508.4.

---

[1] https://www.fs.usda.gov/detail/sawtooth/landmanagement/planning/?cid=stelprdb5391896.

**FIRST AMENDED COMPLAINT - 8**

29.     CEs are available only for actions that are routine and do not raise any concerns about resource conditions— referred to as "extraordinary" conditions in NEPA.  To utilize a CE, the agency must show (1) that the action falls within an established CE and (2) that there are no resource conditions which make the action "extraordinary."  36 C.F.R. § 220.6.

30.     Resource conditions that should be considered include "(i) Federally listed threatened or endangered species or designated critical habitat, species proposed for Federal listing or proposed critical habitat, or Forest Service sensitive species; (ii) Flood plains, wetlands, or municipal watersheds; [and] (iii) Congressionally designated areas, such as wilderness, wilderness study areas, or national recreation areas…."  *Id.*

31.     The Forest Service must determine whether there exists a cause-effect relationship between a proposed action and the potential effect on these resource conditions, and if such a relationship exists, the degree of the potential effect on the resource condition, to determine whether an extraordinary circumstance exists.  *Id.*

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

### *The Property and Easement*

32.     The Ranch Property at issue is located in Custer County, Idaho, adjacent to the southern end of Stanley and westward of State Highway 75, in a contiguous parcel including all or part of Sections 4, 5, 8, 9, 10, 15, 16, and 17 of T.10 N., R. 13 E., Boise Meridian.  The Ranch Property consists of approximately 1,781.07 acres, all of which lies within the SNRA.

33.     Plaintiffs acquired the Property in the fall of 2016.  Plaintiffs Arnone and Boren spend meaningful time on the Property, which includes various structures and facilities.

34.     The historic and current use of the Property is cattle ranching.  The Piva family, who owned the property before the Plaintiffs, owned the property since at least the 1950s. Historically, the Piva family ran a family cattle ranching operation on the Property.  Currently, the Plaintiffs conduct a livestock and ranching operation on the Property.

**FIRST AMENDED COMPLAINT - 9**

145047920.8

35.    The chain of title for the Property includes various easements, including three scenic easements entered into in 1983, 1999, and 2005.  The easement at issue in this case is the Conservation Easement Deed dated May 10, 2005 which was recorded as Instrument 231391 on May 20, 2005, in the real property records of the Custer County Recorder's Office.  The Conservation Deed supersedes the prior scenic easements.  The Property owners in 2005 were various trusts and general/limited partnerships involving various members of the Piva Family, collectively called the "Grantors" in the Conservation Deed, and the United States, by and through the Secretary of Agriculture, called the "Grantees" in the Conservation Deed.

36.    The Conservation Deed's purpose is to maintain the statutory values of the SNRA Act, to prevent "any use of the Property that will significantly impair or interfere with the Conservation Values of the Property," and to "confine the use of the Property to such activities as are consistent with the purposes of this Easement."  Conservation Deed at 2.

37.    Much of the Conservation Deed addresses existing uses, structures or other existing features of the Property, reservation of rights by the Grantors, and other prohibitions or obligations of the parties not relevant to this action.  Part VI section D states that the "provisions of this Easement are enforceable in law or equity by both the Grantors and the United States, their successors or assigns."  Conservation Deed at 9.

38.    The Conservation Deed also grants a public access easement across a portion of the Plaintiffs' property.  The public access Easement was created and defined in the Conservation Deed in Part VI section K which states:

> Nothing herein contained shall be construed as affording the public access to any portion of the Property except that the United States is hereby granted the right to permit public use of the following:
>
> (1) A strip of land to be utilized as a trail in that portion of the Easement area within Secs. 9, 15, and 16, as shown on Exhibit D, attached hereto and made

**FIRST AMENDED COMPLAINT - 10**

a part hereof.  The total right-of-way width of the trail easement shall be 30 feet. The following uses are allowed on the trail: snowmobile, snow grooming equipment, bicycle, horse, and foot travel.  The Grantee may erect appropriate signs to delineate the public use areas where needed.

     (2) A strip of land along Valley Creek, to be utilized for foot travel only, extending from the centerline of Valley Creek to point parallel and being 20 feet distant beyond each mean high water line of Valley Creek.  The Grantee may erect appropriate signs to delineate the public use areas where needed.

Conservation Deed at 6.  Exhibit D is the last page of the Conservation Deed and includes a map depicting the Easement demarcated by a dark line identified in the Legend as the "Trail Easement."

