UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SAWTOOTH MOUNTAIN RANCH LLC, LYNN ARNONE, and DAVID BOREN,<br><br>               Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA; UNITED STATES DEPARTMENT OF AGRICULTURE; SONNY PERDUE, Secretary of Agriculture; UNITED STATES FOREST SERVICE; SAWTOOTH NATIONAL FOREST; JIM DEMAAGD, Forest Supervisor; SAWTOOTH NATIONAL RECREATION AREA; KIRK FLANNIGAN, Area Ranger; FEDERAL HIGHWAY ADMINISTRATION,<br><br>               Defendants. | Case No. 1:19-cv-0118-CWD<br><br>**MEMORANDUM DECISION AND ORDER RE: PLAINTIFFS' SECOND MOTION FOR PRELIMINARY INJUNCTION (DKT. 62)** |

## INTRODUCTION

Pending before the Court is a second expedited motion for a preliminary injunction filed by Plaintiffs Sawtooth Mountain Ranch LLC, Lynn Arnone, and David Boren against Defendants. (Dkt. 62.) Plaintiffs again challenge the approval of and any actions associated with the proposed Stanley to Redfish Trail ("Stanley/Redfish Trail" or

**MEMORANDUM DECISION AND ORDER – 1**

"Trail"), as described in the Decision Memo signed by Kirk Flannigan on June 6, 2017, and seek to halt construction. This motion is premised upon claims asserted under the Environmental Species Act and the Clean Water Act, first alleged in Plaintiffs' Second Amended Complaint filed on May 8, 2020. (Dkt. 59, 50.)

The parties had a full and fair opportunity to provide briefing supported by several declarations. (Dkt. 62, 66.) Defendants submitted also the Amended Administrative Record (AR), and Plaintiffs filed supplemental materials.[1]

The Court conducted a video hearing on June 19, 2020, at which the parties appeared and presented their arguments.[2] After carefully considering the parties' arguments, written memoranda, exhibits, the Amended Administrative Record, and relevant case law, and for the reasons that follow, the Court will deny the motion for preliminary injunction. The Court is not persuaded on the present record that Plaintiffs have demonstrated a likelihood of success on the merits of either their Environmental Species Act claim or their Clean Water Act claim.

---

[1] The United States Forest Service lodged the Revised Administrative Record with the Court on June 10, 2020, at Docket 65. In comparing the Administrative Record lodged at Docket 14 with Docket 65, the AR contains identical documents up through AR 2498. Docket 65 adds documents marked AR 2499 – 2647, and which specifically relate to Plaintiffs' claims brought pursuant to the Endangered Species Act and the Clean Water Act. (Dkt. 59, 50.) The parties cite also to documents with the Bates prefix SAW, which refer to documents Plaintiffs filed with the Court at Docket Nos. 58-2 – 58-6.

[2] The Court denied Plaintiffs' request to present witness testimony during the hearing. (Dkt. 75.)

**MEMORANDUM DECISION AND ORDER – 2**

## FACTUAL BACKGROUND[3]

Redfish Lake and Little Redfish Lake are popular summer destinations located within the Sawtooth National Recreation Area (SNRA) six miles south of the town of Stanley. AR 1127. Visitation to the City of Stanley and the Redfish Lake area occurs primarily between mid-June to Labor Day. AR 0992. During that time, the Redfish Lake Recreation Complex, with its seven campgrounds, boat ramp, rustic lodge and cabins, and day-use facilities serve up to 2,200 people and becomes the largest community in the otherwise sparsely populated area. AR 1127. State Highway 75 connects Redfish Lake to Stanley, with high speed traffic and heavy traffic volumes. AR 1128. There currently is no alternative transportation route connecting Stanley and Redfish Lake, although a snowmobile trail connects the two areas during the winter. AR 1128, 1126.

In the early to mid-1990's, SNRA staff began discussing the idea of constructing a trail connecting Stanley and Redfish Lake to provide an alternate means of travel between the two areas. AR 1126. At that time, the Forest Service envisioned a trail that would provide non-motorized travel, and serve pedestrians, bicyclists, and equestrians. AR 0938. In 2005, the Forest Service purchased a 30-foot-wide "Public Trail Easement"

---

[3] Additional factual background is set forth in the Court's June 13, 2019 Order. (Dkt. 24.)

**MEMORANDUM DECISION AND ORDER – 3**

from the prior owners of Plaintiffs' Property[4] to connect the proposed trail route between

Stanley and Redfish Lake. AR 0698.

In 2012, the Forest Service initiated internal scoping, *see*, e.g., AR 1126, and in

early 2014, began external scoping to solicit feedback on the proposed trail project. AR

0921. During the scoping process, public feedback was received in several ways, through

surveys circulated by the City of Stanley and the Forest Service, at a public meeting

attended by approximately 25 people, and through sixteen (16) written comments.

Decision Memo at 9-10. AR 0296 - 0304. Survey results indicated "overall public

opinion is greatly in support of a trail between Stanley and the Redfish Lake area." AR

1048. The Stanley/Redfish Trail is supported by the City of Stanley, the Idaho

Conservation League, the Sawtooth Association, the Stanley-Sawtooth Chamber of

Commerce, and the Idaho Department of Transportation. Phillips Decl. ¶¶ 8-12 and Exs.

C-F. (Dkt. 17-2.) Brief of Amicus Curiae. (Dkt. 18.)

The Forest Service's internal and external scoping involved analyzing the potential

effects of trail construction on species listed as threatened or endangered under the

Endangered Species Act. On April 16, 2014, the Forest Service completed its biological

assessment and evaluation of the effects of the Stanley/Redfish Trail on terrestrial

---

[4] The Plaintiffs' property ("Property") is located within the SNRA and consists of approximately 1,781.07 acres adjacent to the southern end of the town of Stanley, and westward of State Highway 75. Decl. of Boren ¶ 3. (Dkt. 11-2.) The Property is situated between Redfish Lake and Stanley. The Stanley/Redfish Trail would be about 4.4 miles long, of which about 1.5 miles would traverse the Property within the boundaries of the Public Trail Easement. Proposed Action, Boren Decl. ¶¶ 17-19; Exs. F - H. (Dkt. 11-2.)

**MEMORANDUM DECISION AND ORDER – 4**

wildlife species. AR 2612. The Forest Service concluded the Trail may affect, but would not likely adversely affect, the Canada lynx. AR 2612 – 2639. The United States Fish and Wildlife Service (FWS) concurred. AR 0254 – 0255.

On April 14, 2014, Mark Moulton, the SNRA hydrologist and fisheries and watershed program manager, completed a biological assessment (BA) addressing the effects of the Stanley/Redfish Trail upon listed aquatic species, identified as Snake River sockeye, Snake River spring and summer chinook, Snake River steelhead, Columbia River bull trout, and westslope cutthroat trout. AR 2551 – 2606; 0238 – 0245; Decl. of Mitchell ¶ 3. (Dkt 66-8 at 2.) The BA identified three segments of the proposed trail that would intersect riparian conservation areas (RCAs). AR 0244, 2596. The first segment, located on the Property, would "cross a minor, essentially isolated, seasonally wet area." AR 0244, 2596.