### *Redfish to Stanley Trail*

39.    In early 2014, the Forest Service announced their intent to construct and designate a trail approximately 4.5 miles long connecting the City of Stanley to the Redfish Lake entry station.

40.    Roughly 1.5 miles of the proposed Trail runs through the Plaintiffs' Property.

41.    The Redfish to Stanley Trail was summarized in a "proposed action" that was published in the Sawtooth National Forest's *Schedule of Proposed Actions* in January 2014 and was made available for public comment.

42.    The proposed action stated the Trail would "be a consistent 78" (6'-6") wide to accommodate passing bike traffic."  ECF No. 11-2, Ex. G at 2.  A "natural surface" was proposed on about 1.2 miles of the Trail, with the remainder proposed to consist of "angular gravel" up to several inches "above adjacent grade" and be classified as a Trail Class 4 structure under the Forest Service trail classification system.  *Id.*

43.    According to Forest Service guidance, a Trail Class 4 route is "highly developed" which can be a "single lane" structure or be "[d]ouble lane where traffic volumes are high and

**FIRST AMENDED COMPLAINT - 11**

passing is frequent." ECF No. 11-3, Ex. E. The continuum outlined by the Matrix is intended, in part, to allow agency decisionmakers to "[a]pply the Trail Class that most closely matches the management intent for the trail or trail segment...." *Id.*

44.     In conjunction with the proposed action, the Forest Service released a map, which depicts the location of the proposed Trail along its entire length, including the portion proposed to traverse Plaintiffs' Property.

45.     The Defendants considered public comments and conducted additional analysis in determining whether or how to proceed on the Trail. Mr. Flannigan eventually signed a Decision Memo dated June 6, 2017, which approved construction of the Trail as presented in the proposed action, including the routing as depicted in the February 2014 map, which was reproduced in the Decision Memo.

46.     Neither the Trail route as depicted in the February 2014 map nor the Decision Memo match Exhibit D to the Conservation Deed. The Trail route approved in the Decision Memo would cross Plaintiffs' Property in the vicinity of the southern end of the Stanley airstrip, outside any rational interpretation of the Easement shown in Exhibit D to the Conservation Deed.

47.     During 2017 and 2018, Plaintiffs were involved in various communications with the SNRA regarding the proposed Trail. These included transmission via email from SNRA staff to Plaintiffs of additional information, including mapping, which depicts a different Trail routing than does the Decision Memo. This additional information shows the Trail exiting the eastern boundary of the Property beyond the southern end of the airstrip, consistent with Exhibit D to the Conservation Deed.

48.     In addition to these written communications, in September 2018, Mr. Boren and SNRA staff met at and walked the Property, and generally discussed the Trail. In these

**FIRST AMENDED COMPLAINT - 12**

discussions Mr. Boren expressed various concerns about the Trail, including objection to the extent of proposed development/action outside the scope of the limited provisions of the Conservation Deed, and at the size and extent of development of the Trail, which he did not consider necessary or consistent with the type of "primitive" trail contemplated by the SNRA Act and reflected in nearly all other trails within the SNRA.

49.     Plaintiffs received a letter dated November 26, 2018, signed by Mr. Flannigan that concludes by advising the Defendants "plan[] to proceed with developing the trail, in its entirety as proposed.  I feel that the trail easement allows for this development level and type of use…."

50.     On March 19, 2019, Mr. Boren received an email from SNRA staff which opened by saying "[s]pring is rapidly approaching and the Sawtooth NRA plans to begin construction on the Redfish to Stanley trail this season."  The email proposed several times for a telephone call to "follow-up with you as we prepare for this project."

51.     Mr. Boren coordinated with the Forest Service on the proposed times, and participated in a telephone call on April 2, 2019, with Mr. Flannigan and Matt Phillips, the SNRA Landscape Architect.  During this call Mr. Boren reiterated his various concerns about the Trail, including the routing of the Trail, the fact that the Trail as approved in the Decision Memo would stray outside the defined Easement, the "overdeveloped" nature of the Trail, the public safety concerns due to cattle and human interaction, and objection that the activities described in the Decision Memo would exceed or contradict the terms of the Conservation Deed.

52.     Mr. Boren's concerns were summarized and additionally presented to the Forest Service in a letter signed by Plaintiffs' legal counsel dated April 3, 2019.