The second segment impacting an RCA, located on national forest service land, was described similarly, but was noted as having existing fill associated with a former roadway. AR 0244, 2596. "Both of the wet segments are non-forested, and are separated from critical habitat in the Salmon River by substantial distance, complex wetlands, and Highway 75. This isolation would preclude any measurable influence to the RCA of the Salmon River." AR 0244, 2596. The third segment intersecting an RCA would pass through the RCA "near the confluence of Redfish Lake Creek and the Salmon River," and would "follow the existing treads of a former roadway and the Rock Shelter

**MEMORANDUM DECISION AND ORDER  – 5**

interpretive trail, and cross Redfish Lake Creek on the existing footbridge." AR 0244,

2596.

In sum, the BA describes the trail as follows:

> The trail would be non-motorized, with lengthy segments
> established on existing treads of former roadways. With only
> a few short exceptions, the proposed trail would also reside
> on dry, gentle, terrain far from habitats utilized by the species
> considered here. The intended practices, gentle terrain, and
> substantial typical separation from habitats would preclude
> any measurable influence to individuals of the species
> consider [sic] here, or their designated critical habitat. Where
> 3 short trail segments would intersect RCAs, either the
> segments are isolated from critical habitat with minimal
> construction activities anticipated, or the crossings already
> exist.

AR 0244, 2596. The BA concludes the Trail will have "no effect" on individual fish

species or their designated critical habitat. AR 2597. The fisheries biologist for the

National Marine Fisheries Service (NMFS) concurred. Mitchell Decl. ¶ 5. (Dkt. 66-8.)

The Administrative Record contains also information regarding wetlands found on

the Property. Prior to the Government's purchase of the Public Trail Easement, a wetland

and floodplain assessment of the Property was prepared. In October of 2003, a

reconnaissance level inventory of wetlands existing on the Property was conducted. A

report dated February 20, 2004, identified the wetlands based on hydrophytic vegetation,

hydric soils, and evidence of wetland hydrology. AR 0591. Wetlands were then mapped.

AR 0591. According to the survey, the predominant classification of wetlands on the

Property is PEMC based upon the U.S. Fish and Wildlife Classification system. Wetland

extent is affected by "irrigation activities that regularly occur on the site….some areas would likely convert to upland if irrigation is discontinued." AR 0591.

In February of 2014, the Forest Service sought scoping comments from the Department of the Army Corps of Engineers regarding the Stanley/Redfish Trail. AR 0251. The Corps responded that the development of recreational trails may require an authorization for the discharge of dredged or fill material into waters of the United States, including wetlands, and informed the Forest Service that the proposed project area for the Stanley/Redfish Trail may require a permit. AR 0251 – 52.

After completing internal and external scoping and reviewing public comments, the Forest Service issued a Decision Memo on June 6, 2017, authorizing construction of the Stanley/Redfish Trail. AR 0296 - 0304. The Decision Memo indicated also that the impacts to wetlands would be consistent with Executive Order 11990.[5] AR 0301.

In or about August of 2017, and in partnership with the Forest Service, the Western Federal Lands Highway Division (FHWA) lead the Clean Water Act permitting effort. Chariarse Decl. ¶¶ 2-3. (Dkt. 66-11.) Jennifer Chariarse, Senior Technical Environmental Specialist for the FHWA, Western Division, was assigned to the trail project. *Id.* ¶ 2. Chariarse attended a scoping trip in September of 2017, completed a wetland and waters delineation, and in January of 2018, prepared a permit application for submittal to the United States Army Corps of Engineers for the CWA Section 404

---

[5] Executive Order 11990 may be found at: https://www.fema.gov/executive-order-11990-protection-wetlands-1977.

permitting process. *Id.* ¶ 4. (Dkt. 66-11). SAW0086.[6] The application requested

concurrence from the Corps that a nationwide permit applied to the Stanley/Redfish Trail

project. SAW0087. The application explained that the Trail "crosses through five small

wetland areas in an area of the trail that is located within the US Forest Service-owned

easement on private land." SAW0091. On February 2, 2018, the Corps verified that

Nationwide Permit 42 applied to the construction of the Trail, and that the activity

complies with all terms and conditions of the permit. SAW0141-0148.

On April 12, 2018, the Forest Service entered an intra-agency agreement with the

FHWA to design the trail. Decl. of Matthew Phillips ("Phillips Decl.") ¶ 5. (Dkt. 17-3.)

In July of 2018, FHWA solicited bids for the project and the project was awarded in

September of 2018, to Hobble Creek Services, LLC. Phillips Decl. ¶ 6. (Dkt. 17-3.)

Construction was to begin in May of 2019.

As a result of this litigation, the Government issued a stop work order on May 3,

2019. Second Decl. of Hurst ¶ 3. (Dkt. 66-1.) Full operations resumed on June 17, 2019.

*Id.* Hobble Creek did not complete the project by the original fixed completion date of

---

[6] The permit application is dated January 9, 2017, and submitted by Scott Smithline, Environmental Manager for the FHWA Western Federal Lands Highway Division. SAW 0086-87.

September 5, 2019,[7] which date was thereafter extended. *Id.* ¶ 4. Hobble Creek resumed construction on or about May 1, 2020, and is expected to complete construction of the Stanley/Redfish Trail by late September or early October of 2020. *Id.* ¶ 5, 7.

## PROCEDURAL BACKGROUND

Plaintiffs filed a complaint on April 9, 2019, seeking declaratory and injunctive relief under the Sawtooth National Recreation Area Act, 16 U.S.C. § 460aa *et. seq.* ("SNRA Act"); the National Forest Management Act, 16 U.S.C. § 1600 *et. seq.* ("NFMA"); the National Environmental Policy Act, 42 U.S.C. § 4331, *et. seq.* ("NEPA"); the Administrative Procedure Act, 5 U.S.C. § 551, et. seq. (the "APA"); and the Declaratory Judgment Act, 28 U.S.C. § 2201.

On May 10, 2019, Plaintiffs filed their first motion for preliminary injunction, claiming they could demonstrate a likelihood of success on the merits of three of their claims.[8] The Court on June 13, 2019, issued an order denying Plaintiffs' motion for preliminary injunction, finding Plaintiffs had not demonstrated a likelihood of success on

---

[7] Defendants indicate also that Hobble Creek halted construction activity in response to a letter from Plaintiffs' counsel dated August 6, 2019, stating Plaintiffs are "continuing forward with its lawsuit against the Forest Service and others and has requested that the Forest Service delay construction until next summer, at least as to construction of trail segments located on [Plaintiffs'] property….Hobble Creek Services may suffer significant financial loss if it has invested in…purchase of materials for portions of the Trail that cross the Ranch's property…." Decl. of Hurst Ex. A. (Dkt. 66-2.)

[8] The motion sought a preliminary injunction based upon the merits of Counts Two, Three, and Four, asserting that the SNRA's actions violated NEPA, NFMA, and were contrary to the scope of the Conservation Easement.