**FIRST AMENDED COMPLAINT - 13**

53.     As requested by the April 3 letter, the Forest Service did respond in writing on April 9, 2019.  That letter, signed by Mr. Flannigan, apologized that any "general illustration" of the Trail in the Decision Memo "has caused confusion" and stated the Trail "will be developed completely within the easement" across the Property.  The letter denies that modified or additional decision documents are necessary, otherwise rejects Plaintiffs' concerns about the Trail, and states that Mr. Flannigan "remain[s] committed to seeing this project completed on schedule" which according to "the construction contract" would allow "the contractor to begin work on the trail as soon as mid-May."

### *Quiet Title Act*

54.     The Defendants' recent actions indicate that it could build the Trail outside the physical boundary of the Easement, which interferes with the Plaintiffs' use and enjoyment of their Property.

55.     The Defendants' position on the location of the Trail has not been consistent.  The Forest Service Decision Memo shows the Trail trespassing across the Property, clearly outside the boundaries of the Easement in the Conservation Deed.  Meanwhile, the Forest Service has indicated in private communication with the Plaintiffs that the Trail will be built within the physical boundaries of the Easement.

56.     The construction contract awarded through the Federal Highway Administration is equally confusing.  A map showing the entire length of the Trail shows the Trail trespassing across Plaintiffs' Property, while more detailed maps appear to show the Trail within the Easement boundary.

57.     The Plaintiffs are unsure of where the Defendants intend to build the Trail and fear it will cross the Property outside the physical boundary of the Easement.

**FIRST AMENDED COMPLAINT - 14**

145047920.8

58.     The Defendants also seek to exceed the scope of allowable use of the Easement.

59.     Above-grade construction and development of the public "commuter" Trail was not contemplated when the Conservation Deed was granted.  In fact, several Grantors expressed surprise upon finding out that public access through the Property had been granted in the Conservation Deed.  According to a letter sent by several members of the Piva Family, at least two Grantors believed the Conservation Deed granted to the Defendants only contained development and dude ranching restrictions.

60.     When Plaintiffs purchased the Property from the Piva Family, they did so with the belief that the Property subject to the access Easement would only be used as it exists in its current state—as an undeveloped path that is well hidden within the landscape during the summer and as a snowmobile trail in the winter.

61.     The plain language of the Easement does not allow use of machinery to build a new trail.  The Easement only allows 5 uses— "snowmobile, snow grooming equipment, bicycle, horse, and foot travel."  The Easement text provides for the Forest Service to post signage regarding the trail, but states nothing about constructing or developing any other improvements or trail facilities.  Thus, the Defendants' action seeking to enter the Property with machinery and construct and maintain a highly developed and heavily trafficked 6.5' (78") commuter Trail is in violation of the plain language of the Easement and the overall purpose of the Conservation Deed.

62.     In order to build the Trail, the Defendants will bring in fill materials, including angular gravel.  Some of this fill material will be used to build the Trail through wetland areas on the Plaintiffs' Property.  In addition to the unnecessary environmental damage, this will harm and interfere with the Plaintiffs' use and enjoyment of their Property.

**FIRST AMENDED COMPLAINT - 15**

63.     Finally, the Plaintiffs purchased the Property understanding that the Conservation

Deed allowed for continued agricultural uses, as is stated on page 3 of the Conservation Deed.

The risks associated with continuing to use the Property for agricultural purposes will be

exacerbated if the Trail is developed and used as the Forest Service anticipates.  Interactions

between cattle and people have been known to cause injury, injury for which the Defendants

and/or the Plaintiffs could be at risk of liability.  The risk is further escalated because the Trail

has been designed to be accessible to people who may not have the ability to get away from

cattle as quickly, such as people in wheelchairs or pushing strollers.

64.     Plaintiffs have tried to plan for ways to limit human/cattle interaction, but the path

of the Trail through the Property is not one that is easily addressed.  The area through which the

Trail passes is not easily divided from the rest of the Property.  The Plaintiffs believe that

reducing stocking numbers further, in the hopes that it would reduce interactions, could impair or

interfere with their ranching operation without further guaranteeing public safety, especially

since dangerous wildlife, like elk, also occupy the area.  The use of the Property for agricultural

purposes, as expressly reserved in the Conservation Deed, will be significantly impaired or

interfered with if the Defendants build and maintain the Trail.