**MEMORANDUM DECISION AND ORDER – 9**

the merits of their NEPA and NFMA claims. (Dkt. 24.)[9] The Court found that Plaintiffs did not "make a sufficient showing of irreparable injury sufficient to grant injunctive relief" and that the public interest and balance of equities did "not tip in favor" of an injunction. (Dkt. 24 at 52, 54.)

Following the Court's ruling, Plaintiffs proceeded to amend the complaint. Plaintiffs' first amended complaint, filed on August 8, 2019, added three claims alleging violation of the Quiet Title Act, one of which was later dismissed for lack of jurisdiction. (Dkt. 29, 32, and Order granting motion to dismiss dated January 13, 2020, Dkt. 44.) In December of 2019, Plaintiffs submitted notices of intent to sue to the Forest Service and various other federal agencies under the Clean Water Act and Endangered Species Act, in anticipation of filing a second amended complaint. SAW0001, SAW0047. (Dkt. 58-2 at 1, 47.) Additional motions were filed related to the proposed second amended complaint. On May 8, 2020, the court permitted Plaintiffs to file the second amended complaint, which adds a claim under the Endangered Species Act, 16 U.S.C. § 1531, *et. seq.* ("ESA") and a claim under the Clean Water Act, 33 U.S.C. § 1251, *et. seq.* ("CWA").

On May 20, 2020, Plaintiffs filed this second motion for preliminary injunction, based entirely upon the new ESA and CWA claims. (Dkt. 62.) On June 10, 2020, Plaintiffs filed a motion for temporary restraining order. (Dkt. 67.) Plaintiffs asserted

---

[9] The Court found also that Plaintiffs failed to state a claim for relief under the APA with respect to their claim that the trail project exceeded the scope of the Conservation Easement, because the Quiet Title Act is the exclusive means by which adverse claimants can challenge the United States' claim to real property.

**MEMORANDUM DECISION AND ORDER – 10**

court intervention was "urgent," because Plaintiffs have "begun moving wildlife nests and conducting vegetation clearing and management activities on Plaintiffs' property and intend to move forward with bulldozing and further construction of the Trail on Plaintiffs' real property immediately." (Dkt. 67.) On June 12, 2020, the Court denied Plaintiffs' motion for temporary restraining order, expedited the deadline for Plaintiffs to file a reply memorandum in support of the motion for preliminary injunction, and scheduled a hearing for June 19, 2020. (Dkt. 70.)[10]

## STANDARD FOR PRELIMINARY INJUNCTION

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council, Inc*., 555 U.S. 7 (2008). It is not an adjudication on the merits, "but a device for preserving the status quo and preventing irreparable loss of rights before a judgment." *Idaho Rivers United v. Probert*, No. 3:16-CV-00102-CWD, 2016 WL 2757690, at *6 (D. Idaho May 12, 2016). While courts are given considerable discretion in deciding whether a preliminary injunction should enter, injunctive relief should not be granted unless the movant, by a clear showing, carries the burden of persuasion. *Idaho Rivers United*, at *6 (citing *Sampson v. Murray*, 415 U.S. 61

---

[10] Before the Court issued this Order, Defendants filed a motion for temporary restraining order and preliminary injunction, and a motion to amend the answer. Defendants allege Plaintiffs and proposed third-party defendants Michael Boren and Obsidian Aircraft, LLC, engaged in conduct constituting trespass and nuisance, endangering construction crew workers and threatening continued construction of the Stanley/Redfish Trail. The Court on June 29, 2020, issued an order denying Defendants' motion for TRO, and expediting proceedings with respect to the Defendants' motion for preliminary injunction and motion to amend answer. (Dkt. 85.)

**MEMORANDUM DECISION AND ORDER – 11**

(1974); *Brotherhood of Locomotive Eng'rs v. Missouri-Kansas-Texas R. Co.*, 363 U.S. 528 (1960); *Stanley v. Univ. of S. California*, 13 F.3d 1313 (9th Cir. 1994)).

A plaintiff seeking preliminary injunctive relief must establish (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary injunctive relief; (3) that the balance of equities is in plaintiff's favor; and (4) that the injunction is in the public interest. *Winter*, 555 U.S. at 7. The plaintiff must show suffering irreparable harm is likely, and not just a possibility. *Id*. In the United States Court of Appeals for the Ninth Circuit, issuance of a preliminary injunction is favored when the merits analysis and hardship balance both tip strongly toward the plaintiff, so long as the plaintiff shows also that there is "a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

## ANALYSIS

### 1. Merits of Plaintiffs' Claim That the Trail Project Violates the Endangered Species Act (Claim Eight)

Claim Eight alleges that construction of the Trail will require activities directly adjacent to designated critical habitat for the Upper Columbia River bull trout, Snake River spring/summer Chinook salmon, and Snake River Basin Steelhead. Plaintiffs allege that these activities include ground disturbance and changes to critical habitat, such as the filling in of hydrologically connected wetlands.

Plaintiffs contend they have raised serious questions as to the merits of their ESA claim. First, Plaintiffs assert Defendants did not complete a biological assessment (BA).

**MEMORANDUM DECISION AND ORDER – 12**

Alternatively, they claim there is no support for the Forest Service's "no effects" determination regarding listed aquatic species, because the assessment was not factually correct in four critical areas: a) it stated the Trail would be "non-motorized;" b) it stated that project activities will occur "far from stream habitats;" c) it stated that the wetlands are "essentially isolated" and only "seasonally wet;" and d) the defined project area upon which the no effect determination was reached was too narrow. Accordingly, Plaintiffs argue the Forest Service's "no effect" determination was flawed, and instead mandated a "may effect" determination, triggering the consultation requirement under Section 7 of the ESA.

### A.  Standard of Review

Plaintiffs' claim under the ESA involves final agency action by the Forest Service and is therefore subject to review under the Administrative Procedure Act. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). Under the APA, an agency action must be upheld on review unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The party challenging an agency's action as arbitrary and capricious bears the burden of proof." *W. Watersheds Project v. Ashe*, 948 F. Supp. 2d 1166, 1174 (D. Idaho 2013) (citing *WildEarth Guardians v. Salazar*, 741 F.Supp.2d 89, 97 (D.D.C. 2010)).

The Court may reverse the agency's decision as arbitrary and capricious "only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter

**MEMORANDUM DECISION AND ORDER – 13**

to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F.3d 1105, 1110 (9th Cir. 2015). Conversely, the agency's decision must be upheld if "there is a rational connection between the facts found and the conclusions made," and the determination was "not so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc) (*overruled in part on other grounds by Winter*, supra). The Court must conduct a "substantial inquiry" and "a thorough, probing, in-depth review." *Siskiyou Reg'l Educ. Project v. U.S. Forest Serv.*, 565 F.3d 545, 554 (9th Cir. 2009).