### *Sawtooth National Recreational Area Act*

65.     The Conservation Deed granted to the United States lists its purpose as

"assur[ing] that the Property's scenic, natural, historic, pastoral, and fish and wildlife values, as

contemplated in P.L. 92-400 and described in the SNRA Regulations, be maintained forever and

to prevent any use of the Property that will significantly impair or interfere with the

Conservation Values of the Property."  Conservation Deed at 2.  The Trail threatens to both mar

the landscape of the Property with a 6.5' wide highly developed trail and significantly impair or

**FIRST AMENDED COMPLAINT - 16**

interfere with the Plaintiffs operating their Ranch in the manner as it has been historically used, among the Property's other conservation values.

66.     The Forest Service failed to consider the impact of the Trail on the ranching heritage in the Stanley basin when it issued the Decision Memo.  Even though the history of the SNRA Act clearly calls for the preservation of ranching heritage, landscape, and values, the Forest Service pushed through a project that could significantly impair or interfere with one of the few viable ranching operations still visible from the Highway that provides the scenic foreground of the Sawtooth mountain range.

67.     Since purchasing the Property, Plaintiffs have operated the property as a working cattle ranch.  Its operations have involved a herd of cattle ranging from 200 to 500 cow-calf pairs, spending significant time on the Property.  Plaintiffs purchased the Property with the intent of continuing its historic ranch use while enjoying the outdoor recreational opportunities and scenic beauty that the untouched landscape provides them with.  The Plaintiffs currently manage the Property consistent with a "limited use" philosophy.  This philosophy has led them to reduce use and limit development to retain and enhance the natural values of the Property consistent with the SNRA.

68.     An Americans with Disabilities Act ("**_ADA_**") approved trail running through the middle of a working cattle ranch is not conducive to continued ranching or public safety.  The Trail will increase interactions between cattle and people and could result in injuries for which the Plaintiffs could be at risk of liability.  A commuter trail, like the Trail at issue here, will interfere with their ability to operate the Ranch.

69.     The 6.5' wide, highly developed Trail will be put through areas of pasture land that do not currently have developed trails or improved paths.  The Trail will be constructed with

**FIRST AMENDED COMPLAINT - 17**

145047920.8

angular gravel hauled in from another area, making the Trail starkly visible from the church and facilities at Pioneer Park and even more visibly stark from both the highway and the air as people travel into the town of Stanley.

70.     Other route options exist for the Trail that have less visual and scenic impacts. For example, an old roadbed lies along the Highway from Stanley to Redfish lake that was not considered as an option.  Instead, the Forest Service decided to use miles of untouched ground, impeding views from the Highway, the city park, and the local chapel, which is shared by several churches and used for numerous weddings and special events because of its unimpaired scenic setting.

71.     Finally, both the Conservation Deed and the SNRA prevent the owners of the Property from "division, subdivision, or defacto subdivision of the Property through sales." However, the Forest Service has repeatedly offered to divide and purchase a portion of the Property—possibly because they are aware that they seek to exceed the scope of the Easement and Conservation Deed.  The Plaintiffs have refused these offers because they intend to continue ranching and feel it goes against the principles of the SNRA and the language and purpose of the Conservation Deed to divide off and sell a portion of the Property.

### *National Forest Management Act*

72.     The Trail authorized by the Decision Memo is not consistent with the SFP and thus violates NFMA.

73.     By way of example and illustration, and not limitation, the Trail does not conform with the SFP's direction to protect Wildlife Resources.  The SFP requires the Forest Service to consider a proposed action's impact on wildlife.  Specifically, the SFP requires "the amount, distribution, and characteristics of source habitat are present at levels necessary to support

**FIRST AMENDED COMPLAINT - 18**

persistence of native and desired non-native wildlife species within their respective ranges across the planning unit." III-25. It also requires that "human activities do not affect source environments in a manner that prevents wildlife populations from attaining desired distribution and abundance during critical life stages." *Id.* WIGU12 requires that "calving and fawning areas should be protected from project-related disturbance during big game calving or fawning." *Id*. at III-29. WIGU13 requires the Forest Service to mitigate any disturbances between components such as "big game wallows and licks, public access, wildlife travel routes, created openings, meadows, forested stringers, and winter/spring range." *Id*.

74.     While the Forest Service states it routed the Trail to avoid *some* elk calving grounds, it failed to consider other routes that would have less impact on big game. For example, the Forest Service failed to consider a trail alignment that removes virtually all of the Trail from areas where elk are known to calve. Disturbances to the calving areas could cause a shift in migration patterns and increase the chances of injury to the public who are using the Trail. Furthermore, elk could easily damage the Trail in portions where it crosses their calving grounds, resulting in sky rocketing maintenance costs for upkeep of the Trail. Yet the Forest Service failed to consider these factors for large portions of the proposed Trail.