The standard of review "requires [the Court] to defer to an agency's determination in an area involving a 'high level of technical expertise.'" *Lands Council*, 537 F.3d at 996; *see also Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1185 (9th Cir. 2011) (holding that "Forest Service is entitled to rely on the reasoned opinions of its experts"). Where the agency has relied on "relevant evidence [such that] a reasonable mind might accept as adequate to support a conclusion," its decision is supported by "substantial evidence." *Bear Lake Watch, Inc. v. FERC*, 324 F.3d 1071, 1076 (9th Cir. 2003). Even "[i]f the evidence is susceptible of more than one rational interpretation, [the court] must uphold [the agency's] findings." *Id*. The Court may set aside only those conclusions that do not have a basis in fact, not those with which it disagrees. *Arizona Cattle Growers'*

**MEMORANDUM DECISION AND ORDER – 14**

*Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229, 1236 (9th Cir. 2001).

Under the ESA, the agency must base its actions on evidence supported by "the best scientific and commercial data available." 50 C.F.R. § 402.14(g)(8); 16 U.S.C. § 1536(a)(2). The determination of what constitutes the "best scientific data available" belongs to the agency's "special expertise....When examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential." *Baltimore Gas & Elec. Co.*, 462 U.S. 87, 103 (1983). "Absent superior data[,] occasional imperfections do not violate" the ESA best available standard. *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080–81 (9th Cir. 2006).

Before the Court turns to the merits, however, it must consider whether the extra-record evidence proffered by both parties is admissible.

### B.  Supplementation of the Administrative Record

The APA provides that "the court shall review the whole record or those parts of it cited by a party," and makes no provision for extra-record review. 5 U.S.C. § 706; *see also Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 420 (1971) (stating that "review is to be based on the full administrative record" that was before the agency at the time of its decision), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, (1977). Accordingly, judicial review is limited to the administrative record underlying the challenged decision, and in existence at the time of the decision, not some new record

made initially in the reviewing court. *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005).

While Plaintiffs may submit declarations for the purpose of establishing standing, *see Nw. Envtl. Def. Ctr. v. Bonneville Power Admin*., 117 F.3d 1520, 1527 (9th Cir. 1997), "consideration of extra-record evidence to determine the correctness ... [or] wisdom of the agency's decision is not permitted." *Nw. Envtl. Advocates v. Nat'l Marine Fisheries Serv*., 460 F.3d 1125, 1144 (9th Cir. 2006) (alteration in original) (internal quotation marks and citation omitted); *see also Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985); *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980).

The United States Court of Appeals for the Ninth Circuit allows a reviewing court to consider extra-record materials in an APA case under only four narrow exceptions:

> (1) if necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) when the agency has relied on documents not in the record, or (3) when supplementing the record is necessary to explain technical terms or complex subject matter ... [or (4) ] where plaintiffs make a showing of agency bad faith.

*Sw. Ctr. For Biological Diversity v. U.S. Forest Serv*., 100 F.3d 1443, 1450 (9th Cir. 1996). Plaintiffs bear the burden of demonstrating with particularity that the extra-record evidence they proffer in this case falls within one of the enumerated exceptions. *See Animal Def. Council v. Hodel*, 840 F.2d 1432, 1438 (9th Cir. 1988), *opinion amended by* 867 F.2d 1244 (9th Cir. 1989). The limited exceptions are "narrowly construed and applied." *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005).

**MEMORANDUM DECISION AND ORDER – 16**

Here, Plaintiffs move to admit three declarations of John Stewart to show the Forest Service failed to consider "relevant factors when making its decision and to explain technical and complex subject matter." (Dkt. 73 at 2-4); Pls. Reply at 6. (Dkt. 74 at 6.) Stewart, an expert in hydrology and wetland delineation, among other subjects, opines three points were "lacking in the documents and files submitted for the project." Decl. of Stewart ¶ 5. (Dkt. 62-3.) He claims the Forest Service did not address Chinook or sockeye salmon during the environmental review process; a segment of the Trail is within the 300-foot critical habitat buffer for Chinook and sockeye salmon; and the wetlands identified as affected by the trail project "have an ecological interconnection with the jurisdictional waters of the Salmon River…." *Id.* ¶¶ 5 – 7.

Defendants object to the introduction of Stewart's declaration, and argue if Stewart's declaration is considered, the Court should consider Defendants' responsive declarations from Brenda Mitchell and Jennifer Chariarse. Additionally, Defendants object to the opinions set forth in paragraphs 6, 7, 8, and 9 of Stewart's declaration, pursuant to Fed. R. Evid. 702. Response at 12, n. 6. (Dkt. 66 at 18.)

The Court finds that supplementation of the administrative record with Stewart's declarations is not necessary for judicial review. Stewart's declarations are neither necessary for the Court to determine whether the Forest Service considered all relevant factors and explained its decision, nor does he explain complex subject matter. The administrative record contains sufficient information to explain how the Forest Service used the information before it and why it reached its decision for purposes of this motion.

**MEMORANDUM DECISION AND ORDER  – 17**

*Cook Inletkeeper v. EPA*, 400 Fed. App'x 239, 240–41 (9th Cir. 2010). *See also Native Ecosystems Council v. Weldon*, 232 F. Supp. 3d 1142, 1149 (D. Mont. 2017) (denying extra-record declarations because "[t]hey do not support the proposition that the agency failed to consider relevant factors, but rather that its consideration of those factors was scientifically unsound.").

Plaintiffs do not object to the Court's consideration of the Declarations of Michael Hurst, Brandt Hines, Brenda Mitchell, and Jennifer Chariarse, and "ask the Court to carefully utilize the declarations as benchmarks for what the Defendants should have considered before making their decision to authorize the Trail." Pls.' Reply at 4. (Dkt. 74 at 4.) (Declarations filed at Dkt. 66-1, 66-6, 66-8, 66-11.) The Court declines Plaintiffs' invitation consistent with the above authorities. However, the Court will consider the declaration of Michael Hurst in conjunction with its review of the other *Winter* factors. Further, as the Court explains below, the APA does not apply to its review of the CWA claim, and the Court therefore will consider the Declaration of Jennifer Chariarse and John Stewart's opinions concerning the character of the wetlands on the Property to evaluate Plaintiffs' CWA claim. (Dkt. 62-3).[11]

Plaintiffs do object to the Amended Administrative Record lodged by Defendants at Docket 65. Pls.' Reply at 2-3, n.1. (Dkt. 74.) Defendants supplemented the administrative record in response to the addition of Plaintiffs' claims under the ESA.

---

[11] The Court considers the opinions expressed by Mr. Stewart for the purpose of deciding this motion only, and makes no findings as to their admissibility under Fed. R. Evid. 702.

**MEMORANDUM DECISION AND ORDER – 18**

"Supplementing the administrative record" means "adding to the volume of the administrative record with documents the agency considered...." *Pacific Shores Subdivision, Cal. Water Dist. v. U.S. Army Corps of Engineers*, 448 F. Supp. 2d 1, 5 (D.D.C. 2006). The ESA and CWA claims were asserted for the first time in the Second Amended Complaint, and notice was not given to Defendants of Plaintiffs' intent to amend until December of 2019, well after the first round of litigation concluded related to Plaintiffs' first motion for preliminary injunction. The Court finds Defendants' supplementation justified under these circumstances.