75.     Additionally, multiple comments on the proposed action state that the Trail crosses through several Sandhill crane nesting sites. Besides an offhanded assurance that risks to wildlife were mitigated, there is no evidence that the Forest Service considered the impacts to Sandhill crane habitat in the development of the Trail route.

76.     The Trail route as envisioned is not in compliance with SFP's standards and guidelines regarding Soil, Water, Riparian, and Aquatic Resources. SFP III-18 through III-24. The Forest Service failed to adequately consider the impact of the Trail on wetlands and

floodplains.  The SFP requires the Forest Service to ensure its "management actions result in no long-term degradation of soil, water, riparian, and aquatic habitats, the stability function of stream channels, and the ability to route flood discharges, and provide for downstream uses."  It also requires "wetlands and floodplains [be] maintained where they are properly functioning and restored where degraded."  SFP III-18.  While the Forest Service claims it analyzed Riparian Conservation Areas ("**RCAs**"), there is no evidence that the Forest Service considered the impacts that its actions would have on water quality and hydrology or adequately evaluated whether its actions would require special permitting.  Additionally, the Forest Service miscategorized one of the wetlands as seasonal.

77.     The Trail does not comply with SFP's standards and guidelines regarding Facilities and Roads.  SFP III-61 through III-64.  The Forest Service failed to adequately consider the opportunity to use decommissioned roads for the Trail.  SFP FRGU03 requires the Forest Service to consider opportunities to turn roads marked for decommissioning as alternative forms of transportation.  Several decommissioned roads, including roads that are going to be decommissioned because of the trail, would have provided the Forest Service with an opportunity for using them as portions of the proposed Trail route.  SFP III-63.

78.     The Forest Service failed to analyze the travel management requirements in FRGU09.  The Forest Service is required to use travel management planning to "(a) provide for the safety and welfare of the users; (b) protect threatened and endangered species and their habitat; (c) protect Forest resources, such as wildlife, soil, vegetation, and water; (d) provide a diversity of recreational experiences and reduce user conflicts; [and] (e) protect road and trail investments…."  *Id*.

**FIRST AMENDED COMPLAINT - 20**

79.     The Piva family, Plaintiffs, and various members of the public raised valid safety concerns about building a highly developed, high-use, ADA accessible trail through an operating cattle ranch.  Instead of adequately addressing the concerns, the Forest Service stated in response that it was unable to answer many of the concerns due to "the multitude of potential circumstances."  Instead, the Decision Memo merely states that there will be "mitigation."  At no point did the Forest Service analyze what steps would need to be taken or even what harms could arise from conflicts on the Property between cattle and the public.  The SFP recognizes the importance of taking cattle grazing operations into consideration when planning for new recreational sites or trails, and yet the Forest Service has repeatedly avoided complying with these guidelines.  See SFP III-70, REGU18.

80.     The Forest Service failed to mitigate potential conflicts between people and wildlife along the entirety of the Trail route.  The proposed Trail will cross through elk calving grounds, specifically calving grounds closer to the northern end of the Trail where it is harder for people to exit the Trail system.  Cow elk with newborn or even young calves can be extremely dangerous, making the use of the Trail nearly impossible for an extended period of time every year in late May and early June.  There is no evidence that the Forest Service took these safety concerns into consideration when it approved parts of the Trail route.

81.     The Forest Service did not take the other travel management requirements into consideration when developing the proposed Trail route either.  This lack of compliance is evident through the lack of analysis regarding the damage to elk calving grounds, the damage to wetlands and floodplains, the significant impairment or conflict with the current use available through the Conservation Deed, the inadequacy of the Trail route to remove bicyclists from the highway due to distance from the Highway, the risk of lost investment due to yearly damage to

**FIRST AMENDED COMPLAINT - 21**

the Trail by cattle and wildlife, and the lost investment of decommissioned roads that could be used as a trail bed.

82.     The proposed Trail fails to conform with the Recreation Resources standards and guidelines as set forth in the SFP.  SFP III-65 through III-71.  The Forest Service failed to address significant portions of the standards and guidelines relating to Recreation Resources, including those providing for safe recreational opportunities, mitigation of recreationist and big game conflicts in the winter/spring range, mitigation of effects to RCAs, developing measures to mitigate degrading effects on the National Forest System trails, providing year-round access to recreation, and avoiding commercial livestock grazing areas.