### C.  Analysis

The Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544, evidences a congressional intent to afford endangered species the highest of priorities. *TVA v. Hill*, 437 U.S. 153, 194 (1978). "The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." *Id*. at 184. To accomplish this goal, the ESA sets forth a comprehensive program to limit harm to endangered species within the United States. Section 7 of the ESA affirmatively commands each federal agency to "insure that any action authorized, funded, or carried out" by the agency "is not likely to jeopardize the continued existence of any endangered species...or result in the destruction or adverse modification of habitat of such species which is determined…to be critical." 16 U.S.C. § 1536(a)(2). "Critical habitat" is defined as areas that are "essential to" or "essential for" the conservation of a particular listed species. 16 U.S.C. §§ 1532(5)(A)(i), (ii). A federal action jeopardizes the continued

**MEMORANDUM DECISION AND ORDER  – 19**

existence of a species if it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02 (1992).

Under Section 7, if any listed (or proposed listed) species may be present in the area of the proposed action, the federal agency (the "action agency") must conduct a biological assessment (BA) to determine the likely effect of its proposed action on the species. 16 U.S.C. § 1536(c)(1); *see also* 50 C.F.R. § 402.02. If the action agency concludes that its proposed action may affect listed species or critical habitat, it must initiate formal consultation with the FWS or NMFS. *See* 50 C.F.R. § 402.14. Formal consultation is required when the acting agency or consulting agency determines that the proposed action is *likely* to adversely affect a listed species or critical habitat. 50 C.F.R. §§ 402.13, 402.14. Formal consultation requires the consulting agency, either the FWS or the NMFS, to issue a biological opinion (BiOp) stating whether the proposed action is likely to jeopardize such species or habitat. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14. But, if after preparation of a biological assessment the conclusion is a finding of no significant effect, consultation is not required. 50 C.F.R. § 402.14.

For the reasons that follow, the Court finds Plaintiffs have not demonstrated a likelihood of success on the merits of their ESA claim.

**MEMORANDUM DECISION AND ORDER – 20**

### i.    *Defendants Prepared a Biological Assessment*

The Administrative Record contains evidence the Forest Service prepared a biological assessment in accord with the streamlined consultation procedures for Section 7 of the ESA in effect as of July of 1999. AR 2501 – 2550; 2553 –  2606.[12] Mark Moulton's Key and Checklist for Documenting the Anticipated Effects, and Determination for Federal Action, dated April 14, 2014, and a discussion of the Stanley/Redfish Trail project, are part of a larger "All Aquatics" document constituting the complete biological assessment of the proposed action. AR 2584 – 2597.[13] Moulton's Key and Checklist was adapted from the Service in 1998 and endorsed by the Sawtooth Level 1 project team in March of 1999. AR 2596. The Level 1 Project Team is described in the record as an interagency group of field staff with a variety of expertise and agency responsibility, tasked with the review of project/action design and preliminary effects determinations. AR 2507. Evidence in the record indicates the Level I Project Team met

---

[12] Over the course of several years beginning in 1995, an interagency streamlined consultation procedure for Section 7 of the ESA was developed by the USFS, Bureau of Land Management, NMFS, and the FWS in California, Oregon, Washington, and Idaho. AR 2501. According to the record before the Court, the consultation procedure underwent revisions in 1999. AR 2581.

[13] The biological assessment related to endangered aquatic species inhabiting the Sawtooth National Recreation Area is described as "dynamic." AR 2551. The "All Aquatics" document "contains sufficient information to consider effects from Federal action on the species considered. New proposed actions, or proposed modifications to ongoing actions simply amend [the All Aquatics document] with project descriptions and effects determinations. Other, less frequent, revisions are also completed to other document sections such as baseline and cumulative effects, as necessary." AR 2551, 2581. When new proposed actions are considered, a description of the proposed action, and an effects checklist and matrix, is intended for "insert into, and rel[ies], tier[s], supplement[s], and amend[s], the parent 'All Aquatics document.' Only within the context of the full document does it constitute a complete biological assessment of the action." AR 2582.

**MEMORANDUM DECISION AND ORDER  – 21**

and discussed the Stanley/Redfish trail project on April 15, 2014, and determined that the biological assessment did not need to come back to Level 1, given its conclusion of no significant effect on listed aquatic species. AR 2607 – 2611.

The Court finds Plaintiffs are not likely to succeed on their ESA claim on the grounds that the Forest Service failed to prepare a BA.

### ii.    The Challenge to Defendants' "No Effects" Determination

Plaintiffs alternatively challenge the "no effect" determination, contending they have raised serious questions going to the merits of their ESA claim because the BA was not factually correct in four critical areas.

First, Plaintiffs contend the Key and Checklist incorrectly stated that the Stanley/Redfish Trail will be non-motorized. However, the description of the trail as non-motorized appears consistent with the anticipated use of the Stanley/Redfish Trail. Non-motorized use will occur during spring, summer, and fall when snow is not covering the trail surface. AR 0285, 2595. The information in the record indicates the Forest Service considered motorized and non-motorized use of the route to be separated by seasons, with motorized use by snow machines occurring exclusively during the winter. AR 0285. The only change in use reflected in the record is the addition of non-motorized use of the proposed Stanley/Redfish Trail during the dry months. Plaintiffs' challenge to the BA on this basis does not support their claim.

Second, Plaintiffs challenge the assertion in the BA that the project activities will occur far from stream habitats. Plaintiffs contend that project activities will occur within

**MEMORANDUM DECISION AND ORDER  – 22**

300 feet of the Ordinary High Water Mark of both the Salmon River and Little Redfish Creek, and construction activities planned near the bridge that crosses Little Redfish Creek "will result" in sediment discharges to the creek.

The BA identified the habitats for the listed aquatic species as Redfish Lake, inlet streams, the upper Salmon River, freshwater streams, and tributaries found within the SNRA. AR 2559, 2563-64, 2568, 2571, 2573. The Court's understanding, based upon a review of the administrative record, indicates the Forest Service considered the effects of construction upon the listed habitats. For instance, the Forest Service explained in the BA that, "[a]t the two locations where the trail comes in proximity to designated critical habitat, it would occur on existing treads – i.e. essentially no construction/disturbance would be necessary." AR 2595 – 97. The BA indicated that the trail would "cross Redfish Lake creek on the existing footbridge," resulting in little to no construction disturbance. *Id.* Standard sediment prevention and retention practices would be utilized to control sediment, and activities in wet environments would occur in late summer and fall, when conditions are at their driest. AR 2592. Plaintiffs' arguments are not persuasive in light of the Forest Service's reasoning that construction occurring closest to identified critical habitat (i.e., the Salmon River and Redfish Lake) would be minimal because the trail would utilize existing road treads or existing bridges and sediment control practices would nonetheless be followed, and construction in other areas would occur when conditions are at their driest.

**MEMORANDUM DECISION AND ORDER  – 23**

Third, Plaintiffs challenge the Forest Service's conclusion in the BA that the wetlands affected by the trail route are "essentially isolated" and only "seasonally wet." Plaintiffs claim that "it is likely that due to their positions, the wetlands have an ecological interconnection with the waters of the Salmon River." (AR 2595 – 97.) The BA identified three segments impacting riparian conservation areas, or wetlands.