### *National Environmental Policy Act*

83.     The Forest Service claims that construction and development of the proposed Trail falls within the CE that generally excludes from further analysis the construction and reconstruction of trails.  36 C.F.R. 220.6(e)(1).  However, the Forest Service failed to adequately account for the potential effects of the Trail on multiple resource conditions which render the proposed action "extraordinary" as such term is defined in NEPA.  The Decision Memo does not support the Forest Service's determination that the action contemplated here properly qualifies for a CE.  As such the Forest Service's actions are not in compliance with NEPA requirements.

84.     The Forest Service failed to adequately consider the effect of the Trail on wetlands and floodplains.  There is no evidence the Forest Service took into serious consideration the impact of the Trail on wetlands and floodplains.  An analysis regarding whether the Trail crosses RCAs is not sufficient to meet the burden of showing that the action does not damage or otherwise impact sensitive wetlands.  On the Plaintiffs' Property alone, the Defendants intend to fill a corridor up to 24 feet wide to allow people to walk through a wetland

**FIRST AMENDED COMPLAINT - 22**

area that is currently undisturbed.  The Forest Service did not analyze the impact to water quality that filling an undisturbed wetland would cause.  Furthermore, the Forest Service did not analyze an alternative route that would have routed the Trail through already impacted wetlands areas, including areas encompassing the roadbed for the old highway.

85.     The Forest Service failed to consider all of the historic values of the SNRA when it determined that the Trail would not damage the resource conditions of the SNRA.  The analysis included in the compliance list only states that the agency looked for Archaeological and Historic sites when determining whether the Trail would comply with the SNRA values.  However, one of the key historical aspects of the SNRA Act, as shown through its legislative history, was to preserve ranching heritage and the scenic views that livestock grazing provides to visitors.  The Trail will have a direct impact on the Plaintiffs' ability to continue their ranching operation, which was not considered as part of the SNRA NEPA compliance analysis.

86.     The trail map in the Decision Memo does not match the Trail Easement, and thus, the Forest Service cannot have fully vetted the environmental impacts of Trail as required by NEPA.  The approved Decision Memo shows the Trail route trespassing across the Plaintiffs' Property, but the Forest Service has also stated that the Trail map in the Decision Memo is not an accurate depiction of the actual route of the Trail.  If the map is correct, then the Defendants seek to trespass onto Plaintiffs' property.  If the map is incorrect in the Decision Memo, then the Forest Service has not fully vetted the environmental impacts of the Trail along its actual route.

87.     Because of the inaccuracies in the Trail map as shown in the Decision Memo, the public has likely not had a chance to comment on the actual proposed route of the Trail.  This is important because if the Trail follows the boundaries of the Easement, then the Forest Service

will have to install two more fence crossings, resulting in six crossings within the first mile and a

half of the Trail.

88.     The existence of a number of special resource conditions on the Property, in

addition to the lack of compliance with the SFP and inaccurate map in the Decision Memo,

render the Forest Service's NEPA analysis under a CE arbitrary and capricious, an abuse of

discretion and not in accordance with law.

## CLAIMS FOR RELIEF

### *Claim One:*

### Quiet Title Act: Confirm Physical Boundary of the Easement

89.     Plaintiffs incorporate herein and reallege each of the foregoing paragraphs 1

through 88.

90.     In this action, Plaintiffs seek to quiet title to their land with respect to the

Easement which traverses Plaintiffs' Property under the Quiet Title Act.

91.     The Defendants have put forth multiple documents indicating that the Trail will

be routed outside of the defined Easement boundary.  The Decision Memo indicates that the

Trail is going to be built well outside the Easement boundary and communication from the

Defendants indicates that they "plan[] to proceed with developing the trail, in its entirety as

proposed."  Similarly, the construction contract includes two different maps depicting the route

of the Trail.

92.     The Plaintiffs are entitled to an order of this Court quieting title to their Property

confirming that the Trail may not pass through areas of the Property that are outside of the

Easement boundary.

**FIRST AMENDED COMPLAINT - 24**

145047920.8

*Claim Two:*

**Quiet Title Act: Define Scope of the Easement**

93.    Plaintiffs incorporate herein and reallege each of the foregoing paragraphs 1 through 92.

94.    The Easement only permits public access for "snowmobile, snow grooming equipment, bicycle, horse, and foot travel."  The Easement text provides for the Forest Service to post signage, but is otherwise silent about constructing or developing any other improvements or trail facilities on Ranch Property.  Thus, the Defendants' action seeking to enter the Property with machinery and construct and maintain a highly developed a 6.5' (78") wide commuter trail through the Property burdened by the Conservation Deed is in violation of the plain language of the Conservation Deed and Easement.