> One on private land would cross a minor, essentially isolated, seasonally wet area via a short segment of constructed turnpike. The next RCA crossing just south on NFS lands would be similar, except that the short turnpike would only supplement an existing fill associated with a former roadway. Both of the wet segments are non-forested, and are separated from critical habitat in the Salmon River by substantial distance, complex wetlands, and Highway 75. This isolation would preclude any measurable influence to the RCA of the Salmon River….The 3rd segment passes through the RCA near the confluence of Redfish Lake Creek and the Salmon River. However, here the proposed trail would follow existing treads of a former roadway and the Rock Shelter interpretive trail, and cross Redfish Lake Creek on the existing footbridge.
> ****
> Where 3 short trail segments would intersect RCAs, either the segments are isolated from critical habitat with minimal construction activities anticipated, or the crossings already exist. Either way, the influences would be negligible.

AR 2595 – 97.

Even acknowledging Plaintiffs' theory that the wetlands affected by the trail construction have an interconnection with the Salmon River, the Court's understanding from its review of the administrative record is that the Forest Service considered such a possibility. However, the Forest Service concluded that the RCA crossings at the three wetland areas would have a negligible effect due to substantial distance from the Salmon

**MEMORANDUM DECISION AND ORDER – 24**

River, and the twin barriers of Highway 75 and other complex wetlands. Further, the Forest Service described the three areas as "short" segments of trail that would follow existing roadways. Plaintiffs have not shown that the Forest Service offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference of view or the product of agency expertise. *Alliance for the Wild Rockies v. Brazell*, 2013 WL 6200199, *19 (D. Idaho 2013).

Last, the Plaintiffs challenge the Forest Service's delineation of the project area, asserting it is part of a larger project that was not considered. Plaintiffs point to early planning documents demonstrating the Forest Service's intent to expand its trail system, with the goal of developing a trail transportation network between each of the Redfish Lake recreation facilities and the Stanley/Redfish Trail. AR 0160, 2183. Consequently, Plaintiffs argue the Forest Service failed to consider the broader project, which they claim requires preparation of a biological opinion under the ESA.

An action area for purposes of the ESA means "all areas to be affected directly or indirectly by the Federal action." 50 C.F.R. § 402. The Proposed Action defines the area affected by the Trail as beginning at the Alpine Way trailhead in Stanley and ending at the footbridge at the Redfish Lake entrance station. AR 0294, 0296. The Redfish Lake Recreation Complex is a separate area, with campgrounds, a boat ramp, a rustic lodge with cabins, day use facilities, and an existing trail system accommodating up to 2,200 people. AR 1127. Based upon the Court's understanding of the record, there is little support for Plaintiffs' argument that the BA for the Stanley/Redfish Trail should have

**MEMORANDUM DECISION AND ORDER – 25**

considered the addition of new trails at the Redfish Lake complex, or improvement to the existing complex, given its already developed nature. And, to the extent Plaintiffs re-invigorate their argument that the Forest Service has improperly segmented the project, such a claim arises under the National Environmental Policy Act, which is not before the Court on this motion for preliminary injunction. *See, e.g., San Francisco Baykeeper v. U.S. Army Corps of Engineers*, 219 F. Supp. 2d 1001, 1017 (N.D. Cal. 2002) (discussing cumulative impacts analysis in context of NEPA claim).

For these reasons, the Court finds Plaintiffs have not raised serious questions on the merits of their ESA claim disputing the Forest Service's conclusion that construction of the Stanley/Redfish Trail would have "no effect" upon listed aquatic species or their critical habitat as described in the BA.

## 2.  Merits of Plaintiffs' Challenge Under the Clean Water Act (Claim Nine)

Plaintiffs claim construction of the Stanley/Redfish Trail does not satisfy the conditions of Nationwide Permit No. 42. Specifically, Plaintiffs claim the FHWA's pre-construction notification contained inaccuracies, and did not include information necessary for the United States Army Corps of Engineers to determine the applicability of NWP 42. Thus, Plaintiffs claim Defendants never obtained verification under NWP 42, and are in violation of the Clean Water Act because Defendants are dredging and filling wetlands without a Section 404 permit. *See* Second Am. Compl. ¶¶ 174-179, 221 - 224.

### A. Clean Water Act Framework

The Clean Water Act (CWA) was passed in 1972 to restore and maintain the chemical, physical, and biological integrity of the nation's waters. 33 U.S.C. § 1251(a). Section 301 of the Act makes the discharge of any pollutant into "the waters of the United States" unlawful unless authorized in accordance with specified sections of the Act. 33 U.S.C. §§ 1311(a), 1362(7), (12); *Coeur d'Alene Lake v. Kiebert*, 790 F. Supp. 998, 1007 (D. Idaho 1992).

Section 404 of the CWA prohibits the discharge of "dredged or fill material" into navigable waters, including wetlands, without a permit issued by the U.S. Army Corps of Engineers. *See* 33 U.S.C. §§ 1344, 1362(7); 33 C.F.R. §§ 323.2(d), 328.3(a), (b); *Resource Investments, Inc. v. U.S. Army Corps of Engineers*, 151 F.3d 1162, 1166 (9th Cir. 1998). The Corps may issue both individual and general permits. *See* 33 U.S.C. 1344(a), (e). Individual permits are processed on a case-by-case basis, upon completion of a multi-step examination process. *See* 40 C.F.R. § 230.5. General permits, on the other hand, are issued on "a State, regional, or nationwide basis." 33 U.S.C. § 1344(e). A general permit may be issued "if the Secretary determines that the activities in [any category of activities involving discharges of dredged or fill material] are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e) (1). A nationwide permit (NWP) undergoes the NEPA process when it is promulgated. *Snoqualmie Valley Pres. All. v. U.S. Army Corps of Engineers*, 683

F.3d 1155, 1160 (9th Cir. 2012). The Corps's NWP program is "designed to regulate with little, if any, delay or paperwork certain activities having minimal impacts." 33 C.F.R. § 330.l(b).

NWPs provide standing authorization for all activities that fit the description in the permit. *Snoqualmie Valley Pres. All.*, 683 F.3d at 1158 (citing 33 U.S.C. § 1344(e)). If an NWP applies, "the applicant needs merely to comply with its terms, and no further action by the [Corps] is necessary." 40 C.F.R. § 230.5(b). However, advance notification, known as pre-construction notification, is required in some cases. 33 C.F.R. § 330.1(e). If pre-construction notification is required, the Corps will verify the applicability of the NWP to the proposed activity. 33 C.F.R. § 330.1(e)(2).

Challenges to an agency's determination to issue an individual section 404 permit under the CWA, or to the Corps's promulgation of a nationwide permit, falls under the APA. *See, e.g., Snoqualmie Valley Pres. All. v. U.S. Army Corps of Engineers,* 683 F.3d 1155, 1163 (9th Cir. 2012) (analyzing the Corps's decision to issue a 404 permit under the APA); *N. Plains Res. Council v. U.S. Army Corps of Engineers*, No. CV-19-44-GF-BMM, 2020 WL 1875455, at *2 (D. Mont. Apr. 15, 2020) (analyzing Corps's decision to re-issue a nationwide permit under the APA).