95.    The Plaintiffs are entitled to an order of this Court under the Quiet Title Act quieting title to their Property and declaring the Defendants may not enter the Easement to alter the landscape of the Plaintiffs' Property but may only allow public access to the existing and unaltered landscape and installation of guidance signs as allowed by the plain language of the Easement.

*Claim Three:*

**Quiet Title Act: Confirm Proposed Use is Incompatible with the
Conservation Values Protected in the Conservation Deed**

96.    Plaintiffs incorporate herein and reallege each of the foregoing paragraphs 1 through 95.

97.    The Conservation Deed granted to the United States lists its purpose as "assur[ing] that the Property's scenic, natural, historic, pastoral, and fish and wildlife values… be maintained forever and to prevent any use of the Property that will significantly impair or

**FIRST AMENDED COMPLAINT - 25**

interfere with the Conservation Values of the Property."  The Trail threatens to mar the landscape of the Property with the development of a 6.5' wide trail that divides the Property and significantly impairs or interferes with the Plaintiffs operating their Ranch in the manner as it has been historically used.

98.     The Plaintiffs are entitled to an order of this Court under the Quiet Title Act quieting title to their Property and declaring the Defendants may not construct the Trail as currently proposed because the intended developed and high-traffic use of the Trail impairs and is otherwise not compatible with the Conservation Values of the Property and interferes with Plaintiffs' rights protected by the Conservation Deed.

### *Claim Four:*

### Violation of Sawtooth National Recreation Area Act and Its Implementing Regulations

99.     Plaintiffs incorporate herein and reallege each of the foregoing paragraphs 1 through 98.

100.     The Forest Service violated the SNRA Act and its implementing regulations in approving the Decision Memo authorizing the Trail because it failed to consider the historic conservation purposes of the Act and associated Conservation Deed.

101.     The Forest Service failed to consider the impact of the Trail on the ranching heritage in the Stanley Basin.  The Trail as proposed could significantly impair or interfere with the Plaintiffs' ability to continue this protected historical use of the Property.

102.     The Forest Service failed to consider reasonable alternatives that would locate the Trail on existing roadbeds, thus eliminating the need to impact the scenic views and values.  The Forest Service has insisted that the Trail be built on untouched land, marring the scenic view from the highway, Pioneer Park, the local chapel, and the air.

**FIRST AMENDED COMPLAINT - 26**

145047920.8

103.    The Forest Service has repeatedly offered to purchase a portion of the Property,

despite prohibitions in the Conservation Deed and in the SNRA Act against dividing historic

ranching properties.

104.    Accordingly, the Forest Service's actions and decisions in the preparation,

issuance, and reliance upon the Decision Memo is arbitrary, capricious, an abuse of discretion,

contrary to the SNRA Act and its implementing regulations, not in accordance with the law,

without observance of procedures required by law, and in excess of statutory jurisdiction,

authority, or limitations, within the meaning of the APA.  5 U.S.C. §§ 701-706.

## *Claim Five:*

### Violation of National Forest Management Act and Its Implementing Regulations

105.    Plaintiffs incorporate herein and reallege each of the foregoing paragraphs 1

through 104.

106.    The Forest Service violated NMFA and its implementing regulations in approving

the Decision Memo because it failed to ensure its actions were consistent with the SFP.

107.    The Forest Service did not properly assess the impacts to Wildlife as required by

the SFP.  The Trail passes through habitat for both elk and Sandhill cranes, and yet the Forest

Service failed to mitigate the impacts of the Trail for either species along the entire length of the

proposed Trail route.

108.    The Forest Service did not properly assess the impacts to Soil, Water, Riparian,

and Aquatic Resources as required by the SFP.  The inclusion of 2 RCA analyses is not enough

to comply with the SFP.  In addition to crossing the 2 RCAs, the proposed Trail alignment

crosses wetlands, floodplains, and streams, and another RCA—yet there is no evidence that the

Forest Service obtained information on the impacts to water quality or hydrology.

**FIRST AMENDED COMPLAINT - 27**

109.    The Forest Service did not properly consider the SFP's standards and guidelines regarding Facilities and Roads.  There was opportunity for the Forest Service to route the Trail across decommissioned roads, including some that will be decommissioned because of the Trail. The Forest Service also failed to consider travel management requirements, which require the Forest Service to consider public safety, effects to wildlife, impacts on water, diversity of recreational opportunities, and the protection of investment.