Here, Plaintiffs have made clear that they "are not challenging the Corps's issuance of NWP 42,…nor are they challenging the Corps's issuance of the verification under NWP 42…." Reply at 11. (Dkt. 74.) Notably, Plaintiffs have not named the Corps as a defendant. Plaintiffs have not pointed to any agency action enumerated in 5 U.S.C. §

**MEMORANDUM DECISION AND ORDER – 28**

551(13) (defining "agency action" to include the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."). Accordingly, the APA does not apply here, because Plaintiffs are not challenging a final agency action. Rather, Plaintiffs challenge Defendants' representations in the underlying application submitted to the Corps for verification under NWP 42.

Based upon Plaintiffs' explanation of the basis for their CWA claim, it appears to have little merit at this stage in the proceedings. A citizen suit may be brought only for violation of a permit limitation "which is in effect" under the Act. 33 U.S.C. § 1365(f). *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc*., 484 U.S. 49, 59, 108 S. Ct. 376, 382, 98 L. Ed. 2d 306 (1987). A citizen may commence an action on his own behalf against any person alleged to be in violation of any "effluent standard or limitation." 33 U.S.C. § 1365(a)(1). For the purpose of citizen suits, "effluent standard or limitation" includes "unlawful acts under 33 U.S.C. § 1311(a)," which states that a discharge of pollutants not in compliance with the CWA is unlawful. *Idaho Conservation League v. Atlanta Gold Corp*., 844 F. Supp. 2d 1116, 1127 (D. Idaho 2012). One of the elements of a prima facie case for a violation of the CWA requires a plaintiff to show that pollutants were discharged without a permit or other statutory authorization for such discharge, or in violation of a permit issued under the CWA. *See Stillwater of Crown Point Homeowner's Ass'n, Inc. v. Stiglich*, 999 F. Supp. 2d 1111, 1125 (N.D. Ind. 2014)

But, Plaintiffs' assertion that they do not challenge the Corps' issuance of the verification under NWP 42 necessarily requires a finding that Defendants complied with

**MEMORANDUM DECISION AND ORDER – 29**

33 U.S.C. § 1311(a) — Defendants submitted a pre-construction application and received verification by the Corps that construction of the Stanley/Redfish Trail complies with NWP 42. In other words, Plaintiffs have not sufficiently alleged a violation of, let alone an ongoing violation of, a particular effluent standard or limitation. Plaintiffs are therefore not likely to prevail on their claim under the CWA.

Even construing Plaintiffs' claim broadly as a claim to enforce particular effluent standards or limitations set forth in NWP 42,[14] the Court finds Plaintiffs are not likely to prevail on the record currently before the Court. *See* 33 U.S.C. § 1365(a) (CWA authorizes the district courts to enforce such effluent standards or limitations set forth in a permit). In making its determination, the Court considered aspects of Stewart's declaration, (Dkt. 62-3), cited in Plaintiffs' memorandum; SAW0019 – SAW0325; and the declaration of Jennifer Chariarse.

### B.  The Terms of NWP 42

Effective March 19, 2017, NWP 42 applies to "[d]ischarges of dredged or fill material into non-tidal waters of the United States for the construction or expansion of recreational facilities. Examples of recreational facilities that may be authorized…include…hiking trails, bike paths,… [and] horse paths…." 82 Fed. Reg. 1860; (Dkt. 63-13).[15] Prior to commencing activity that may be covered by NWP 42, the

---

[14] Plaintiffs allege Defendants did not accurately represent the facts in its pre-construction notice supporting their request for verification by the Corps that an NWP applied. It is not clear whether Plaintiffs state a cognizable claim, and Plaintiffs did not provide authority. However, the question is not squarely before the Court on Plaintiffs' motion for preliminary injunction.

[15] *See also* https://www.swf.usace.army.mil/Portals/47/docs/regulatory/Permitting/Nationwide/NWP42LA.pdf.

**MEMORANDUM DECISION AND ORDER  – 30**

permittee must submit a pre-construction notification to the district engineer. An

applicant may not proceed with construction until 45 days have passed, or the Corps

verifies the application of NWP 42. NWP 42 ¶ 32.

The pre-construction notification must include the following:

> A description of the proposed activity; the activity's purpose;
> direct and indirect adverse environmental effects the activity
> would cause, including the anticipated amount of loss of
> wetlands, other special aquatic sites, and other waters
> expected to result from the NWP activity, in acres, linear feet,
> or other appropriate unit of measure; a description of any
> proposed mitigation measures intended to reduce the adverse
> environmental effects caused by the proposed activity… the
> PCN must include the quantity of anticipated losses of
> wetlands,…[and] a delineation of wetlands…on the project
> site.

NWP 42 ¶ 32(b)(4), (5).

NWP 42 specifies that discharge:

> must not cause the loss of greater than 1/2-acre of non-tidal
> waters of the United States. The discharge must not cause the
> loss of more than 300 linear feet of stream bed, unless for
> intermittent and ephemeral stream beds the district engineer
> waives the 300 linear foot limit by making a written
> determination concluding that the discharge will result in no
> more than minimal adverse environmental effects. The loss of
> stream bed plus any other losses of jurisdictional wetlands
> and waters caused by the NWP activity cannot exceed 1/2-
> acre.

Second, NWP 42 specifies that:

> [n]o activity is authorized under any NWP which is likely to
> directly or indirectly jeopardize the continued existence of a
> threatened or endangered species…No activity is authorized
> under any NWP which "may affect" a listed species or critical

**MEMORANDUM DECISION AND ORDER – 31**

habitat, unless ESA section 7 consultation addressing the
effects of the proposed activity has been completed.

And third, the regulations state that "NWPs do not authorize any injury to the
property or rights of others." 33 C.F.R. § 330.4(b)(4).

### C. Analysis

Plaintiffs claim Defendants' preconstruction notification under NWP 42 was
inaccurate for four reasons: (1) the nature of the wetlands was not described accurately,
in that they are in close proximity to, and adjacent to, the Salmon river with a hydrologic
connection via shallow subsurface flows; (2) information about impacts to endangered
aquatic species and critical habitat was not disclosed; (3) Defendants did not indicate
construction of the trail would be constructed on an easement crossing Plaintiffs'
property; and (4) construction of the Stanley/Redfish Trail will both injure Plaintiffs'
property and their substantive right to challenge the Corps' preliminary jurisdictional
determination (PJD) and receive an approved jurisdictional determination (AJD)
regarding the presence of "waters of the United States" on the Property. Put simply,
Plaintiffs allege that, had Defendants told the truth, the Corps would not have issued a
verification under NWP 42 and would have required an individual 404 permit. The Court
concludes Plaintiffs are not likely to succeed, for the reasons discussed below.

First, the nature of the wetlands and their alleged hydrologic connection to the
Salmon River are irrelevant to verification under NWP 42. Regardless of the type,
quality, or connectivity of a wetland, NWP 42 authorizes "discharges of dredged or fill
material into non-tidal waters of the United States" provided the discharge does "not

**MEMORANDUM DECISION AND ORDER – 32**

cause the loss of greater than ½-acre of non-tidal waters of the United States" or the loss of "more than 300 linear feet of stream bed."