110.    The Forest Service did not properly consider the Recreation Resources as required by the SFP.  It failed to consider significant portions of the standards and guidelines relating to recreation, including those addressing safety, mitigation of wildlife conflicts, prevention of trail degradation, year-round access, and commercial livestock grazing.

111.    Accordingly, the Forest Service's actions and decisions in the preparation, issuance, and reliance upon the Decision Memo are arbitrary, capricious, an abuse of discretion, contrary to the NFMA and its implementing regulations, not in accordance with the law, and without observance of procedures required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the APA.  5 U.S.C. §§ 701-706.

### *Claim Six:*

### Violation of National Environmental Policy Act and Its Implementing Regulations

112.    Plaintiffs incorporate herein and reallege each of the foregoing paragraphs 1 through 111.

113.    The Forest Service violated NEPA and its implementing regulations and the APA in approving the Decision Memo because it failed to consider resource conditions which prevent the use of a categorical exclusion to achieve NEPA compliance.

**FIRST AMENDED COMPLAINT - 28**

145047920.8

114.     The Forest Service failed to adequately consider the effects of the Trail on wetlands and floodplains throughout the length of the Trail route. On the Plaintiffs' Property alone, the Defendants intend to construct a highly developed turnpike trail by filling in several currently undisturbed wetland areas.

115.     The Forest Service failed to adequately consider the historic values of the SNRA in its NEPA analysis. The Forest Service's analysis failed to include analyzing the impacts to the ranching heritage of the area as well as the impacts to scenic values.

116.     The Forest Service cannot have truly taken the required "hard look" at environmental impacts of the Trail because the location of the Trail route keeps changing. The map in the Decision Memo shows the Trail route trespassing across Plaintiffs' Property, but the Forest Service have also indicated in communications with Plaintiffs that the Trail will not trespass across the Property. The Decision Memo cannot comply with NEPA and be upheld if the Forest Service did not analyze the environmental impacts of the actual route of the Trail.

117.     Accordingly, the Forest Service's actions and decisions in the preparation, issuance, and reliance upon the inadequate and inaccurate Decision Memo is arbitrary, capricious, an abuse of discretion, contrary to the NEPA and its implementing regulations, not in accordance with the law, and without observance of procedures required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the APA. 5 U.S.C. §§ 701-706.

## **PRAYER FOR RELIEF**

WHEREFORE, having alleged the above-described violations of law, Plaintiffs respectfully request judgment in their favor on each and every claim alleged herein, and request that the Court rule, adjudge, declare, and grant relief as follows:

**FIRST AMENDED COMPLAINT - 29**

145047920.8

1.  Quiet title to their Property with respect to the physical boundaries of the Easement held by the United States and administered by the Forest Service;

2.  Quiet title to their Property declaring that the only permissible uses of the Easement are "snowmobile, snow grooming equipment, bicycle, horse, and foot travel" and that the Defendants may not enter and construct, use, or maintain a developed commuter trail through the Property;

3.  Quiet title to their Property declaring that the development of a commuter Trail on the Property is not consistent with the terms and intent of the Conservation Deed;

4.  Declare unlawful and set aside the Decision Memo;

5.  Remand the Decision Memo and enjoin construction, use, and maintenance of the Trail for further analysis and action in accordance with applicable law;

6.  Award to the Plaintiffs of their reasonable fees, costs, and expenses of litigation as allowed by the Equal Access to Justice Act, 28 U.S.C. § 241 *et seq.* and other applicable law or rule of court; and

7.  Grant such further and additional relief as the Court deems just and proper.


DATED:  August 8, 2019.                    **PERKINS COIE LLP**


By: */s/ Erika E. Malmen*
     Erika E. Malmen
     EMalmen@perkinscoie.com
     Robert A. Maynard
     RMaynard@perkinscoie.com
     1111 West Jefferson Street, Suite 500
     Boise, ID  83702-5391

     *Attorneys for Plaintiffs*


**FIRST AMENDED COMPLAINT - 30**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 8, 2019, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Christine Gealy England
Christine.england@usdoj.gov

Marie Callaway Kellner
mkellner@idahoconservation.org


_____/s/ Erika E. Malmen_____
Erika E. Malmen

**FIRST AMENDED COMPLAINT - 31**

145047920.8