Defendants' representations in the permit application and the Declaration of Chariarse indicate the impacts to wetlands are below NWP 42's thresholds. Decl. of Chariarse ¶ 8. (Dkt. 66-11 at 4.) *See Snoqualmie Valley Pres. All.*, 683 F.3d at 1163 ("Nationwide permits... are designed to regulate with little, if any, delay or paperwork certain activities having minimal impacts[,]…such as those involving the discharge of less than a half an acre of fill. Requiring an elaborate analysis of the applicable regulations and the facts would defeat this purpose."). Nothing in NWP 42 requires a description of the nature or type of wetland, nor have Plaintiffs identified such a requirement.

Next, Plaintiffs allege Defendants did not analyze potential effects to ESA listed species. NWP 42 requires federal agencies to follow their own procedures for complying with the requirements of the ESA and to submit documentation to demonstrate compliance. NWP 42 ¶ 18(a), (b). NWP 42 does not impose an obligation upon the Corps to review the assumptions made by the action agency with respect to its findings under the ESA. Instead, the Corps is supposed to verify procedural compliance. *See* SAW0142 – 43. The record before the Court indicates Defendants provided documentation of compliance. Plaintiffs' restatement of their claim under the ESA, which the Court determined was not likely to succeed on the merits, is unavailing here.

**MEMORANDUM DECISION AND ORDER – 33**

Third, Plaintiffs claim the pre-construction notification did not disclose the nature of Defendants' rights in the Property, because the notice did not disclose that the Stanley/Redfish Trail would be partially constructed on an easement owned by the United States. The Court's review of the permit application indicates otherwise. *See* SAW0086 (FHWA January 9, 2017 letter to the Corps indicated the trail "will be built on United States Forest Service (USFS) owned land, and within a 30 foot wide easement that the USFS owns on private land."); SAW0090 ("The majority of the trail alignment is located in upland areas, however the trail crosses through five small wetland areas in an area of the trail that is located within the U.S. Forest Service-owned easement on private land."); SAW0134 ("Approximately 1.5 miles of the trail will be constructed on a Forest Service trail easement."); SAW0115 ("The project will construct an approximately 4.4 mile trail (includes approximately 1.5 miles on a Forest Service trail easement)."). The single statement referenced by Plaintiffs to support their argument refers to the need to acquire a right of way or an easement. SAW0138. Defendants acquired the Public Trail Easement in 2005.

Last, Plaintiffs argue their property rights will be impaired, because commencement of construction will injure Plaintiffs' "substantive right to challenge the PJD and receive/obtain an AJD for activities affecting the Property." Because it can be difficult to determine whether a particular wetland constitutes "waters of the United States," the Corps allows property owners to obtain a standalone "jurisdictional determination" (JD) whether particular property contains "waters of the United States."

**MEMORANDUM DECISION AND ORDER – 34**

33 C.F.R. § 331.2. A JD may be either "preliminary," advising a property owner that such waters "may" be present, or "approved," definitively "stating the presence or absence" of such waters. *Id*. Here, the Corps issued a PJD that there "may be" waters of the United States in the area of construction. SAW0152. PJDs are advisory and may not be appealed. 33 C.F.R. § 331.2. Plaintiffs do not explain how they may challenge the PJD, which is advisory, or how their ability to obtain an AJD is threatened.[16]

Further, the PJD's finding that the Property "may contain" waters of the United States obligated Defendants to comply with the CWA, and to obtain either an individual permit or verification under a general permit. The record before the Court indicates the Corps verified compliance with NWP 42.

Plaintiffs' claim attempts to circumvent the nationwide permit system by attacking the veracity of the statements Defendants made in the pre-construction notification. The Court has not found, and Plaintiffs have not cited to, authority that such a claim is cognizable under the CWA. The Corps's role under the nationwide permit system is limited to determining whether the project in question does or does not satisfy the terms of the general permit, and if not, what steps the party seeking verification must take to bring their project within the ambit of that authorization. 33 C.F.R. § 330.1(e)(3). In other words, under the nationwide permit system, the Corps has already done an environmental

---

[16] If an AJD later results in a finding that the Property does not contain waters of the United States, the CWA would not apply and Plaintiffs' cause of action under the CWA would have no merit.

review on a general categorical basis and has given its imprimatur to discharges affecting waters of the United States caused by specific activities. *Id.*

The Court finds that Plaintiffs have not demonstrated a likelihood of success on the merits of their claim under the CWA that the Stanley/Redfish Trail project does not qualify for coverage under NWP 42.

### 3.    Remaining Preliminary Injunction Factors

To warrant a preliminary injunction, Plaintiffs must demonstrate that they meet all four of the *Winter* factors. *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 944 (9th Cir. 2013); *DISH Network Corp. v. F.C.C.*, 653 F.3d 771, 776 (9th Cir. 2011); *Friends of Clearwater v. Probert*, No. 3:16-CV-00485-REB, 2017 WL 2367048, at *9 (D. Idaho May 31, 2017). The Court discussed the remaining three *Winter* factors in its prior Order denying Plaintiffs' first motion for preliminary injunction for the sake of completeness, although it need not have done so. (Dkt. 24.) In support of this motion, Plaintiffs raise similar arguments, and the Court's analysis of the alleged irreparable harm, the public interest, and the balance of the equities would not be

**MEMORANDUM DECISION AND ORDER – 36**

substantially different.[17] Accordingly, the Court declines to address the remaining *Winter*

factors, finding that Plaintiffs' motion for preliminary injunction falls short of a

substantial case for relief on the merits. The Court therefore concludes there is no basis to

issue a preliminary injunction.

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

Plaintiffs' Motion for Preliminary Injunction (Dkt. 62) is **DENIED**.

DATED: June 30, 2020

Honorable Candy W. Dale
United States Magistrate Judge

---

[17] Under *Cottrell*, a moving party raising a serious question going to the merits of the claim may still prevail if it can show "a balance of hardships that tips sharply" in its favor. *Cottrell*, 632 F.3d at 1135. Even if Plaintiffs could present the necessary "serious questions," the balance of hardships does not tip sharply in their favor. *Friends of Clearwater v. Probert*, No. 3:16-CV-00485-REB, 2017 WL 2367048, at *9 (D. Idaho May 31, 2017). Here, Plaintiffs have not shown that irreparable harm to any listed aquatic species will result based upon the record before the Court. *See Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015). Plaintiffs have alleged only that a change to the way the wetlands function "may" change the way wildlife in general utilize the area, and "could" affect the Salmon River, and described generalized harm to themselves. Pls.' Mem. at 18. (Dkt. 62-1 at 24.) But this falls far short of a showing that the listed aquatic species inhabiting the Salmon River, Redfish Lake, and its tributaries are *likely* to suffer irreparable harm as a result of construction of the Stanley/Redfish Trail and the discharge of fill *under* the threshold limits of NWP 42. Moreover, the public and community support in favor of the trail as proposed, including the support of environmental groups that participated in the scoping process, is high, as is the loss of government resources should construction be delayed further.

**MEMORANDUM DECISION AND ORDER – 37**