UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SAWTOOTH MOUNTAIN RANCH LLC, LYNN ARNONE, and DAVID BOREN,<br><br>　　　　　　Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA; UNITED STATES DEPARTMENT OF AGRICULTURE; THOMAS J. VILSACK,[1] Secretary of Agriculture; UNITED STATES FOREST SERVICE; SAWTOOTH NATIONAL FOREST; JIM DEMAAGD, Forest Supervisor; SAWTOOTH NATIONAL RECREATION AREA; KIRK FLANNIGAN, Area Ranger; UNITED STATES DEPARTMENT OF TRANSPORTATION, FEDERAL HIGHWAY ADMINISTRATION,<br><br>　　　　　　Defendants. | Case No. 1:19-cv-00118-CWD<br><br>**MEMORANDUM DECISION AND ORDER**<br><br>**RE: Claims Three through Nine[2]** |

---

[1] Sonny Perdue is no longer Secretary of Agriculture. Because Mr. Perdue was sued in his official capacity, his successor, Thomas J. Vilsack, is substituted as a defendant pursuant to Fed. R. Civ. P. 25(d).

[2] Claims One and Two, which Plaintiffs brought pursuant to the Quiet Title Act, are distinct from their environmental claims. Accordingly, the Court has issued a separate memorandum decision and order addressing Claims One and Two under the QTA. (Dkt. 50.)

**MEMORANDUM DECISION AND ORDER - 1**

## INTRODUCTION

Sawtooth Mountain Ranch, LLC, David Boren, and Lynn Arnone challenge the decisions of the United States Forest Service and the United States Department of Transportation, Federal Highway Administration, to construct a non-motorized public trail connecting the town of Stanley, Idaho with the Redfish Lake entrance station. With a vista of the Sawtooth mountains, the 4.4 mile trail will traverse Plaintiffs' property along a 1.5 mile stretch within the boundaries of an easement the Government acquired on May 10, 2005, pursuant to a Conservation Easement Deed.[3] When finished, the trail will permit bicycle, horseback, and foot travel during the spring, summer and fall, and snowmobile and snow grooming equipment use during the winter. Construction of the Stanley Redfish Trail[4] began in or about June of 2019 and is not yet complete. Defs.' Opening Brief at 1. (Dkt. 115.)

Plaintiffs claim construction of the Trail will result in irreparable harm to the environment and will adversely impact their ranch operations as well as their personal use and enjoyment of the property. Second Am. Comp. ¶ 112. (Dkt. 50.) Plaintiffs allege violations of the Endangered Species Act, 16 U.S.C. § 1531 *et. seq.* ("ESA"); the Clean Water Act, 33 U.S.C. § 1251 *et. seq.* ("CWA"); the National Forest Management Act, 16

---

[3] Plaintiffs challenged also the scope of the easement granted to the Government by Plaintiffs' predecessors in interest, the Pivas, asserting two claims under the Quiet Title Act. Plaintiffs insisted the Conservation Easement Deed, which contains a provision granting the Government a 30 foot wide public trail easement, did not allow for the construction of what they characterize as a "commuter trail" through their property. The Court issued a separate order denying Plaintiffs' motion for summary judgment and granting the Defendants' motion on Claims One and Two, finding the Quiet Title Act's twelve-year statute of limitations bars those two claims. (Dkt. 132.)
[4] In this decision, the Court will refer to the entire project as the Trail Project, while the trail itself will be referred to as the Trail, or the Stanley Redfish Trail.

U.S.C. § 1600 *et. seq.* ("NFMA"); the Sawtooth National Recreation Area Act, 16 U.S.C. § 460aa *et. seq.* ("SNRA"); and the National Environmental Policy Act, 42 U.S.C. § 4321 *et. seq.* ("NEPA").

Pending before the Court are Plaintiffs' Motion for Summary Judgment and Defendants' Cross Motion for Summary Judgment. (Dkt. 114, 116.)[5] Because review of agency actions is limited to the administrative record without triable facts, summary judgment may be granted to either party based on a review of the record. Having carefully reviewed the extensive administrative records lodged in this matter, and after considering the briefing and oral arguments of the parties, the Court enters the following order denying Plaintiffs' motion and granting Defendants' motion on Claims Three through Nine of the Second Amended Complaint, for the reasons discussed below.

In light of the Court's companion memorandum decision and order dismissing Claims One and Two under the Quiet Title Act as time-barred, judgment will be entered for Defendants on all claims in Plaintiffs' Second Amended Complaint. (Dkt. 50.)

---

[5] Plaintiffs filed also a motion under Rule 56(d). (Dkt. 118.) That motion, however, related only to Plaintiffs' Quiet Title Act claims, and is addressed in the Court's Memorandum Decision and Order on Claims One and Two. (Dkt. 132.)

**MEMORANDUM DECISION AND ORDER - 3**

## BACKGROUND

**1.    Factual Background**[6]

Plaintiffs own or have ownership-related interests in real property in Custer County, Idaho, adjacent to the southern end of the town of Stanley, and westward of State Highway 75, in a contiguous parcel including all or part of Sections 4, 5, 8, 9, 10, 15, 16 and 17 of T.10 N., R. 13 E., Boise Meridian ("Property"). The Property is located within the Sawtooth National Recreation Area (SNRA), and consists of approximately 1,781.07 acres. Decl. of Boren ¶ 3. (Dkt. 11-2.)

The SNRA is located in south-central Idaho, covering more than 756,000 acres. (AR 1127.) The SNRA is a Congressionally-designated area, created in 1972 "to assure the preservation and protection of the natural, scenic, historic, pastoral, and fish and wildlife values and to provide for the enhancement of the recreational values associated therewith …." 16 U.S.C. § 460aa. Redfish Lake and Little Redfish Lake are located within the SNRA six miles south of the town of Stanley. (AR 1127.) The Redfish Lake Complex "is the single most popular destination in the SNRA. Its many facilities have the

---

[6] Unless otherwise indicated, the facts are taken from the administrative records submitted by the Forest Service and the Federal Highway Administration. Citations to the Forest Service's record will be noted as AR, while citations to the Federal Highway Administration's record will be noted as FHWA AR. The parties submitted statements of undisputed facts pursuant to Fed. R. Civ. P. 56, and responses thereto. (Dkt. 114-4, 115-1, 116-2, 117-3.) However, the Court "is not required to resolve any facts in a review of an administrative proceeding." *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985). Rather, the Court's purpose "is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Id.* To the extent the parties dispute each other's characterization of the facts contained within the administrative records, the Court has considered these disputes in the context of the parties' arguments regarding Defendants' compliance with the ESA, CWA, NFMA, SNRA, and NEPA.

capability to host around 2,200 visitors during peak times in the summer months," and tourism in the area "is most active during the two month peak summer season in July and August." (AR 1048.) State Highway 75 connects Redfish Lake to Stanley, with high speed traffic and heavy summer traffic volumes. (AR 1128.) There currently is no alternative transportation route connecting Stanley and Redfish Lake during the summer. (AR 1128.)

In the early to mid-1990's, SNRA staff began discussing the idea of constructing a trail connecting Stanley and Redfish Lake to provide an alternate means of travel between the two areas. (AR 1126.) The Forest Service envisioned a trail that would allow non-motorized travel, and serve pedestrians, bicyclists, and equestrians during spring, summer and fall. (AR 0938.) To realize such a possibility, the Forest Service began investigating acquiring an easement for the Trail through the Property. (*See*, e.g., AR 0653 – 0665.)

On May 10, 2005, the United States, by and through the Secretary of Agriculture, and the Pivas,[7] Plaintiffs' predecessors in interest, executed a Conservation Easement Deed encumbering the Property. The Deed was recorded in the records of Custer County on May 20, 2005, as record number 321391. (AR 0824.) Plaintiffs acquired the Property[8] in the Fall of 2016, and were aware of the May 10, 2005 Conservation Easement Deed

---

[7] The Piva family, and various family trusts and partnerships, previously owned the Property. (AR 0824.)

[8] Sawtooth Mountain Ranch, LLC, holds title to the Property, while Mr. Boren is the organizer and sole member of Sawtooth Mountain Ranch, LLC. He is married to Lynn Arnone. Second Am. Compl. ¶¶ 5 – 7. (Dkt. 50.)

**MEMORANDUM DECISION AND ORDER  - 5**

when they purchased the Property. Second Am. Compl. ¶ 79. (Dkt. 50; AR 0001.) This lawsuit was filed in 2019.

Per Section K(1) of the Conservation Easement Deed, the Grantors granted to the United States "the right to permit public use of…A strip of land to be utilized as a trail" within a designated thirty foot wide Easement area, "as shown on Exhibit D" to the Deed.[9] (AR 0833.) The easement allowed for the following uses "on the trail: snowmobile, snow grooming equipment, bicycle, horse, and foot travel." (AR 0833.)



**View from the proposed trail along the trail easement section**

(Proposed Project Briefing Paper, Matt Phillips, AR 0903.)

---

[9] Section K(1) of the Conservation Easement Deed is referred to as the Trail Easement.

**MEMORANDUM DECISION AND ORDER  - 6**



(Ex. D, 2005 Conservation Easement Deed, AR 0850.)

In 2012, the Forest Service initiated internal scoping to review the environmental impacts of the potential trail connecting Stanley and Redfish Lake, and in early 2014, began external scoping to solicit feedback on the proposed project. (*see*, e.g., AR 1126, AR 0921.) The Forest Service published the proposed Trail Project on July 1, 2014, in the Sawtooth National Forest's Schedule of Proposed Action. (AR 2648 – 2655.)

As part of the scoping process, the Forest Service completed several evaluations of resources that could be affected by the Trail Project. On April 23, 2013, Soils Scientist Terry Hardy reviewed Sawtooth Forest Plan Standards, and concluded the Trail Project would result in "no issues" provided the trail is designed and constructed with rolling dips and drainage structures to ensure sustainability of the facility and minimize erosion of the trail head. (AR 0155.) Forester Jim Rineholt was consulted on December 6, 2013, to address concerns regarding trees that might be felled during construction. (AR 0170 – 0171.) Deb Taylor, North Zone Botanist for the Sawtooth National Forest, prepared a report dated March 10, 2014, evaluating the potential effects of the proposed Trail Project upon listed plant species, sensitive and forest watch plant species, native plant communities, and pollinators. (AR 0178 – 0235.)

On April 14, 2014, Hydrologist Mark Moulton completed an evaluation of the anticipated effects upon listed aquatic species and their habitat within the SNRA watershed. (AR 0238 – 0245.) He considered the potential effects of the Trail Project upon habitat, channel condition and dynamics, flow/hydrology, and watershed conditions. Moulton concluded the Trail Project would have "no effect" upon listed fish species or their designated critical habitat. (AR 0245.) Moulton's report, which consists

of Appendix A and a Key and Checklist, is intended to supplement a larger, All Aquatics

document and, when considered together, constituted a complete biological assessment of

the action. (AR 0238, 2551 – 2606.) The record contains also a Wetland and Floodplain

Assessment dated February 20, 2004, which preceded the Government's purchase of the

2005 Conservation Easement. (AR 0591 – 0593.)

Robin Garwood, Wildlife Biologist, completed an assessment on April 15, 2014,

of the effects of the Trail Project upon terrestrial sensitive wildlife species. (AR 0246 –

0250.) She concluded the project would not pose an unacceptable risk to terrestrial

sensitive wildlife species such as sage grouse and other species.

On March 1, 2017, the Forest Service completed a Forest Plan Consistency

Checklist. (AR 0258 – 0272.) In this checklist, the Forest Service considered multiple

Forest Plan Standards applicable to botanical resources; wildlife resources; soil, water,

riparian and aquatic resources; hydrology and watershed processes; aquatic habitat;

vegetation; botanical resources; facilities and roads; big game; and travel management,

among other resources. And, on March 4, 2017, the Forest Service completed its

evaluation pursuant to 36 C.F.R. § 212.55(b), which requires consideration of the Trail

Project's effects upon forest resources, wildlife habitats, and conflicts between motor

vehicle uses and recreational uses. (AR 0282 – 0287.)[10]

On June 6, 2017, SNRA Ranger Kirk Flannigan approved a Decision Memo on

behalf of the Forest Service authorizing construction of the Trail without further

---

[10] Other resource evaluations are contained in the Forest Service's administrative record. The
ones highlighted above are most pertinent to the Court's analysis.

environmental analyses pursuant to a Categorical Exclusion ("CE"). (AR 0294 - 0304.) The stated purpose of the Trail Project is to provide "a multi-use (pedestrian, bike and equestrian), fully-accessible, non-motorized trail" with a natural surface which will be adopted into the SNRA trail system. (AR 0294.) The applicable CE pertains to the "construction and reconstruction of trails." 36 C.F.R. § 220.6(e)(1). (AR 0300.)

The Decision Memo references the resource evaluations discussed above, as well as several others. (AR 0294 – 0304.) Based upon the proposed action and the project record, the Decision Memo contains an analysis of the Trail Project's relationship to extraordinary circumstances. The Forest Service concluded that, "while there are resource conditions present, the record shows the effects from the proposed action do not warrant further analysis." (AR 0300.) In arriving at this conclusion, the Forest Service considered the Trail Project's effects upon federally listed threatened or endangered species or designated critical habitat; floodplains, wetlands, and municipal watersheds; and congressionally designated areas. (AR 0300 – 0302.) Further, the Forest Service explained why the decision was consistent with all applicable laws and regulations, including the National Forest Management Act and the 2012 Sawtooth National Forest Land Management Plan (Forest Plan). (AR 0303.)

On April 12, 2018, the Forest Service entered into an intra-agency agreement with the Western Federal Lands Highway Division of the United States Department of Transportation to design the trail. (FHWA AR 087 – 110.) The Federal Highway Administration applied its own CE, applicable to "construction of bicycle and pedestrian lanes, paths, and facilities." 23 C.F.R. § 117(c). (FHWA AR 128 – 132.) During its

environmental review process, the Federal Highway Administration reviewed the Trail Project's compliance with Section 404 of the Clean Water Act, finding that a nationwide permit ("NWP") applied. (FHWA AR 129.)  In reliance upon the Forest Service's 2017 Decision Memo and the specialists' reports, the Federal Highway Administration issued a Decision on December 20, 2017, authorizing construction of the Trail. (FHWA AR 128 – 132.)

Construction of the Stanley Redfish Trail began on or about June 17, 2019. A second project was proposed to develop a two mile, fully accessible, multi-purpose, non-motorized public trail from the Redfish Lake Entrance Station to Redfish Lake, to "seamlessly connect Stanley and Redfish Lake." (AR 2664.) The Forest Service published the notice of proposed action for Phase 2 of the Redfish to Stanley Trail on July 1, 2015. (AR 2656 – 2665.)

## 2.    Procedural Background

Plaintiffs' April 9, 2019, Complaint initially sought declaratory and injunctive relief against the Forest Service and its personnel, alleging violations of the SNRA, NEPA, and NFMA. (Dkt. 1.) On May 10, 2019, Plaintiffs filed a motion for preliminary injunction. Plaintiffs argued the Forest Service's actions were contrary to the terms of the 2005 Conservation Easement Deed; extraordinary circumstances existed precluding approval of the Trail Project under a categorical exclusion, in violation of NEPA; and, the Trail Project was inconsistent with the Sawtooth Forest Plan, as it disregarded development standards requiring mitigation to riparian conservation areas in violation of NFMA.

MEMORANDUM DECISION AND ORDER  - 11

Following extensive briefing and oral argument, including briefing submitted by the Idaho Conservation League as amicus curiae in favor of the Trail, (Dkt. 18), the Court denied Plaintiffs' motion on June 13, 2019. The Court found Plaintiffs had neither demonstrated a likelihood of success on the merits, nor demonstrated a likelihood of irreparable harm or that the balance of hardships tipped in their favor. (Dkt. 24.)

On August 8, 2019, Plaintiffs filed an amended complaint against the Forest Service Defendants and named the Federal Highway Administration and its personnel as defendants (Dkt. 29, 30.) The Government filed a motion to dismiss for lack of subject matter jurisdiction related to Claims One, Two, and Three of Plaintiffs' Amended Complaint. The Court granted Defendants' motion to dismiss. (Dkt. 44.)[11] Thereafter, Plaintiffs filed the Second Amended Complaint which, after further briefing, was deemed filed on May 8, 2020. (Dkt. 50, 59.) In addition to their claims under the SNRA, NEPA, and NFMA, Plaintiffs added claims under the ESA and CWA.

On May 20, 2020, Plaintiffs filed a second motion for preliminary injunction limited to their newly asserted ESA and CWA claims. By this time, construction of the Trail had commenced. Plaintiffs insisted Defendants failed to prepare a biological assessment; challenged the Forest Service's "no effects" determination for listed aquatic species; disputed the Forest Service's conclusions regarding effects of trail construction on existing wetlands; and claimed Defendants lied to the United States Army Corps of

---

[11] The motion was limited in scope to dismissal of Claim One, brought pursuant to the Quiet Title Act, and dismissal of Defendants Federal Highway Administration and Dean Umathum, who were named as Defendants in Claims One, Two, and Three.

**MEMORANDUM DECISION AND ORDER - 12**

Engineers when Defendants sought verification that the Trail Project fell within the parameters of NWP 42.

Plaintiffs also filed a motion for a temporary restraining order on June 10, 2020, seeking a court order prohibiting Defendants from continuing with construction activities on the grounds that "immediate and irreparable injury, loss, or damage will result to the Plaintiffs before Defendants can be heard in opposition" on their motion for preliminary injunction. (Dkt. 67.) On June 12, 2020, the Court denied Plaintiffs' motion for temporary restraining order, on the grounds Plaintiffs had not demonstrated immediate threatened injury if trail construction proceeded as scheduled. (Dkt. 70.) The Court conducted a hearing on Plaintiffs' second motion for preliminary injunction on June 19, 2020. (Dkt. 76.)

On June 24, 2020, Defendants filed a motion for temporary restraining order and preliminary injunction against Plaintiffs and third parties Michael Boren and Obsidian Aircraft LLC. (Dkt. 78.) Defendants alleged its contractor, Hobble Creek Services, received a letter dated August 6, 2019, from Defendants' counsel threatening it "may suffer significant financial loss" should it proceed with constructing the Trail within the Easement area on Plaintiffs' Property. (Dkt. 66-2.) Defendants also alleged that, on June 20, 2020, while Hobble Creek Services' work crew was working within the Easement area on Plaintiffs' Property, a helicopter owned by Michael Boren, Plaintiff David Boren's brother, "harassed the Hobble Creek Services' work crew by engaging in three unsafe and dangerous low-level flights or passes in close proximity" to the work crew and its construction equipment. (Dkt. 78-1.) Video of the helicopter incident was lodged

MEMORANDUM DECISION AND ORDER - 13

with the Court. (Dkt. 80.) The Court denied Defendants' request for a temporary restraining order, on the grounds that the record before the Court did not demonstrate Defendants were entitled to the relief sought, and the evidence did not demonstrate the threat of irreparable harm. (Dkt. 85.) Later, Defendants withdrew their motion for a preliminary injunction related to the allegations against Plaintiffs, Michael Boren, and Obsidian Aircraft LLC arising from the events of June 20, 2020. (Dkt. 92, 94.)

On June 30, 2020, the Court issued its memorandum decision and order denying Plaintiffs' second motion for preliminary injunction. (Dkt. 86.) The Court found Plaintiffs did not demonstrate a likelihood of success on the merits of their ESA claim, because the record clearly contained a biological assessment, and within that assessment, there was evidence the Forest Service considered the potential impacts of the Trail Project upon existing wetlands and aquatic habitat. As for the CWA claim, the Court found Plaintiffs would be unlikely to succeed on their theory, because Plaintiffs merely reframed their failed ESA claim and the Court considered it an attempt to circumvent the nationwide permit system by attacking the veracity of the statements submitted to the Corps in the Federal Highway Administration's NWP verification request. The Court could find no authority supporting Plaintiffs' claim under the CWA.

Additional motion practice ensued, and the Forest Service and the Federal Highway Administration lodged their respective administrative records with the Court.

(Dkt. 65, 93, 98.)[12] The parties filed their cross motions for summary judgment on April 4, 2021, and May 3, 2021. (Dkt. 114, 116.) The Court heard oral argument on the pending summary judgment motions on September 8, 2021. (Dkt. 126.) Thereafter, the Court asked for supplemental briefing on Plaintiffs' Quiet Title Act claims specifically addressing the QTA's statute of limitations. (Dkt. 127, 128.)

Considered here are Claims Three through Nine of the Second Amended Complaint. Claim Three alleges the Forest Service violated the SNRA and its implementing regulations because the Forest Service failed to consider: (a) the historic conservation purposes of the Act; (b) the impact on the Property's ranching heritage; and (c) reasonable alternatives for the Trail's location. Claim Four alleges the Forest Service did not ensure its actions were consistent with the Forest Plan, in violation of NFMA. Claims Five, Six, and Seven allege violations of NEPA on the grounds the Forest Service failed to consider connected, cumulative, and similar actions, and that both the Forest Service and the Federal Highway Administration improperly used a CE to achieve NEPA compliance. Claim Eight alleges Defendants did not complete Section 7 consultation with the United States Fish and Wildlife Service ("USFWS") regarding the impacts of the Trail upon endangered fish species and their critical habitat, in violation of the ESA. Last, Claim Nine alleges Defendants obtained permission to proceed under NWP 42 without

---

[12] The Forest Service lodged its administrative record on May 24, 2019, (Dkt. 14), which was later supplemented on June 10, 2020, (Dkt. 65), and revised and supplemented on November 27, 2020 (Dkt. 98). On August 13, 2021, the Forest Service filed a supplement to its Second Revised Administrative Record at the Court's request, as the Court was unable to open AR 0877-0878. (Dkt. 123.)

MEMORANDUM DECISION AND ORDER  - 15

fully disclosing the nature of the activities associated with constructing the Trail, in violation of the CWA.

Defendants argue they are entitled to summary judgment on Plaintiffs' environmental claims. They also assert the affirmative defense of unclean hands, arguing Plaintiffs inequitable conduct deprives them of equitable relief, referring to the letter directed to Defendants' contractor, Hobble Creek, and the helicopter fly over by Plaintiff David Boren's brother in June of 2020.

Plaintiffs' three NEPA claims depend, in part, upon analysis of the claims asserted under the ESA, CWA, and NFMA. Accordingly, the Court will address the claims out of sequence, and will discuss below Defendants' affirmative defense; followed by a discussion of Plaintiffs' claims under the ESA, CWA, NFMA, NEPA, and SNRA.

## STANDARD OF REVIEW

### 1.    Summary Judgment

Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56(a). "Summary judgment is [also] the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review." *Loma Linda Univ. Med. Ctr. v. Sebelius*, 684 F.Supp.2d 42, 52 (D.D.C. 2010) (citing *Stuttering Found. of Am. v. Springer*, 498 F.Supp.2d 203, 207 (D.D.C. 2007)).

2.       **Administrative Procedure Act (APA)**

The Forest Service's 2017 Decision Memo and the FHWA's 2017 Decision are

final agency actions reviewable under the APA, 5 U.S.C. § 551 *et. seq*. Plaintiffs

challenge the two agency actions under the APA as violating the requirements of the

ESA, CWA,[13] NFMA, NEPA, and SNRA.

Under the APA, it is the role of the agency to resolve factual issues to arrive at a

decision that is supported by the administrative record, whereas "the function of the

district court is to determine whether or not as a matter of law the evidence in the

administrative record permitted the agency to make the decision it did." *See Occidental*

*Eng'g Co. v. INS*, 753 F.2d 766, 769–70 (9th Cir. 1985). An agency action must be

upheld under the APA unless it is found to be "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Friends of*

*Earth v. Hintz*, 800 F.2d 822, 830–31 (9th Cir. 1986). Judicial review under this standard

is to be "searching and careful," but remains "narrow," and the Court should not

substitute it judgment for that of the agency. *Mt. Graham Red Squirrel v. Espy*, 986 F.2d

1568, 1571 (9th Cir. 1993).

The Court may reverse the agency's decision as arbitrary and capricious "only if

the agency relied on factors Congress did not intend it to consider, entirely failed to

consider an important aspect of the problem, or offered an explanation that runs counter

---

[13] Plaintiffs claim also that their CWA claim is brought pursuant to the citizen suit provision of
the CWA, which is not reviewable under the APA. The Court discusses the standard of review in
more detail in its discussion of Plaintiffs' claim under the CWA.

to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F.3d 1105, 1110 (9th Cir. 2015). Conversely, the agency's decision must be upheld if "there is a rational connection between the facts found and the conclusions made," and the determination was "not so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc) *overruled in part on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008).

"Deference to an agency's technical expertise and experience is particularly warranted with respect to questions involving…scientific matters." *United States v. Alpine Land and Reservoir Co.*, 887 F.2d 207, 213 (9th Cir. 1989); *see also Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1185 (9th Cir. 2011) (holding that "Forest Service is entitled to rely on the reasoned opinions of its experts"). The Court may set aside only those conclusions that do not have a basis in fact, not those with which it disagrees. *Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229, 1236 (9th Cir. 2001).

Nevertheless, the "presumption of agency expertise may be rebutted if the decisions, even though based on scientific expertise, are not reasoned." *Greenpeace v. NMFS*, 80 F.Supp.2d 1137, 1147 (W.D. Wash. 2000). "Where an agency fails to articulate a rational connection between the facts found and the choice made, the Court may not supply a reasoned basis for the agency's action that the agency itself has not

given." *Defenders of Wildlife v. Babbitt*, 958 F.Supp. 670, 679 (D.D.C. 1997) (internal quotation marks and citations omitted).

"The party challenging an agency's action as arbitrary and capricious bears the burden of proof." *W. Watersheds Project v. Ashe*, 948 F. Supp. 2d 1166, 1174 (D. Idaho 2013) (citing *WildEarth Guardians v. Salazar*, 741 F.Supp.2d 89, 97 (D.D.C. 2010)).

## ANALYSIS

1.     **Affirmative Defense No. 5 – Unclean Hands**

Defendants raise the affirmative defense of unclean hands as a bar to all of Plaintiffs' environmental claims, arguing Plaintiffs are not entitled to equitable relief because they attempted to interfere with a valid contract for construction of the Trail. Defendants cite Plaintiffs' August 2019 letter to Hobble Creek, its contractor, threatening "significant financial loss" should trail construction proceed, despite the Court's order denying Plaintiffs' motion for preliminary injunction. Plaintiffs contend the single letter does not give rise to a colorable unclean hands defense.

Courts should not apply the unclean hands doctrine if it would frustrate the purpose of a federal statute or contravene public policy. *Idaho Rural Council v. Bosma*, 143 F. Supp. 2d 1169, 1183 (D. Idaho 2001). The Court notes that the history of this case, considered with the letter and the helicopter fly-over, create an inference that the claims made here are a pretext for different aims. *See Jicarilla Apache Tribe v. Andrus*, 687 F.2d 1324, 1340 (10th Cir. 1982) (affirming the district court's holding that "it was unjust and inequitable to allow the Tribe to use NEPA as a device solely for economic gain" when it was clear the Tribe was motivated by "its desire to obtain the maximum possible

compensation for the development."). However, the evidence in the record is insufficient to establish this affirmative defense and bar the lawsuit considering the important public policies behind the various environmental laws alleged to have been violated. *See Bosma*, 143 F.Supp. at 1183 (declining to apply the doctrine of unclean hands to bar the plaintiff's suit under the CWA given the broader public purpose of the statute). The Court therefore denies summary judgment to Defendants on this affirmative defense, and proceeds to discuss the merits. Before doing so, however, the Court must consider the admissibility of Plaintiffs' extra-record declarations, and Defendants' objections to the same.

### 2.   Admissibility of Extra Record Evidence

Plaintiffs seek to introduce the declarations of John Stewart (Dkt. 62-3, 67-2, 74-1), Jennifer Chariarse (Dkt. 66-11), and Brenda Mitchell (Dkt. 66-8). Plaintiffs argue their testimony is admissible because it shows Defendants did not consider all relevant factors when they arrived at their decisions to approve construction of the Trail. Specifically, Plaintiffs contend the Forest Service did not consider the significance of the hydrological connectivity between the wetlands on the Property and the Salmon River, or the surface water connection via culverts between the wetlands and the Salmon River. They attack the Forest Service's conclusion that the wetlands are "essentially isolated [and] seasonally wet," by pointing to Stewart's observation of a culvert or culverts beneath Highway 75, which he contends provide a direct surface hydrological connection between the wetlands on the Property to the Salmon River. Second Decl. of Stewart ¶ 17. (Dkt. 67-2.) Third Decl. of Stewart ¶ 21. (Dkt. 74-1.); Decl. of Stewart ¶ 7. (Dkt. 62-3.)

Defendants accurately note the Court previously rejected Plaintiffs' argument,[14] and also counter that Plaintiffs' assertions are belied by the record, citing AR 2591. If the Court is inclined to consider the Stewart declarations, Defendants offer the declarations of Mitchell and Brian Anderson (Dkt. 68-1), as well as an illustrative map, to explain technical information contained in the administrative record, to provide information not included in any document, and to assist the Court.

### A.    *Applicable Law*

The APA provides that "the court shall review the whole record or those parts of it cited by a party," and makes no provision for extra-record review. 5 U.S.C. § 706; *see also Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 420 (1971) (stating that "review is to be based on the full administrative record" that was before the agency at the time of its decision), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, (1977). The APA is clear that the Court's review is limited to "the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

---

[14] In its Memorandum Decision and Order on Plaintiffs' second motion for preliminary injunction, the Court found that supplementation of the record with the Stewart declarations in the record was not necessary for judicial review. (Dkt. 86 at 17-18.) Initially, Plaintiffs contended that the Stewart declarations were necessary to show that the Forest Service failed to consider relevant factors, and to explain technical and complex subject matter. Plaintiffs have abandoned their claim that the Stewart declarations are necessary to explain technical and complex subject matter. Also, Defendants submitted the declarations of Chariarse and Mitchell to counter the Stewart declarations in the event the Court admitted them. (Dkt. 86 at 17.) Plaintiffs now seek to introduce the Chariarse and Mitchell declarations in support of their motion.

However, the United States Court of Appeals for the Ninth Circuit allows a reviewing court to consider extra-record materials in an APA case under four narrow exceptions:

> (1) if necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) when the agency has relied on documents not in the record, or (3) when supplementing the record is necessary to explain technical terms or complex subject matter ... [or (4) ] where plaintiffs make a showing of agency bad faith.

*Sw. Ctr. For Biological Diversity v. U.S. Forest Serv*., 100 F.3d 1443, 1450 (9th Cir. 1996). Plaintiffs bear the burden of demonstrating with particularity that the extra-record evidence they proffer in this case falls within one of the enumerated exceptions. *See Animal Def. Council v. Hodel*, 840 F.2d 1432, 1438 (9th Cir. 1988), *opinion amended by* 867 F.2d 1244 (9th Cir. 1989). The limited exceptions are "narrowly construed and applied." *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005).

## B.    *Analysis*

The Court previously addressed the admissibility of extra record evidence in its decision denying Plaintiffs' motion for preliminary injunction. (Dkt. 86.) A further review of Plaintiffs' arguments and the portions of the declarations Plaintiffs rely upon to question the conclusions in the Forest Service's Decision Memo reinforces the Court's earlier decision that the relevant factors exception does not apply.

Here, the record contains sufficient information to explain how the Forest Service utilized the information before it and why it reached the decision it did. *See Cook Inletkeeper v. EPA*, 400 Fed. App'x 239, 240–41 (9th Cir. 2010). The information

relevant to wetlands, riparian conservation areas (RCAs), and surface water connectivity between the wetlands and the Salmon River is set forth in the All Aquatics Biological Assessment ("BA") and Appendix A to the same, prepared by Hydrologist Mark Moulton. The BA broadly describes the interaction between the lower elevation valley bottoms of drainages in the Sawtooth Valley and their importance to maintaining constant streamflows. (AR 2554, 2558, 2562, 2566, 2570, 2580, 2585.)  The BA identifies endangered aquatic species present in the Sawtooth Valley and their critical habitat, as well as describes the connectivity between upland streams, the Salmon River, Redfish Lake, and Little Redfish Lake. (*Id.*)

Appendix A to the BA, which analyzes the Trail Project's impact upon the watershed, indicates the Forest Service was aware the Trail would traverse RCAs. Appendix A describes the measures proposed to "accommodate seasonal flow through" two of the three RCAs. (AR 2591.) Specifically, "[a] culvert (or culverts) would be installed…beneath the turnpike trail tread" to allow for seasonal flows. (*Id.*) Moulton concludes that the "intended practices, gentle terrain, and substantial typical separation from habitats would preclude any measurable influences to individuals of the [aquatic] species consider[ed] here, or their designated critical habitat." (AR 2596.) Appendix A identifies also the mitigation measures designed to reduce or eliminate potential effects upon Salmon River and Redfish Lake critical habitat. (AR 0238 – 0245, 0282 – 0287.) And, the CE Checklist dated March 31, 2014, indicates the Forest Service concluded that the proposed action "effectively mitigates any potential issues associated" with the crossings of the three riparian conservation areas. (AR 0236.)

The record demonstrates the Forest Service considered the connectivity of the waters within the entire Sawtooth Valley, and that the hydrologist analyzed project impacts upon the same in Appendix A to the All Aquatics BA. Yet, Plaintiffs take the extraordinary leap by arguing that the Forest Service somehow failed to consider the hydrological connection between the wetlands and the Salmon River because it did not mention one (or more) culverts beneath Highway 75. *See* Pls' Response/Reply at 11. (Dkt. 117.) Stewart Decl. ¶ 21. (Dkt. 74-1.)[15] The Court will not make that leap.

A failure to discuss a culvert or culverts transporting water beneath Highway 75 to the Salmon River does not change, alter, or otherwise detract from the evidence in the record indicating the Forest Service's awareness of the hydrological connectivity of the Sawtooth Valley watershed, and its analysis of potential effects from the Trail Project upon the same. (AR 0238 – 0245, 2551 – 2606.) Put simply, Stewart's declaration adds nothing. *See, e.g., San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 993 (9th Cir. 2014) (The Court may not look to extra-record evidence "as a basis for questioning the agency's scientific analyses or conclusions"); *Native Ecosystems Council v. Weldon*, 232 F. Supp. 3d 1142, 1149 (D. Mont. 2017) (denying extra-record declarations because "[t]hey do not support the proposition that the agency failed to consider relevant factors, but rather that its consideration of those factors was scientifically unsound.").

---

[15] Appendix A mentions "an existing culvert on the [existing gravel road] that drains the meadow to the west" at the Trail's closest section to Highway 75. (AR 2591.) It is not clear from the record whether this culvert is the same one Stewart observed.

**MEMORANDUM DECISION AND ORDER - 24**

The Court therefore will not admit the extra-record declarations of Stewart, Mitchell and Chariarse.

### 3.      Endangered Species Act (ESA) - Claim Eight

Plaintiffs segue from their discussion of extra-record evidence directly to Claim Eight, their ESA claim. Plaintiffs assert the Forest Service was required to, but did not, complete Section 7 consultation with the United States Fish and Wildlife Service ("USFWS") regarding the impacts of sediment discharge from construction activities upon endangered species and their critical habitat. Plaintiffs contend the Forest Service's[16] "no effect" findings for listed aquatic species and their critical habitat is flawed because: (1) the need for mitigation measures to eliminate sediment discharge at three RCA crossings renders the Forest Service's determination per se arbitrary and capricious; (2) the type of construction activities proposed at Redfish Lake are implicitly recognized as having a negative impact upon aquatic species; and (3) the Forest Service entirely overlooked the hydrological connection between the RCAs and the Salmon River.[17]

---

[16] Although Claim Eight refers to all Defendants, Plaintiffs challenged only the Forest Service's findings. Defendants argue that Plaintiff's failure to identify any legal deficiency under the ESA with respect to the Federal Highway Administration's Decision, and its reliance upon the Forest Service's Decision Memo, requires entry of judgment in favor of the Federal Highway Administration. The Court agrees, and will enter summary judgment in favor of the Federal Highway Administration on Claim Eight for this reason. *All. for the Wild Rockies v. Brazell*, No. 3:12-CV-00466-MHW, 2013 WL 6200199, at *21 (D. Idaho Nov. 27, 2013), *aff'd*, 595 F. App'x 700 (9th Cir. 2015) (finding no cause of action under the ESA against the Forest Service where it relied upon the biological opinion of the Fish and Wildlife Service).

[17] Plaintiffs did not make these same arguments in the second motion for preliminary injunction. *See* Mem. Decision and Order at 12 – 13. (Dkt. 86.)

The Forest Service disputes Plaintiffs' interpretation of the applicable law, and contends the record reflects the agency considered the factors Plaintiffs claim were ignored. In reliance upon the BA and the 2017 Decision Memo, the Forest Service asserts its "no effect" finding is reasonably supported by the evidence before it, and that Plaintiffs have not identified facts or circumstances that the agency failed to consider. The Court agrees, and as explained below, finds the Forest Service's conclusion that the Trail Project will have no effect upon listed fish species or their habitat from sediment discharge during construction was not arbitrary and capricious.

## A.    *Applicable Law*

The Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544, evidences a congressional intent to afford endangered species the highest of priorities. *TVA v. Hill*, 437 U.S. 153, 194 (1978). Section 7 of the ESA affirmatively commands each federal agency to "insure that any action authorized, funded, or carried out" by the agency "is not likely to jeopardize the continued existence of any endangered species…or result in the destruction or adverse modification of habitat of such species which is determined…to be critical." 16 U.S.C. § 1536(a)(2). A federal action jeopardizes the continued existence of a species if it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02 (1992).

Under Section 7, if any listed (or proposed listed) species may be present in the area of the proposed action, the federal agency (the "action agency") must prepare a biological assessment (BA) to determine the likely effect of its proposed action on the

species. 16 U.S.C. § 1536(c)(1); *see also* 50 C.F.R. § 402.02. A determination by the

Forest Service in a BA that an action "may affect" a listed species or critical habitat gives

rise to a consultation requirement under section 7 of the ESA. *Karuk Tribe of Cal. v. U.S.*

*Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012).

Because the ESA does not specify a standard of review, the Court must review

Defendants' compliance under the APA and uphold agency action unless it is arbitrary,

capricious, an abuse of discretion, or contrary to law. *Or. Nat. Res. Council v. Allen*, 476

F.3d 1031, 1036 (9th Cir. 2007); 5 U.S.C. § 706(2)(A). The Court finds that the Forest

Service's "no effect" findings survive this deferential review.

### B.    *The Forest Service's No Effect Determination*

There is no dispute that the Forest Service completed a BA for the Trail Project.

(AR 2551 – 2606).[18] The BA identified human caused sediment increases as a threat to

the Sawtooth Valley Subpopulations of Snake River sockeye salmon, Snake River

Steelhead, Snake River spring/summer chinook, Columbia River bull trout, and

westslope cutthroat trout. (AR 2551 – 2552, 2587.) The BA recognizes that the large, flat

meadows with thick mats of organic material present in the Sawtooth Valley store and

release large quantities of water and maintain constant streamflows. (AR 2554.)

Designated critical habitat is identified via maps depicting each fish subpopulation within

the Sawtooth Valley, which includes the Salmon River and Little Redfish Lake. (AR

---

[18] When appended to the larger All Aquatics document, Exhibit A, Hydrologist Mark Moulton's assessment, constitutes a "complete biological assessment of the action." (AR 2590.) Plaintiffs concede the Forest Service completed a BA. Pls.' Mem. at 26 – 27. (Dkt. 114-5.)

2558, 2562, 2566, 2570, 2580, 2585.) These maps depict stream tributaries throughout the Sawtooth Valley, and their trajectory toward the Salmon River and the Redfish Lake complex. (*Id.*)

The Forest Service's hydrologist, Mark Moulton, concluded the Trail Project would have "no effect" upon listed fish species and their designated critical habitat. (AR 2597.) He reached this determination by considering the potential effects of trail construction on subpopulation character, water quality, habitat access, habitat elements, channel conditions and dynamics, flow/hydrology, and watershed conditions. (AR 0294-0304, 2594 – 2606.)[19]

The hydrologist's "no effects" determination analyzed several population and habitat indicators to assess the risk to the local fish populations and their designated critical habitat. For example, with regard to population size, the hydrologist concluded "no influence to listed species is anticipated at the local population scale from the proposed action," because the proposed Trail "would reside on dry, gentle, terrain, far from habitats utilized by the species considered here. At the two locations where the trail comes in proximity to designated critical habitat, it would occur on existing treads – i.e, essentially no construction /disturbance would be necessary." (AR 2594.)

Hydrologist Moulton recognized that construction would include "installing proper drainage…to meet resource and safety needs," and that construction work would

---

[19] The record reflects also that Forest Service personnel discussed the Trail Project with the National Marine Fisheries Service and the Fish and Wildlife Service at a Level 1 team meeting. (AR 2607 – 2611.)

be completed using "a trail dozer, hand crews, or similar equipment." (AR 2591.) Two

sections of the Trail that would cross RCAs south of the private land boundary and on the

private land easement section are described as approximately 100 feet long, and would

"require turnpike trail construction" with the installation of a "culvert (or culverts)"

beneath the turnpike trail tread to "accommodate seasonal flow through this area." (AR

2591.) At the Trail's closest section to Highway 75, the Trail would follow along the

"existing gravel road…(approx. 375') – also crossing over an existing culvert on the road

that drains the meadow to the west." (AR 2591.)

The hydrologist concluded the Project would "preclude any measurable influence

from sediments" because of "[t]he intended practices, gentle terrain, and substantial

typical separation from habitats…." (AR 2594.) Floodplain connectivity would similarly

be unaffected, because "[n]one of the intended federal actions would influence the

connection of streams within their floodplains within the action area…." (AR 2595.)

The summary discussion of the effects upon RCAs, and the resulting "no effects"

determination, was based upon the following rationale:

> Three segments of the proposed trail would intersect RCAs.
> One on private land would cross a minor, essentially isolated,
> seasonally wet area via a short segment of constructed
> turnpike. The next RCA crossing just south on NFS lands
> would be similar, except that the short turnpike would only
> supplement an existing fill associated with a former roadway.
> Both of the wet segments are non-forested, and are separated
> from critical habitat in the Salmon River by substantial
> distance, complex wetlands, and Highway 75. This isolation
> would preclude any measureable [sic] influence to the RCA
> of the Salmon River. These slight influences to wetlands
> would also be consistent with Executive Order 11990.

The 3rd segment passes through the RCA near the confluence of Redfish Lake Creek and the Salmon River. However, here the proposed trail would follow existing treads of a former roadway and the Rock Shelter interpretive trail, and cross Redfish Lake Creek on the existing footbridge. As such, essentially no construction/disturbance would be necessary, and use of the trail would be expected to result in negligible influence to RCA conditions.

(AR 2596.)

In sum, Moulton reached a "no effects" determination for listed aquatic species and identified critical habitat because the direct and indirect effects of the action would not improve, maintain, or degrade a population or habitat indicator. (AR 2596.) This conclusion was based upon the following reasons:

The trail would be non-motorized, with lengthy segments established on existing treads of former roadways. With only a few short exceptions, the proposed trail would also reside on dry, gentle, terrain, far from habitats utilized by the species considered here. The intended practices, gentle terrain, and substantial typical separation from habitats would preclude any measureable [sic] influence to individuals of the species consider[ed] here, or their designated critical habitat. Where 3 short trail segments would intersect RCAs, either the segments are isolated from critical habitat with minimal construction activities anticipated, or the crossings already exist. Either way, the influences would be negligible.

(AR 2596.)

The Forest Service's 2017 Decision Memo incorporates Moulton's conclusions and requires implementation of standard sediment prevention and retention practices. (AR 0294 – 0304.) Specific to sediment control, such measures would include "silt fences" and "wattles" where construction occurs in the RCAs, unless "an aquatic specialist determines natural filters are clearly sufficient;" and confining construction

MEMORANDUM DECISION AND ORDER  - 30

activities occurring in wetland environments "to late summer and fall when site conditions are at their driest." (AR 2596.)

### C.    Whether the Analysis is Arbitrary or Capricious

The Court finds the Forest Service considered the relevant factors and articulated a rational connection between the facts found and the choice made. *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011). The Forest Service acknowledged that construction activities would produce sediment which, in turn, is considered harmful to listed fish species and their habitat. The Court finds, however, that the Forest Service's BA adequately explained why trail construction activities would have no "measurable" effect. For instance, the Forest Service intended to use hand crews and repurpose former roadways for sections of the Trail. A large section of the Trail would be far from habitats occupied by ESA listed fish species. One area known to be seasonally wet would involve turnpike construction to allow the unimpeded flow of water. When construction must occur in RCAs, construction activities would be confined to dryer months. And, silt fences and wattles would be used in RCAs to contain sediment. Nothing in the record supports a finding that the Forest Service's "no effects" conclusion was arbitrary. By insisting the mere discharge of sediment and implementation of mitigation measures mandates a "may affect" determination, Plaintiffs miss the entire risk analysis that follows.

For instance, Plaintiffs' first argument equates the mere presence of sediment discharge and the implementation of mitigation measures as mandating a "may affect" finding. Plaintiffs' argument is not persuasive, and misperceives the holdings in *Karuk*

MEMORANDUM DECISION AND ORDER - 31

*Tribe of Ca. v. U.S. Forest Service*, 681 F.3d 1006 (9th Cir. 2012), and *Native*

*Ecosystems Council v. Krueger*, 946 F.Sup.2d 1060 (D. Mont. 2013), as applied to this

case. In *Karuk*, the Forest Service argued that habitat protection criteria "assured that

there would be no impact" on listed Coho salmon from its suction dredge mining project

along the banks of the Kamath River system. *Id.* at 1028. Yet, the record revealed that

compliance with mitigation efforts would "reduce – not eliminate – the impacts to" the

salmon. *Id.* at 1028. There was also ample evidence in the record that suction dredge

mining, in and of itself, would result in harm to the salmon in a variety of ways. *Id.* at

1029. Accordingly, the court rejected the Forest Service's argument, finding that the

mining activities "may affect" the listed Coho salmon and therefore the Section 7

consultation requirement was triggered. *Id.*

In *Nat'l Fam. Farm Coal. v. U.S. Env't Prot. Agency*, 966 F.3d 893, 924 (9th Cir.

2020), the court explained *Karuk* does not stand for the proposition that adoption of

mitigation measures, standing alone, compels a "may affect" finding. Rather, it is when

mitigation measures merely "reduce, but cannot scientifically eliminate an effect" upon

listed species. *Id.* But, when an agency is able to rule out any effect upon ESA listed

species or habitat in partial reliance on mitigation measures, and determines at the outset

that the risks of exposure to habitat damaging activities will have "no effect" based upon

sound scientific analysis of the risks, the use of mitigation measures is not evidence

requiring a "may effect" finding. *Id.* at 925.

In *Krueger*, a wildlife report expressly stated that the Forest Service's road project

"will result in disturbance effects [to the grizzly bear] due to increased traffic, human

activity, and equipment use during project activities." 946 F.Supp.2d at 1078. Despite

this assessment, the Forest Service concluded its road project would have "no effect" on

grizzly bears. The court found this inherent contradiction rendered the Forest Service's

conclusion arbitrary and capricious. 946 F.Supp.2d at 1079.

In contrast to both *Karuk* and *Krueger*, the record before the Court here reflects

the Forest Service recognized the potential for habitat damage due to sediment discharge

from construction activities, and performed a risk analysis. The Forest Service's

determination of "no effects" is supported by Moulton's analysis that use of existing

roadway treads, the distance of the Trail from critical habitat, the presence of complex

wetlands, and the gentle terrain would preclude measurable effects. (AR 2596.) Where

there would be ground disturbance at the three RCA crossings, the Forest Service

considered the use of mitigation measures to eliminate any possible effect from

construction disturbance to soils. Nonetheless, it is clear that the hydrologist considered

other factors (distance, isolation, presence of wetlands, and existing treads) still applied

to eliminate any measurable effect from sediment discharge to listed species and critical

habitat. Thus, unlike the effects at issue in *Karuk* and *Krueger*, the anticipated effects of

the Trail's construction from sediment were deemed to be minimal *before*

implementation of mitigation measures.

Under these circumstances, the use of mitigation measures is not evidence

requiring a "may affect" finding. *Nat'l Family Farm Coalition*, 966 F. 3d at 925.

Mere exposure to conditions that are known to destroy habitat does not equate to a "may

affect" finding, as Plaintiffs suggest. *Nat'l Family Farm Coalition*, 966 F.3d at 924.

**MEMORANDUM DECISION AND ORDER  - 33**

Rather, it is a "recognition that [the Forest Service] did what the ESA requires it to do: assess risks to determine whether the exposure would have any possible effect." *Id.* The Forest Service determined the risks to aquatic species and critical habitat would not be "measurable" or would be "negligible" based upon the analysis conducted. The Forest Service is not required to consult when it determines, based upon a reasoned analysis, that exposure to harmful sediment would be negligible. *Id.*at 924 (citing *Friends of Santa Clara River v. United States Army Corps of Engineers*, 887 F.3d 906, 915 (9th Cir. 2018) (where Corps concluded steelheads' exposure to harmful chemicals would be within normal limits, it was not required to consult with NMFS to discharge its responsibilities under the ESA)).

Next, Plaintiffs argue that the types of construction activities, which include creating a new base and resurfacing the existing trail bed at Little Redfish Creek, are activities that can cause sedimentation and negatively impact listed species and designated critical habitat. Plaintiffs liken the activities to road construction, and declare that the Forest Service intentionally minimized such construction activities to reach a "no effects" determination. Plaintiffs ask the Court to consider the construction drawings and plans for the turnpike trail construction at Wetland 1 and Little Redfish Creek, which depict installation of a 36 inch culvert with headwalls and a rock spillway, along with a raised trail bed. In response, Defendants argue extrinsic evidence is not permissible, and point to the record to demonstrate the Forest Service accounted for the construction activities anticipated at RCA crossings.

A review of the record demonstrates that the Forest Service considered the impacts of construction activities at RCA crossings. The hydrologist recognized the need for turnpike trail construction at RCA crossings. He also noted that trail construction would "include installing proper drainage and a fully accessible grade…to meet resource and safety needs." (AR 2591.) Further, Soils Scientist Terry Hardy completed an analysis and found "no issues," provided that the Trail would be designed and constructed with "rolling dips and drainage structures to ensure sustainability of the facility. Implementing these features will minimize erosion of the trailhead, which if located in RCAs (riparian conservation areas) could contribute sediment to nearby streams." (AR 0155.) The Soils Scientist recommended also that ground disturbance be "restored to similar amounts of pre-disturbance soil (ground) cover, to minimize erosion…." (AR 0155.)

Maps of the proposed Trail depict the two areas of turnpike trail construction and use of the existing bridge north of the Redfish Entrance Station. (AR 2640.) Renderings of the trail concept illustrate the proposed trail tread. (AR 0909.) Finally, the BA and the Decision Memo indicate that construction activities would be completed using a trail dozer, hand crews, or similar equipment. The construction activities described in the AR bear few similarities to the more extensive earth moving, heavy equipment and other activities required for road construction.

Last, Plaintiffs contend that the Forest Service's "no effects" determination is flawed, because the hydrological connection between the wetlands and the Salmon river was overlooked. Plaintiffs contend that, "[n]owhere in the Administrative Record did the Forest Service mention the surface water connection, nor did it appear to take it into

consideration. Thus, the entire basis for its "no effects" determination – that the wetlands are isolated, and thus sediment cannot reach the River – is undermined…." Pls.' Mem. at 29. (Dkt. 114-5.)

The Court needs only to look at the All Aquatics BA and Hydrologist Mark Moulton's analysis (Appendix A to the same) to conclude Plaintiffs' assertion is contrary to the record. The BA discussed that all water in the Sawtooth Range and Sawtooth Valley is hydrologically connected to the Salmon River and Redfish Lake. (AR 2554.) Maps depict the hydrological connection between the creeks, rivers, and wetlands, and the Salmon River and Redfish Lake. (AR 2558, 2562, 2566, 2570, 2580, 2585.) And in 2004, engineers conducted a wetland and floodplain assessment specific to the Easement area on Plaintiffs' Property. (AR 0591 – 0593.)

A review of Exhibit A to the BA reveals Hydrologist Moulton considered the hydrological connection between the wetlands and the Salmon River. First, he recommended installation of proper drainage. (AR 2590.) Second, he recommended turnpike trail construction for two trail sections, with "[a] culvert (or culverts)" to be installed "beneath the turnpike trail tread (built to project standards) in order to accommodate seasonal flow through" the area. (AR 2591.) Third, he noted that trail tread construction "on the moraine, including the sloped trail sections leading up to the moraine on both sides, would include a minimum 10.5' wide bench…with sufficient cross-slope for drainage…" (AR 2590.) Last, he noted that, at the Trail's closest section to Highway 75, the Trail would follow the existing gravel road and "cross[] over an existing culvert on the road that drains the meadow to the west." (AR 2591.)

MEMORANDUM DECISION AND ORDER - 36

In sum, the Court finds the Forest Service did not act arbitrarily and capriciously in making its "no effect" finding concerning listed aquatic species and their critical habitat. The Forest Service considered the impact of sediment discharge, and offered a plausible explanation for concluding its construction activities would result in little measurable effect upon reproduction, numbers, or distribution of listed fish populations and fish habitat. Accordingly, the Court finds the Forest Service did not violate the ESA, and summary judgment will be granted to Defendants on Claim Eight.

## 4.     Clean Water Act (CWA) - Claim Nine

Plaintiffs argue Defendants failed to disclose the nature of the wetlands or the potential effects to ESA listed species and critical habitat in the preconstruction notification to the Army Corps of Engineers. Accordingly, Plaintiffs contend the Corps lacked critical information necessary for it to make an informed decision as to whether the proposed trail construction activities were covered by Nationwide Permit 42 (NWP 42). Plaintiffs further assert that the failure to disclose such information "renders the NWP invalid." [20] In response, Defendants contend Plaintiffs have failed to identify any agency action subject to judicial review, requiring dismissal of Claim Nine in its entirety.

---

[20] In Claim Nine, Plaintiffs alternatively contend that NWP 42 does not apply because construction of the Trail "may" cause more than 300 linear feet of a stream to be filled and cause injury to property rights, contrary to the conditions of NWP 42. Plaintiffs' opening brief contains no argument concerning this alternative theory, and they have therefore failed to carry their burden upon summary judgment. The Court notes that the Corps acknowledged in its verification letter that project activities "include the discharge of approximately 290 cubic yards of rock fill…." (Dkt. 58-2.)

MEMORANDUM DECISION AND ORDER  - 37

A.    *Clean Water Act Framework*

The CWA was passed in 1972 to restore and maintain the chemical, physical, and biological integrity of the nation's waters. 33 U.S.C. § 1251(a). Section 301 of the Act makes the discharge of any pollutant into "the waters of the United States" unlawful unless authorized in accordance with specified sections of the Act. 33 U.S.C. §§ 1311(a), 1362(7), (12); *Coeur d'Alene Lake v. Kiebert*, 790 F. Supp. 998, 1007 (D. Idaho 1992). A "discharge" of dredged or fill material occurs when dredged material is added into the waters of the United States. 33 C.F.R. § 323.2(d). "Navigable waters" are defined by the CWA as "the waters of the United States." 33 U.S.C. § 1362(7). By regulation, the term encompasses "wetlands," which are themselves broadly defined. *See* 33 C.F.R. § 328.3(a), (b).

Congress has charged the Army Corps of Engineers with regulation of the discharge of dredged or fill material into navigable waters. *Resource Investments, Inc. v. U.S. Army Corps of Engineers*, 151 F.3d 1162, 1166 (9th Cir. 1998). Section 404 of the CWA prohibits the discharge of "dredged or fill material" into navigable waters without a permit issued by the Corps. *See* 33 U.S.C. § 1344.

The Corps may issue both individual and general permits. *See* 33 U.S.C. 1344(a), (e). Individual permits are processed on a case-by-case basis. Evaluation of an individual permit application requires completion of a multi-step examination process. *See* 40 C.F.R. § 230.5. An individual permit will not be issued "if there is a practicable alternative to the proposed discharge which would have less adverse impact." 40 C.F.R. § 230.10(a).

General permits, on the other hand, are issued on "a State, regional, or nationwide basis." 33 U.S.C. § 1344(e). A general permit may be issued only "if the Secretary determines that the activities in [any category of activities involving discharges of dredged or fill material] are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e) (1). A nationwide permit (NWP) undergoes the NEPA process when it is promulgated. *Snoqualmie Valley Pres. All. v. U.S. Army Corps of Engineers*, 683 F.3d 1155, 1160 (9th Cir. 2012).

NWPs provide standing authorization for all activities that fit the description in the permit. *Snoqualmie Valley Pres. All. v. U.S. Army Corps of Engineers*, 683 F.3d 1155, 1158 (9th Cir. 2012) (citing 33 U.S.C. § 1344(e)). Permittees need only request verification from the Corps that an activity complies with the terms and conditions of a nationwide permit. *Id.* (citing 33 C.F.R. § 330.6(a)(1)). Thus, the existence of an NWP means that an extensive process was undertaken prior to promulgating the NWP itself, and the Corps determined that activities falling within the scope of an NWP will have "minimal adverse environmental effects." *See id.* at 1158, 1160-61. Therefore, if an NWP applies to an applicant's activities affecting navigable waters, "the applicant needs merely to comply with its terms, and no further action by the [Corps] is necessary." 40 C.F.R. § 230.5(b).

Activities falling within the scope of an NWP are automatically authorized without an individualized inquiry, although advance notification, known as pre-construction notification, is required in some cases. 33 C.F.R. § 330.1(e). If pre-

construction notification is required, the Corps will verify the applicability of the NWP to the proposed activity. 33 C.F.R. § 330.1(e)(2). If pre-construction notification is not required, the Corps may nevertheless exercise "discretionary authority" to restrict the otherwise automatic application of the NWP program. 33 C.F.R. § 330.1(d).

**B.   *Terms of NWP 42***

Effective March 19, 2017, NWP 42 has applied to "[d]ischarges of dredged or fill material into non-tidal waters of the United States for the construction or expansion of recreational facilities. Examples of recreational facilities that may be authorized…include…hiking trails, bike paths,… [and] horse paths.…" 82 Fed. Reg. 1860; (Dkt. 63-13).[21] Prior to commencing activity that may be covered by NWP 42, a permittee must submit a pre-construction notification to the district engineer. An applicant may not proceed with construction until 45 days have passed, or the Corps verifies the application of NWP 42. NWP 42 ¶ 32.

The pre-construction notification must include the following:

> A description of the proposed activity; the activity's purpose; direct and indirect adverse environmental effects the activity would cause, including the anticipated amount of loss of wetlands, other special aquatic sites, and other waters expected to result from the NWP activity, in acres, linear feet, or other appropriate unit of measure; a description of any proposed mitigation measures intended to reduce the adverse environmental effects caused by the proposed activity… the PCN must include the quantity of anticipated losses of wetlands,…[and] a delineation of wetlands…on the project site.

---

[21] *See also* https://www.swf.usace.army.mil/Portals/47/docs/regulatory/Permitting/Nationwide/NWP42LA.pdf.

**MEMORANDUM DECISION AND ORDER - 40**

NWP 42 ¶ 32(b)(4), (5).

NWP 42 specifies that discharge:

> [M]ust not cause the loss of greater than 1/2-acre of non-tidal waters of the United States. The discharge must not cause the loss of more than 300 linear feet of stream bed, unless for intermittent and ephemeral stream beds the district engineer waives the 300 linear foot limit by making a written determination concluding that the discharge will result in no more than minimal adverse environmental effects. The loss of stream bed plus any other losses of jurisdictional wetlands and waters caused by the NWP activity cannot exceed 1/2-acre.

And, NWP 42 ¶ 18(a) specifies that:

> No activity is authorized under any NWP which is likely to directly or indirectly jeopardize the continued existence of a threatened or endangered species… No activity is authorized under any NWP which "may affect" a listed species or critical habitat, unless ESA section 7 consultation addressing the effects of the proposed activity has been completed.

Challenges to an agency's determination to issue an individual Section 404 permit under the CWA, or to the Corps' promulgation of a nationwide permit, fall under the APA. *See, e.g., Snoqualmie Valley Pres. All. v. U.S. Army Corps of Engineers,* 683 F.3d 1155, 1163 (9th Cir. 2012) (analyzing the Corps's decision to issue a 404 permit under the APA); *Wild Bainbridge v. Mainlander Servs. Corp.*, 544 F. Supp. 2d 1159, 1164 (W.D. Wash. 2008) (same); *N. Plains Res. Council v. U.S. Army Corps of Engineers*, No. CV-19-44-GF-BMM, 2020 WL 1875455, at *2 (D. Mont. Apr. 15, 2020) (analyzing Corps's decision to re-issue a nationwide permit under the APA); *Ohio Valley Envtl. Coal. v. Hurst*, 604 F. Supp. 2d 860, 882 (S.D.W. Va. 2009) (same).

Alternatively, a citizen suit may be brought for violation of a permit limitation "which is in effect" under the Act. 33 U.S.C. § 1365(f). *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc*., 484 U.S. 49, 59 (1987). A citizen may commence an action on his own behalf against any person alleged to be in violation of any "effluent standard or limitation." 33 U.S.C. § 1365(a)(1). For the purpose of citizen suits, "effluent standard or limitation" includes "unlawful acts under 33 U.S.C. § 1311(a)", which states that a discharge of pollutants not in compliance with the CWA is unlawful. *Idaho Conservation League v. Atlanta Gold Corp*., 844 F. Supp. 2d 1116, 1127 (D. Idaho 2012). One of the elements of a prima facie case of violation of the CWA requires a plaintiff to show that pollutants were discharged without a permit or other statutory authorization for such discharge, or in violation of a permit issued under the CWA. *See Stillwater of Crown Point Homeowner's Ass'n, Inc. v. Stiglich*, 999 F. Supp. 2d 1111, 1125 (N.D. Ind. 2014).

### C.    *Analysis*

The Court previously expressed doubt that Plaintiffs stated a claim under the CWA based upon their contention that the pre-construction notification submitted to the Corps was deficient because it did not contain information necessary for the Corps to make an informed decision regarding application of NWP 42. (Dkt. 86.) The Court will not reverse course, as Plaintiffs have failed to present any legal authority to support their theory presented by Claim Nine.

Although Plaintiffs affirmatively state that their claim under the CWA falls under the APA,[22] Plaintiffs have not challenged any final agency action in this claim. *See* 5 U.S.C. § 551(13) (defining "agency action" to include the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act"). Notably, Plaintiffs have not named the Corps as a defendant.[23] Rather, Plaintiffs attempt to circumvent the nationwide permit system by attacking the veracity of the statements Defendants made in the pre-construction notification itself.[24] Put simply, Plaintiffs' claim rests upon their allegation that Defendants lied regarding the nature of the wetlands and the impact to ESA-listed species and their habitat to obtain the Corps' verification that the Trail Project could proceed under NWP 42.

But the Corps's role under the nationwide permit system is limited to determining whether the project in question does or does not satisfy the terms of the general permit, and if not, what steps the party seeking verification must take to bring their project within the ambit of that authorization. 33 C.F.R. § 330.1(e)(3). The nationwide permit process is far less involved than the probing assessment of the particular facts, circumstances, and environmental consequences of a specific project proposal that precedes a Corps

---

[22] *See* Pl. Mem. at 30. (Dkt. 114-5.) ("Many of the Plaintiffs' claims – CWA, NFMA, SNRA, and NEPA – fall under the Administrative Procedure Act.").

[23] The Administrative Record of the Corps is not before the Court. The only information in the record concerning the Federal Highway Administration's request to the Corps for NWP verification is contained at Docket No. 58, Plaintiffs' Reply in Support of Motion to Amend Complaint, in which Plaintiffs sought to add a claim under the CWA.

[24] Plaintiffs include all Defendants in Claim Nine. However, only the Federal Highway Administration is responsible for CWA permitting. *See* Letter, Feb. 24, 2020, FHWA to Plaintiff. (Dkt. 58-3.) The Federal Highway Administration, in turn, relied upon the Forest Service's analysis under the ESA.

**MEMORANDUM DECISION AND ORDER - 43**

determination of whether an individual discharge permit should issue. *Sierra Club v. United States Army Corps of Engineers*, 990 F. Supp. 2d 9, 27 (D.D.C. 2013). Under the nationwide permit program, the Corps has already conducted an environmental review on a general categorical basis and has given its imprimatur to discharges that result from the type of construction activity at issue under specified circumstances. *Id.* When a prospective permittee files a pre-construction notice, the Corps's district engineers simply verify that the planned project does, in fact, fit within the category of activities that the Corps has already authorized.[25]

In other words, NWP 42 imposes no obligation upon the Corps to review the assumptions made by the action agency and reflected in its application. 33 C.F.R. § 330.1(e)(3). *See also* SAW0142 – 43. (Dkt. 58.) Regardless, Plaintiffs attempt to manufacture a violation of the CWA by challenging the underlying assumptions of the BA concerning the Forest Service's "no effect" determination on listed aquatic species and their habitat. The Court has, however, already discussed Plaintiffs' claim under the ESA, finding the Forest Service did not act arbitrarily and capriciously in satisfying its obligations under the law.

Perhaps recognizing the futility of their claim, Plaintiffs contradict themselves in their response/reply brief and claim they request relief under 33 U.S.C. §§ 1344 and 1365. (Dkt. 117 at 17.) Plaintiffs allege that the "discharge of a pollutant at issue is the fill of the wetlands on both the Property and just south of the Property" on Forest Service

---

[25] The Corps' NWP Verification is in the record at Docket 58-2, pages 23 – 46.

land. Plaintiffs contend the construction of the Trail constitutes a "discharge into a jurisdictional wetland under the CWA," which is "ongoing since the fill will remain in the wetlands until the Property is remediated." Plaintiffs next assert that the Federal Highway Administration did not have a valid discharge permit, because: (a) it never obtained "a valid NWP because the preconstruction notice failed to disclose important information that would have rendered NWP 42 inapplicable; or (b) the FHWA violated the 'effluent standards or limitations' of the NWP by not complying with the general conditions of the NWP."

The problem with Plaintiffs' efforts to request relief under Sections 1344 and 1365 of the CWA, as Defendants note in their reply brief, is that there are no such allegations in the Second Amended Complaint other than the reference to NWP 42, and this new claim was not described with particularity in Plaintiffs' Notice of Intent to Sue. (*See* Dkt. 58-2 at 1 - 3.) Although Plaintiffs reference paragraphs 63, 71, and 221-224 of the Second Amended Complaint (Dkt. 50), contending these paragraphs provided notice of their claim under Section 1365 of the CWA, a close look reveals otherwise. Paragraphs 63 and 71 allege that Section 404 of the CWA requires agencies that plan to discharge fill material into wetlands to obtain a permit, and that failure to comply with the terms of a permit constitutes a violation of federal law. Paragraphs 222 – 224 allege the Trail Project does not qualify for "coverage under NWP 42." There is no separate claim asserted in the Second Amended Complaint, or referenced in the notice of intent to sue, under Section 1365 alleging a violation of a particular effluent standard as that term is defined by Section 1365(f).

MEMORANDUM DECISION AND ORDER - 45

In this case, the only conceivable effluent standard implicated is the "discharge of a pollutant." 33 U.S.C. § 1311(a). However, Section 1311(a) states that the discharge of any pollutant by any person is unlawful, "[e]xcept as in compliance with this section and section[]…1344." Section 1344 is applicable to permits for dredged or fill material, and specifically references the Secretary's ability to issue "general permits on a State, regional, or nationwide basis for any category of activities involving discharges of dredged or fill material…." 33 U.S.C. § 1344(3)(1). Here, there is no dispute that the Corps authorized the Trail Project in accordance with NWP 42. (Dkt. 58-2 at 23.) Compliance with the terms of a general permit is deemed compliance for purposes of Section 1365. 33 U.S.C. § 1344(p).

Even taking Plaintiffs' latest contentions at face value, the Court cannot contort them into a cognizable claim under the CWA. First, the nature of the wetlands and their alleged hydrologic connection to the Salmon River in this case are not relevant to verification under NWP 42. Regardless of the type, quality, or connectivity of a wetland, NWP 42 authorizes "discharges of dredged or fill material into non-tidal waters of the United States" provided the discharge does "not cause the loss of greater than ½-acre of non-tidal waters of the United States" or the loss of "more than 300 linear feet of stream bed." NWP 42. Nothing in NWP 42 required a description of the nature or type of

wetland,[26] nor have Plaintiffs identified such a requirement. Plaintiffs have not provided evidence that the Trail Project exceeds the limitations expressed in NWP 42. And, there is no dispute the Corps authorized the Trail Project to proceed under NWP 42.

Second, Plaintiffs failed to allege which "effluent standard" Defendants allegedly violated. Notice regarding an alleged violation of an effluent standard must include sufficient information to permit the recipient to identify the specific standard or order alleged to have been violated, the activity alleged to constitute a violation, the location, and the dates of the violation, among other information. *Ctr. For Biological Diversity v. Marina Point Dev. Co.*, 566 F.3d 794, 801 (9th Cir. 2009) (citing 40 C.F.R. § 135.3(a)). No such allegations appear in the Second Amended Complaint.

Based on the above analysis of Claim Nine, the Court finds Plaintiffs' allegations neither constitute a challenge to agency action under the APA, nor raise a compliance issue with NWP 42. Therefore, Plaintiffs fail to state a claim under the CWA, and the Court will grant summary judgment on Claim Nine to Defendants.

---

[26] The record reflects the Forest Service obtained a wetland and floodplain assessment of the Property in 2004. (AR 0591 – 0593.) The Forest Service was aware of the nature of the wetlands, noting the "predominant classification of wetlands is PEMC based upon the U.S. Fish and Wildlife Service Classification System," but that small areas "were considered to be OEMA, PEMB, PEMF, PUBH, and PFOC." (AR 0591.) The assessment noted also that the extent of the wetland "is affected by irrigation activities that regularly occur on the site. Corps jurisdiction of the entire wetland area is questionable because some areas would likely convert to upland if irrigation is discontinued." (AR 0591.) That is, the area was wet due to the property owner's use of water for irrigation purposes.

**MEMORANDUM DECISION AND ORDER - 47**

5.      **National Forest Management Act (NFMA) - Claim Four**

Plaintiffs insist the Forest Service did not apply NFMA to the entirety of the Trail, contending that Defendants were required to, but did not, apply the Standards and Guidelines from the Forest Plan[27] to the trail segment within the Easement area.

Plaintiffs argue alternatively that, even if the Court concludes the Forest Service applied NFMA to the trail segment within the Easement area, there is a lack of evidence of Forest Plan compliance in the record. Plaintiffs contend the Forest Service did not: (1) complete the Consistency Checklist, which would have confirmed whether the Forest Service complied with NFMA; (2) consider rerouting portions of the Trail on the Property to avoid sensitive areas, such as elk calving areas or RCAs; or (3) complete an adequate analysis of the Forest Plan Standards and Guidelines for management of soil, water, riparian, and aquatic resources. With respect to the last assertion, Plaintiffs state they cannot: (a) locate the hydrological specialist report in the record; (b) find evidence of consideration of wildlife resources; and (c) find evidence that the Forest Service complied with Forest Plan Standards and Guidelines for the management of facilities and roads.[28]

In response, the Forest Service points the Court to the reports of several specialists in the Administrative Record, including the hydrologist's analysis (AR 2594 – 2596); the soil scientist's report (AR 0155); the wildlife biologist's report (AR 0258– 0274; 0246–

---

[27] The Sawtooth National Forest Land and Resource Management Plan (Forest Plan), as amended in 2012, is included in the Administrative Record at 1160-1967.

[28] Plaintiffs did not previously raise these arguments in their motion for preliminary injunction.

**MEMORANDUM DECISION AND ORDER  - 48**

0250); and the botanist's report (AR 0178– 0235). The Forest Service also directs the

Court to the Decision Memo itself, which relied upon the specialists' reports and

discussed the diversity of recreational experiences, reducing user conflicts, protecting

Trail investments, and compliance with the Conservation Easement Deed.

> **A.** *NFMA Framework*

The National Forest System:

> [C]onsists of units of federally owned forest, range, and
> related lands throughout the United States and its territories…
> [and] shall include all national forest lands reserved or
> withdrawn from the public domain of the United States, all
> national forest lands acquired through purchase, exchange,
> donation, or other means,…and other lands, waters, or
> interests therein which are administered by the Forest Service
> or are designated for administration through the Forest
> Service as a part of the system.

16 U.S.C.A. § 1609(a).

The NFMA creates a management framework for national forests. The framework

is divided into a two-step process. First, the Forest Service must develop a Land Resource

Management Plan and an EIS for the entire forest. 36 C.F.R. § 219.10(a), (b); *Neighbors

of Cuddy Mountain v. U.S. Forest Serv*., 137 F.3d 1372, 1376 (9th Cir. 1998). Second,

once a forest plan is created, the Forest Service has an obligation "to ensure that '[s]ite-

specific projects and activities…be consistent with an approved forest plan,' and to

'strictly comply with a forest plan's standards, which are considered binding

limitations.'" *Oregon Nat. Desert Ass'n v. United States Forest Serv*., 957 F.3d 1024,

1035 (9th Cir. 2020) (internal citations omitted).

"Procedurally, all management activities undertaken by the Forest Service must comply with the forest plan, which in turn must comply with the NFMA." *Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 932 (9th Cir. 2010) (quotation omitted). Substantively, the NFMA also places a duty on the Forest Service to "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area…." 16 U.S.C. § 1604(g)(3)(B). To ensure compliance with the forest plan and the NFMA, the Forest Service must conduct an analysis of each "site specific" action, such as construction of the Trail, to ensure that the action is consistent with the forest plan. *Tidwell*, 599 F.3d at 932. (quotation omitted). "Every project and activity must be consistent with the applicable plan components. A project or activity approval document must describe how the project or activity is consistent with applicable plan components…." 36 C.F.R. § 219.15(d), *cited in WildEarth Guardians v. Jeffries*, 370 F. Supp. 3d 1208, 1232 (D. Or. 2019).

However, the Court must "give the Forest Service ample latitude in ensuring the consistency of its actions with Forest Plans: 'We will conclude that the Forest Service acts arbitrarily and capriciously only when the record plainly demonstrates that the Forest Service made a clear error in judgment in concluding that a project meets the requirements of the NFMA and relevant Forest Plan.'" *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1018 (9th Cir. 2012) (quoting *Lands Council v. McNair*, 537 F.3d 981, 994 (9th Cir. 2008)). And, the Court must give the Forest Service's interpretation and implementation of its own Forest Plan substantial deference. *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012).

MEMORANDUM DECISION AND ORDER - 50

Thus, in reviewing the Decision Memo's consistency with the Forest Plan, the Court must ask whether, based upon the record before it, the Forest Service's actions reflect a "clear error of judgment." *Weldon*, 697 F.3d at 1056. Moreover, "[e]ven when an agency explains its decision with 'less than ideal clarity,' a reviewing court will not upset the decision on that account 'if the agency's path may reasonably be discerned.'" *Alaska Dep't of Env't Conservation v. E.P.A.*, 540 U.S. 461, 497 (2004).

B.      ***Application to Easement Area***

Pursuant to the plain language of 16 U.S.C.A. § 1609(a), the National Forest System consists of "other lands…or interests therein which are administered by the Forest Service…." Here, the Forest Service acquired an interest in Plaintiffs' Property, specifically the Easement area, for the purpose of constructing a trail to be managed as part of the trail system within the SNRA. Thus, the Forest Service is required to comply with the NFMA, but only to the extent of its recorded interest in Plaintiffs' Property. *Friends of Crazy Mountains v. Erickson*, No. CV 19-66-BLG-SPW, 2019 WL 3416206, at *6 (D. Mont. July 29, 2019) (recognizing the NFMA does not apply to privately owned lands over which the Forest Service does not have a recorded interest). The Court therefore finds the Forest Service was limited to considering application of the Forest Plan, and in turn the NFMA, to the 30-foot wide Easement area.

Plaintiffs assert in their opening brief that the Forest Service admitted it failed to apply the NFMA to the entire Trail, citing Defendants' response to Plaintiffs' first motion for preliminary injunction. Pls.' Mem. at 34. (Dkt. 114-5.) The Court fails to find any such admission contained in the record. Rather, Defendants argued then that the Forest

Plan did not apply to the RCAs within the Easement area because it was not part of the National Forest System. Nonetheless, Defendants asserted that the Forest Service analyzed the impact of the Trail, including the segment within the Easement area, and its effect upon RCAs located therein. Defs.' Opposition at 16-17. (Dkt. 17.) The Forest Service does not dispute that the Forest Plan applies to the extent of its interest in Plaintiffs' Property. Defs.' Mem. n. 17. (Dkt. 116.)

Turning to the Administrative Record, the Court finds ample evidence that the Forest Service considered the Standards and Guidelines of the Forest Plan when evaluating the Trail segment within the Easement area. For instance, the Soil Scientist's report expressly includes a reference to the Trail segment within the existing "Forest Service trail easement through private property along the proposed trail corridor." (AR 0148.) The report next references application of the Sawtooth Forest Plan to the Trail Project as a whole. (AR 0151.) The Botanist Specialist report likewise considers the entirety of the Trail, and specifically references the 1.5 miles of Trail located within the Easement area. (AR 0180, 0181.) The hydrologist also considered the trail segment within the Easement area, discussing the RCAs located on the Property that the Trail would cross. (AR 0239, 0241.)

Next, the Forest Plan Consistency Checklist acknowledges the specialists' respective reports. (AR 0258 - 0272.) Upon review of the same, there is no indication that, when considering Forest Plan Standards and Guidelines, the Forest Service excluded the trail segment located within the Easement area.

Finally, the 2017 Decision Memo reflects consideration of the Forest Plan along the entirety of the Trail's proposed route, including within the Easement area. (AR 0296.) For instance, the Decision Memo references REST02 of the Forest Plan concerning RCA crossings located within the Easement area. (AR 0296.) The Decision Memo references several other Forest Plan provisions in the discussion of Botanical Resources (AR 0297), and noxious weeds, for example. (AR 0298.)

Based upon the specialist reports referenced above and the discussion in the 2017 Decision Memo concerning the Forest Plan, the Court finds no support for Plaintiffs' contention that the Forest Service's analysis of Forest Plan compliance excluded consideration of the Trail segment within the Easement area.

### C.   *The Forest Service Complied with Applicable Forest Plan Provisions*

Plaintiffs' remaining NFMA claim and its subparts concerns compliance with aspects of the Forest Plan itself. Importantly, Plaintiffs do not challenge the substance of agency decisions undertaken pursuant to Forest Plan provisions. Rather, Plaintiffs insist the Administrative Record lacks evidence of compliance with the Forest Plan, and that the Forest Plan was simply disregarded in certain key areas. The Court finds Plaintiffs' arguments are without merit.

Plaintiffs claim there is no evidence of compliance with the Forest Plan, because the Forest Service did not complete the Consistency Checklist. (AR 0258 – 0272.) However, the record contains a completed a Forest Plan Consistency Checklist, noted as "FINAL," consisting of a four column table that references Forest Plan Standards, considers whether the specific standard is applicable, and if so, provides a brief reference

to "where, why and how do you implement and show compliance." (AR 0258-0272.) There are, admittedly, a few references that appear somewhat cryptic, such as a reference to "Mark"[29] in the section referencing FRST02, related to design of new culverts, replacement culverts, and other stream crossings in flood zones. (AR 0267.) However, Plaintiffs' characterization that the Court (and the public) cannot discern compliance from these references "in the extremely sparse Record" goes too far.

Upon its review of the record as a whole, the Court is able to discern easily the references made in the Consistency Checklist and find support for discussion of the applicable Forest Plan provisions Plaintiffs contend were ignored. *See Alaska Dep't of Env't Conservation v. E.P.A.*, 540 U.S. at 497 (court may not upset decision so long as "agency's path may reasonably be discerned"); 36 C.F.R. § 219.15(d) ("Every project and activity must be consistent with the applicable plan components.").

Plaintiffs' next contention is that they cannot discern if the Forest Service analyzed whether the Trail Project meets Forest Plan standards for management of soil, water, riparian and aquatic resources. Specifically, Plaintiffs state they have been "unable to locate even a viable substitute for the analysis that is required by Appendix B [of the Sawtooth Forest Plan] in the Project Record," and were only able to find one email concluding there would be "no issues." Pls.' Mem. at 39. (Dkt. 114-5.)

---

[29] Mark Moulton, the hydrologist, completed Appendix A to the All Aquatics Biological Assessment, which expressly considered floodplain connectivity, hydrology, and the need for turnpike trail construction at RCAs. (AR 0238-0245, 2551-2606.) There is also a Wetland-Floodplains Map of the Easement Area, completed in 2004. (AR 0591-0593.)

**MEMORANDUM DECISION AND ORDER - 54**

The Court is not certain what record Plaintiffs reviewed, as the Court identified ample evidence the Forest Service considered soil, water, riparian, and aquatic resources present in the Project area. For instance, Soils Scientist Terry Hardy completed an analysis in 2013 of impacts from the Trail Project to soils. (AR 0148–0155.) Botanical Specialist Deb Taylor[30] completed a 58-page report identifying listed plant species and native plant communities in the area, and analyzed the environmental consequences of the Trail Project upon the same. (AR 0178–0235.) Wildlife Biologist Robin Garwood completed a risk assessment for terrestrial wildlife species. (AR 0246–0250.) And, Hydrologist Moulton completed an analysis intended for inclusion in the All Aquatics Biological Assessment concerning the impacts of the Trail Project to listed fish species and RCAs, including RCAs located within the Easement area. (AR 0238–0245, 2551–2602.)

It is clear to the Court that Mark Moulton's Matrix, and the comprehensive All Aquatics Biological Assessment to which it is appended, constitutes the analysis required by Appendix B of the Forest Plan that Plaintiffs complain is missing from the record.[31] For instance, Appendix B of the Forest Plan indicates there must be an analysis of "Pathways Indicators," such as subpopulation character, flow/hydrology, and watershed conditions. Moulton included an analysis of the applicable pathways indicators relevant

---

[30] Plaintiffs complain the Checklist refers cryptically to "Deb" – ostensibly a reference to Deb Taylor, the Botanical Specialist. (AR 0262.)

[31] Plaintiffs claim they are "unable to locate this 'hydrological specialist report' in the Administrative Record referred to in the Forest Plan Consistency Checklist." Pls.' Mem. at 39. (Dkt. 114-5.) Plaintiffs attacked the sufficiency of Moulton's report in their arguments under the ESA; to now claim they cannot locate the document strains credulity.

to the Trail Project in his Key and Checklist, analyzing subpopulation character, flow/hydrology, and watershed conditions. (AR 2594 – 2606.) In fact, a comparison of the decision matrix designed to demonstrate compliance with Appendix B of the Forest Plan is identical to the Key and Checklist Moulton in fact used. (*Compare* AR 1683 – 1686 with AR 2551 – 2606.) There is even a reference in the matrix Moulton used as having been adapted from "USFWS 1998, Endorsed by Sawtooth Level I, March 18, 1999." (AR 2596.)

Third, Plaintiffs contend the Forest Service did not comply with the Management Direction for Wildlife Resources. Plaintiffs cite the Compliance Checklist's reference to "hazard trees" and the note that it states, "did not analyze this…." (AR 0263, 0264.) The Management Direction for Wildlife Resources WIST01 requires the Forest Service to "maintain at least 20 percent of the acres within each forested PVG found in a watershed (5th field HUC) in large tree size class…." (AR 0263.) The Compliance Checklist's full quote, "Did not analyze this, but I don't think this project is affecting large tree size clas [sic] at the 5th HUC scale. I have a concern that the reroute will lead to large snags being felled due to 'hazard tree' concern." (AR 0263.)

A review of the Decision Memo reveals that the Forest Service did address the concern regarding hazard trees noted in the Compliance Checklist. The Decision Memo indicates large trees will not be felled, as any live conifer trees utilized for project objectives "will generally be between 7 and 12 inches dbh. Standing trees with cavities or

with raptor or raven nests will not be cut/used for these objectives." (AR 0297.) [32]

Further, the Decision Memo indicates that a "hazard tree evaluation will be conducted

prior to and after construction and trees with obvious visual defects within falling

distance of the improved surface of the trail will be removed." (AR 0297.) The Decision

Memo references that project managers must abide by the USDA, Forest Service, Forest

Pest Management, *Tree Hazards: Recognition and Reduction in Recreation Sites*," in

evaluating and reducing hazard tree concerns within the Project Area. (AR 0297.)

Fourth, Plaintiffs insist the Forest Service failed to consider big game on the trail

segment within the Easement Area, which "demonstrates a complete lack of compliance

with NFMA." Pls.' Mem. at 39. (Dkt. 114-5.) The Compliance Checklist indicates that

WIST06 requires the Forest Service to mitigate human-caused disturbances within

winter/spring ranges if disturbances cause displacement of wildlife while occupying those

ranges. The Forest Service "routed the trail to attempt to avoid some elk calving areas."

(AR 0264.) It is not clear what responsibility, if any, the Forest Service had to reroute the

Trail to mitigate big game disturbance within the 30-foot Easement area – the Forest

Service had no ability to reroute the Trail absent acquiring an additional easement or

other property rights in Plaintiffs' Property. Additionally, there is no evidence in the

record that big game or other wildlife utilized the Easement area or would otherwise be

---

[32] The record reveals also that Forester Jim Rineholt was consulted regarding effects upon trees that could be part of the construction contract, and that he had no concerns because he did not believe there would be a lot of tree cutting. (AR 0170 – 0171.) To the extent trees would be cut, he suggested taking care of any "dead or green hazard trees that are leaning toward the trail" during construction. *Id.*

disturbed by the Trail. And finally, it is difficult to square Plaintiffs' hyperbole with the evidence in the record of consideration and compliance with WIST06 as it pertains to Forest Service lands, which would exclude Plaintiffs' Property other than the extent of the Forest Service's interest in the Easement area.

Last, Plaintiffs claim the Administrative Record is "devoid of evidence demonstrating compliance with several Forest Plan Standards and Guidelines for the management of facilities and roads." Pls.' Mem. at 40. (Dkt. 114-5.) Plaintiffs complain the Compliance Checklist is missing information, and failed to analyze "*seven* independent factors related to the Project, including how the Trail would provide for safety and welfare of users, considering the proximity to the Stanley Airport." But the record belies Plaintiffs' assertion that the Forest Service "did not conduct even the bare minimum analysis." Again, the Court's review of the record reveals the Forest Service applied and analyzed the applicable Forest Plan Standards and Guidelines.

The Court notes that, of the fourteen Standards and Guidelines, the Forest Service determined one Standard and four Guidelines applied. (AR 0267 – 0268.) The Standard that the Forest Service deemed applicable relates to the requirement to design stream crossings to accommodate a 100-year flood recurrence interval. (AR 0267.) Plaintiffs complain they cannot decipher the reference to "Mark" in the analysis column. However, as mentioned previously, Hydrologist *Mark Moulton* prepared an analysis that assessed the Trail Project's effects upon channel condition and dynamics, which included an evaluation of floodplain connectivity; flow/hydrology; and watershed conditions. Moulton concluded that there would be no impact in these areas, and that turnpike

construction would be utilized where the Trail intersected three RCAs. (AR 0238–0245.) The Decision Memo incorporates Moulton's analysis. (AR 0300 – 0301.) The Forest Service concludes in the Decision Memo that the Trail Project would not "influence the connection of streams within their floodplains within the action area, or change the probability or severity of extreme flood events." (AR 0301.)

Plaintiffs contend the Forest Service did not conduct the analysis required under Guideline FRGU09, which contains subparts (a) – (g) pertaining to travel management. FRGU09 requires the Forest Service to implement travel management policies "as needed" to: a) Provide for the safety and welfare of the users; b) Protect threatened and endangered species and their habitat; c) Protect Forest resources, such as wildlife, soil, vegetation, and water; d) Provide a diversity of recreational experiences and reduce user conflicts; e) Protect road and trail investments; f) Comply with Forest contracts or permits, cooperative agreements, road purchase agreements, easement deeds, or other formal documents of the Government requiring that road use be controlled; and g) Coordinate hunting and fishing opportunities with State agencies. Plaintiffs contend they cannot locate an analysis of these factors anywhere in the Administrative Record.

Here, the Consistency Checklist admittedly does not contain a brief analysis. (AR 0268.)[33] However, a review of the Decision Memo reveals the Forest Service addressed the applicable guidelines as they relate to travel management. For instance, the Decision Memo addressed user safety and welfare with respect to hazard trees and user conflicts

---

[33] The Checklist states, "Is there a std. boilerplate answer for this one?? Which essentially says this project will do all good and no bad." (AR 0268.)

with cattle and dogs. (AR 0297.) The Forest Service record also contains various specialists' reports addressing wildlife, soil, vegetation, and water, which in turn contain discussions of threatened and endangered species and their habitat found within the project area. (AR 0296 – 0297; 2551 – 2602; 2612 – 2639; 0294 – 0304; 0246 – 0250; 0148 – 0155; 0178 - 0235.) The Decision Memo relied upon the specialists' reports, and contained a discussion of botanical resources; hydrology/fisheries resources; and wildlife resources. (AR 0294 – 0304.)

The Trail Project as a whole was designed to enhance recreational experiences for destination travelers staying in Stanley or at the Redfish Lake complex, and would not only be "fully accessible," but would also accommodate a variety of users, including pedestrians; equestrians; and cyclists. (AR 0294, 0296.) User conflicts with dogs and cattle would be "adaptively manage[d]…where needed," and the Trail would have cattle-guards or similar fence pass-through features, self-closing gates, and signage. (AR 0297.) Road and trail investments were similarly considered, given the Trail Project incorporates repurposing a segment of the Stanley Administrative Site south access road; relocating the Alpine Way trailhead; converting approximately ½ mile of trailhead access road (and trailhead) to single-track trail; and obliterating and rehabilitating approximately ¾ miles of sewer line access road. (AR 0296.) Finally, the Decision Memo acknowledged the 1.5 miles of trail within the Easement area. (AR 0294.)

Plaintiffs do not take issue with the substance of the Forest Service's analysis under the NFMA. Instead, they pick and choose isolated portions of the Compliance Checklist, and claim the Administrative Record does not reflect consideration of the

MEMORANDUM DECISION AND ORDER  - 60

NFMA. However, the Court's review of the Record reveals the Forest Service considered the applicable Forest Plan Standards and Guidelines. Plaintiffs' attempt to parse the record with blinders to the record as a whole fails.

The Court finds Defendants established that the Forest Service described how the Trail Project was consistent with applicable Forest Plan components, and the Court is able to discern the Forest Service's analysis and conclusions with reference to the Compliance Checklist and other documents in the record, including the Decision Memo. Therefore, summary judgment will be granted to Defendants on Claim Four.[34]

## 6.    National Environmental Policy Act (NEPA) – Claims Five, Six, and Seven

Claims Five and Six challenge the Forest Service's application of a categorical exclusion (CE) to its approval of the Decision Memo authorizing construction of the Stanley Redfish Trail, and Claim Seven challenges the Federal Highway Administration's reliance upon the Forest Service's record.[35] Plaintiffs first assert the Forest Service unlawfully approved a CE when resources conditions indicated the presence of extraordinary circumstances. Next, referencing Phase 2 of the Stanley Redfish Trail, Plaintiffs contend the Forest Service "improperly segmented" the Trail Project to downplay the cumulative environmental impacts of connected or cumulative actions under 40 C.F.R. § 1508.25, and were required to, but did not, analyze the cumulative impact of the Trail Project with respect to reasonably foreseeable future

---

[34] There are no NFMA claims alleged against the Federal Highway Administration Defendants.
[35] Plaintiffs rely, in part, upon extra-record evidence, seeking again to introduce Stewart's declarations. For the same reasons expressed above, the Court declines to admit the Stewart declarations.

actions. Last, Plaintiffs assert the Federal Highway Administration's reliance upon the Forest Service's administrative record was arbitrary and capricious because of the "unusual circumstances surrounding the Project."[36]

Defendants justify their application of the relevant CEs utilized by the agencies, and dispute that the Forest Service was required to analyze the two projects as either connected or cumulative actions, or consider cumulative effects.

## A.     NEPA Standards

An agency can comply with NEPA in three ways. It can prepare an EIS; it can prepare an EA; or it can invoke a CE. An EIS is the most searching review. It is required for any action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An EA is less searching. Its central function is to determine whether an EIS is required. 40 C.F.R. § 1508.9.[37] A CE allows an agency to proceed with a proposed action, without preparing either an EA or and EIS, absent extraordinary circumstances.

CEs are appropriate for "actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect." 40 C.F.R. § 1508.4. If an action falls into a categorical exclusion, an agency must have procedures for determining whether "extraordinary circumstances" exist, such that the action, though "normally excluded" from full NEPA analysis, "may have a significant environmental effect." *Id*.; *see also Ctr. for Biological Diversity v. Salazar*, 706 F.3d

---

[36] Plaintiffs have not previously raised these arguments, and instead asserted other reasons in support of their NEPA claims in the motion for preliminary injunction. (Dkt. 24.)

[37] 40 C.F.R. § 1508, applicable to CEs, was amended effective September 13, 2020. The amendments do not apply retroactively.

1085, 1096 (9th Cir. 2013); *Alaska Ctr. For Env't v. U.S. Forest Serv*., 189 F.3d 851, 858 (9th Cir. 1999). "An agency satisfies NEPA if it applies its categorical exclusions and determines that neither an EA nor an EIS is required, so long as the application of the [CE] to the facts of the particular action is not arbitrary and capricious." *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1456 n.5 (9th Cir. 1996).

Under its regulations, the Forest Service has determined that the "construction and reconstruction of trails" is entitled to a categorical exclusion to full NEPA analysis. 36 C.F.R. § 220.6(e)(1). Examples of trail construction and reconstruction "include, but are not limited to: (i) constructing or reconstructing a trail to a scenic overlook, and (ii) reconstructing an existing trail to allow use by handicapped individuals." *Id.*, § 220.6(e)(1)(i), (ii). In the Decision Memo, the Forest Service concluded that the Stanley Redfish Trail project constituted "trail construction," and therefore the Forest Service determined the project fell within the CE for the same. Relying upon the Forest Service's record, the Federal Highway Administration applied its own categorical exclusion for "[c]onstruction of bicycle and pedestrian lanes, paths, and facilities." 23 C.F.R. § 771.117(c)(3). (FHWA AR 126 – 130.)

The Court must give the agency's interpretation of the CE controlling weight unless it is plainly erroneous or inconsistent with the terms used in the CE. *Salazar*, 706 F.3d at 1094. "An agency's determination that a particular action falls within one of its categorical exclusions is reviewed under the arbitrary and capricious standard." *Alaska Ctr. for Env't v. U.S. Forest Service*, 189 F.3d 851, 857 (9th Cir. 1999). Thus, the key when reviewing an agency's determination that an action falls within a CE is whether the

decision was based on a consideration of relevant factors or whether the agency made a clear error of judgment. *See id*. at 858 (finding the agency's interpretation of its categorical exclusion was "not inconsistent or contrary to the language of the regulation").

### B.    *Extraordinary Circumstances*

Plaintiffs assert that the Forest Service violated NEPA with regard to the extraordinary circumstances analysis set forth in the Decision Memo in three respects. First, Plaintiffs argue the Forest Service did not adequately analyze the effects upon listed ESA aquatic species and critical habitat. Second, Plaintiffs again raise the fact that the Trail would cross through wetlands that are hydrologically connected to the Salmon River, and would cross Little Redfish Creek, both of which are designated critical habitat for several listed ESA species. Plaintiffs assert the Decision Memo did not explain sufficiently the Forest Service's conclusion that the effects upon wetlands (RCAs), and in turn the Salmon River, would be insignificant. And third, Plaintiffs contend that the Decision Memo failed to contain the required analysis under the SNRA, and that the Forest Service "ignored" the fact that the Trial is located within a national recreation area. Plaintiffs contend these resource conditions were "blatantly ignored," and mandated a finding of "extraordinary circumstances" such that an EA or an EIS should have been prepared. Pls.' Mem. at 54. (Dkt. 114-5.)

Extraordinary circumstances are those circumstances "in which a normally excluded action may have significant environmental effect." 40 C.F.R. § 1508.4. The Forest Service has identified various "[r]esource conditions that should be considered in

determining whether extraordinary circumstances related to a proposed action warrant

further analysis and documentation in an EA or an EIS," 36 C.F.R. § 220.6(b)(1),

including "[f]lood plains, wetlands, or municipal watersheds," and "Congressionally

designated areas, such as wilderness, wilderness study areas, or national recreation

areas," *id*. § 220.6(b)(1)(ii), (iii).

However, the "mere presence" of one or more of these resource conditions does

not preclude the agency's application of a CE; rather, "[i]t is the existence of a cause-

effect relationship between a proposed action and the potential effect on these resource

conditions, and if such a relationship exists, the degree of the potential effect of a

proposed action on these resource conditions that determines whether extraordinary

circumstances exist." *Id*. § 220.6(b)(2). The agency is required to conduct "scoping" to

determine whether a proposed action may have a significant effect on the environment,

including whether such a cause-effect relationship exists. *Id.* § 220.6(c). The scoping

process is used to "determine the scope of the issues to be addressed and for identifying

the significant issues related to a proposed action." 40 C.F.R. § 1501.7.

"When an agency decides to proceed with an action in the absence of an EA or

EIS, the agency must adequately explain its decision." *Alaska Ctr. For Env't v. U.S.

Forest Serv*., 189 F.3d 851, 859 (9th Cir. 1999). "Once the agency considers the proper

factors and makes a factual determination on whether the impacts are significant or not,

that decision implicates substantial agency expertise and is entitled to deference." *Id*.

The Forest Service concludes in the Decision Memo that "there are no

extraordinary circumstances related to the decision that may result in a significant

individual or cumulative environmental effect," referencing the 2014 Proposed Action and the project record. (AR 0300.) The Decision Memo contains an analysis of each of the seven resource conditions listed in 36 C.F.R. § 220.6(b),[38] including federally listed threatened or endangered species or designated critical habitat; wetlands and municipal watersheds; and the Sawtooth Recreation Area. (AR 0300 – 0301.) The Forest Service concludes that "the record shows the effects from the proposed action do not warrant further analysis." (AR 0300; *see also* 0236.) Because the analysis relies upon the record, the Court may look to the underlying record as well. *See Ctr. for Biological Diversity v. Ilano*, 261 F. Supp. 3d 1063, 1069 (E.D. Cal. 2017) (considering not just the decision memo approving the project, but also the biological evaluation prepared as part of the approval process, in affirming the Forest Service's conclusion that no extraordinary circumstances existed).

With regard to the first two reasons Plaintiffs cite in support of their argument that extraordinary circumstances existed, the Court discussed the Forest Service's consideration of ESA listed aquatic species, critical habitat, and the impact of the Trail Project upon RCAs and wetlands in its discussion, above, concerning Plaintiffs' arguments under the ESA, and will not belabor the rejection of Plaintiffs' argument here. The BA discussed the existing aquatic habitat present in the area, the fish species present in the watershed, and the presence of wetlands. There is an extensive discussion in the

---

[38] These resource conditions include: federally listed threatened or endangered species or designated critical habitat; wetlands; Congressionally designated areas, such as national recreation areas; potential wilderness area; research natural areas; Native American religious or cultural sites; and archaeological sites.

BA concerning the hydrological connection between the entire watershed and the Salmon river. Moulton's Appendix A, appended to the larger All Aquatics document, analyzed the anticipated effects of the Trail Project upon the same.

The Decision Memo references Moulton's analysis as support for the Forest Service's conclusion that the Stanley Redfish Trail would have minimal impact upon floodplains, wetlands (including at the three RCA crossings), and municipal watersheds that aquatic species depend upon. (AR 0300 – 0301.) This is not a situation where the Forest Service failed to engage in a scoping process and failed to consider the Trail Project's effects on RCAs and aquatic species prior to concluding there were no extraordinary circumstances requiring the preparation of an EA or EIS. *See Riverhawks v. Zepeda*, 228 F.Supp.2d 1173, 1190-91 (D. Or. 2002) (noting that, despite the presence of potential impacts of the project upon salmonids, turtles, and fish, there was no scoping process and no discussion of the effects of the project). After scoping, the Forest Service identified the resources present, and assessed the degree of the potential environmental effects of the Trail Project upon RCAs and other critical habitat, finding the effects to be "minimal." This conclusion was reached in reliance upon the short length of the trail segments and the preexisting conditions present at RCA crossings, as well as the minimal construction disturbance anticipated for these areas. (AR 0301.) In other words, the proposed Trail utilized existing topographical alterations, where present, to ensure the least amount of disturbance to the three RCAs the Trail would cross, and the Forest Service discussed the anticipated effect upon aquatic habitat located within the project area.

**MEMORANDUM DECISION AND ORDER - 67**

As explained in the Decision Memo and supported by the underlying scoping documents, the Forest Service did not identify any likelihood of harm "significant enough to rise to the level of an extraordinary circumstance." *Ilano*, 261 F.Supp. 3d at 1069. Plaintiffs' argument, however, invites the Court to ignore the Forest Service's analysis of the effects of trail construction upon resource conditions. But the mere presence of some effect is insufficient to rise to the level of an extraordinary circumstance. *Id.* at 1070 (uncertainty about the effect of the project on the spotted owl was insufficient to conclude that the finding of no extraordinary circumstances was arbitrary and capricious).

Plaintiffs contend also that the Forest Service "ignored the fact" the project is within a national recreation area, and did not conduct the analysis required under the SNRA. The Court finds Plaintiffs' argument is without support in the record. The Forest Service recognized that the project would occur inside the SNRA, "but does not adversely affect the NRA." (AR 0301.) For the reasons discussed in Section 8, below, the Court finds in favor of Defendants on this claim.

Accordingly, the Court finds that the Forest Service's determination that no extraordinary circumstances existed to preclude application of the CE is supported by the record, and was therefore not arbitrary or capricious. Plaintiffs have not pointed to any analysis that was required but was not performed, or to any analysis that was significantly deficient. Rather, the record shows Defendants gathered information regarding the effect the Trail Project might have upon wetlands, RCAs, ESA listed fish species, and SNRA values during the scoping process, and the Court finds there is a rational connection between the facts found and the conclusions made. The Forest Service provided a

reasoned decision consistent with the analyses and findings during scoping, and considered the relevant factors. Accordingly, Plaintiffs have not shown that the Forest Service "offered an explanation that runs counter to the evidence before the agency," or is "so implausible that it could not be ascribed to a difference of view or the product of agency expertise." *Alliance for the Wild Rockies v. Brazell,* 2013 WL 6200199, *19 (D. Idaho 2013).

The Court concludes that the Forest Service appropriately found that construction of the Stanley Redfish Trail fit the identified CE and adequately explained why the Project record demonstrated that the degree of effects of the proposed action did not rise to the level of extraordinary circumstances warranting further consideration.

### C.      Connected and Cumulative Actions

The project briefing paper for the Trail Project illustrates that the Stanley Redfish Trail will terminate at the Redfish Entrance Station, and it is referred to as Phase 1. (AR 0903 – 0905.) The record reflects that Phase 2 of the trail system consists of a second, 1.75 mile trail from the Redfish Lake Entrance Station to Redfish Lake. *Id.* While the proposed Stanley Redfish Trail is 6.5 feet wide with a natural or compacted gravel surface, the Redfish Lake complex trail proposed will be 8 – 10 feet wide and constructed entirely of compacted gravel. *Id.* The proposed Redfish Lake complex trail would proceed along the forest service road from the entrance station, and split at the roundabout above Little Redfish Lake, with both routes reaching Redfish Lake. (AR 0905.)

The Redfish Lake complex trail system also involves a proposal to develop a more comprehensive non-motorized trail system within the Redfish Lake Recreation Complex connecting the developed recreation sites, including the Redfish Lake entrance station, to serve the estimated 2,200 visitors to the complex at any given time.[39]

Plaintiffs view the development of a trail from the Redfish Recreation Complex that would ultimately end at the Redfish Lake Entrance Station at the terminus of the Stanley Redfish Trail as a "connected action," requiring consideration by the Forest Service of the two projects in one comprehensive NEPA analysis. Plaintiffs argue the Stanley Redfish Trail has no independent utility unless the Redfish Lake Recreation Complex trail system is also constructed to connect the two trail systems. As it stands now, the Stanley Redfish Trail will end at the Redfish Lake Entrance Station on Forest Road 214, two miles from Redfish Lake. Accordingly, Plaintiffs argue the Forest Service was required to expand the scope of its review to encompass the entire trail length from Redfish Lake to Stanley and prepare one NEPA document, pursuant to the connected action doctrine. Alternatively, Plaintiffs argue the Stanley Redfish Trail and the Redfish Lake Trail Complex are "cumulative actions" because they are geographically linked, thereby requiring a single NEPA analysis.

Plaintiffs' arguments are premised upon their claimed application of 40 C.F.R. § 1508.25, which provides that "the scope of an environmental impact statement" should

---

[39] The Sawtooth National Forest Schedule of Proposed Action references Phase 2 of the Stanley Redfish Trail and contains the following Web Link: http://www.fs.fed.us/nepa/nepa_project_exp.php?project=46683 (AR 2664.)

include any connected actions or cumulative actions. 40 C.F.R. § 1508.25. The regulation

states that:

> To determine the scope of environmental impact statements,
> agencies shall consider 3 types of action, 3 types of
> alternatives, and 3 types of impacts. They include:
> (a) Actions (other than unconnected single actions) which
> may be:
> > (1) Connected actions, which means that they are closely
> > related and therefore should be discussed in the same
> > impact statement. Actions are connected if they:
> > > (i) Automatically trigger other actions which may
> > > require environmental impact statements[;]
> > > (ii) Cannot or will not proceed unless other actions are
> > > taken previously or simultaneously[; or]
> > > (iii) Are interdependent parts of a larger action and
> > > depend on the larger action for their justification[.]
> > (2) Cumulative actions, which when viewed with other
> > proposed actions have cumulatively significant impacts
> > and should therefore be discussed in the same impact
> > statement.
> > (3) Similar actions….

*Id*.

However, Plaintiffs incorrectly interpret the regulations applicable to the Forest

Service concerning when an agency must consider connected and cumulative actions.

*Sierra Club v. United States Army Corps of Engineers*, 64 F. Supp. 3d 128, 153 (D.D.C.

2014), *aff'd*, 803 F.3d 31 (D.C. Cir. 2015). The regulations require that an agency

consider "connected actions and cumulative actions" only with respect to developing a

single EA or EIS. *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt*., 387 F.3d

989, 998 (9th Cir. 2004). By its plain language, 40 C.F.R. § 1508.25 does not apply to

application of categorical exclusions. *Ctr. for Biological Diversity v. Salazar*, 706 F.3d

1085, 1097 (9th Cir. 2013). *See also Oregon Nat. Desert Ass'n v. Cain*, 17 F. Supp. 3d

1037, 1059 (D. Or. 2014) (declining to apply 40 C.F.R. § 1508.25(a)(1) when the BLM

proceeded pursuant to a CE).

"[A]pplication of section 1508.25's requirements to categorical exclusions is

inconsistent with the efficiencies that the abbreviated categorical exclusion process

provides." *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1097 (9th Cir. 2013).

This is the case because categorical exclusions are "categories of actions which do not,

individually or cumulatively, have a significant effect on the human environment and

therefore, do not require an EA or EIS." *Alaska Ctr. For Env't v. U.S. Forest Serv.*, 189

F.3d 851, 857 (9th Cir. 1999) (citing 40 C.F.R. § 1508.4).

Consistent with *Ctr. for Biological Diversity v. Salazar*, the Court concludes that

Section 1508.25, which requires the action agency to consider connected and cumulative

actions when determining the scope of an EA or EIS, do not apply to the Forest Service's

CE analysis here regarding the Trail.[40] The Forest Service needed only to determine first

whether the proposed action – construction of the Stanley Redfish Trail – fell under a

categorical exclusion and then whether "extraordinary circumstances" existed that would

require further review in either an EA or an EIS. *Ctr. for Biological Diversity v. Salazar*,

706 F.3d at 1097. According to the record, the Forest Service conducted the required

---

[40] Notably absent from Plaintiffs' briefing is any discussion of *Salazar*'s holding regarding application of Section 1508.25 to CEs.

analysis under 36 C.F.R. § 220.6(e)(1).[41] The Court therefore needs not address the

merits of Plaintiffs' claim that the Stanley Redfish Trail, and Phase 2 of the same,

constitute connected or cumulative actions.[42]

### D.   Cumulative Impact

Last, Plaintiffs contend NEPA requires an evaluation of cumulative impacts before

the Forest Service can authorize the Trail Project pursuant to a CE. A cumulative impact

is "an impact on the environment which results from the incremental impact of the action

when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R.

§ 1508.7.[43] When an action "is related to other actions with individually insignificant but

---

[41] Plaintiffs assert there is conflicting precedent regarding the application of 40 C.F.R. § 1508.25 to CEs. Pls.' Mem. at 45 n.12. (Dkt. 114-5.) They contend that, because the Forest Service engaged in scoping, and planned the two projects in conjunction with each other, the regulation applies. However, Plaintiffs provided no authority discussing any "conflicting precedent" within the Ninth Circuit. Moreover, when considering whether a proposed action may be categorically excluded from further analysis in an EA or EIS, the Forest Service is required to conduct scoping to determine whether a proposed action may have a significant effect on the environment, including whether a cause-effect relationship exists. 36 C.F.R. § 220.6(c). Thus, the fact the Forest Service conducted scoping does not trigger application of 40 C.F.R. § 1508.25, as scoping is required pursuant to 36 C.F.R. § 220.6(c).

[42] Plaintiffs' primary concern appears to be that Phase 2 will facilitate trail access between Redfish Lake and Stanley for the 2,200 visitors who frequent the area during the summer, and that, if the trails are "connected" via completion of Phase 2, public access from Redfish Lake to Stanley via the Stanley Redfish Trail will be seamless. Regardless, the two projects target entirely different areas within the SNRA, and are proceeding on different timelines. The Redfish Lake Complex trail system targets the area in and around Redfish Lake, including improving the ability to travel on foot, by bike, or by horse, to the entrance of the Stanley Redfish Trail along Forest Road 214. On the other hand, the Stanley Redfish Trail traverses undeveloped land north of Little Redfish Lake that previously had no non-motorized trail route during the summer. The benefit of non-motorized travel between Stanley and the Redfish Lake entrance station will exist regardless of whether and when the Redfish Lake Complex trail system is completed.

[43] This rule was repealed effective September 14, 2020. 40 C.F.R. § 1508.1(g)(3). The current rule requires only that agencies consider effects that are "reasonably foreseeable and have a reasonably close causal relationship" to the proposal, and further states that this is analogous to "proximate cause" (but not to mere but-for causation) in tort law. 40 C.F.R. § 1508.1(g).

cumulatively significant impacts," significance exists if "it is reasonable to anticipate a cumulatively significant impact on the environment." 40 C.F.R. § 1508.27(b)(7).

Plaintiffs argue that the Forest Service did not, but was required to, consider the cumulative impacts of its reasonably foreseeable future project when it issued the 2017 Decision Memo authorizing construction of the Stanley Redfish Trail. Plaintiffs contend 40 C.F.R. § 1508.4 "clearly requires" the Forest Service to analyze whether the Project has cumulative impacts prior to authorizing any project under a CE. Plaintiffs rely upon the projects' geographical proximity to each other, and the fact that the two trail systems will seamlessly connect the Redfish Lake Complex with Stanley.

Plaintiffs' argument would effectively undercut the purpose of categorical exclusions generally. *Utah Envt'l. Cong. v. Bosworth,* 443 F.3d 732, 741 (10th Cir. 2006). The regulations themselves define a CE as a "category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations…." 40 C.F.R. § 1508.4. By definition, a CE "does not create a significant environmental effect; consequently, the cumulative effects analysis required by an environmental assessment need not be performed. That assessment has already been conducted as a part of the creation of the exclusion," which Plaintiffs do not challenge here. *Utah Env't Cong. v. Bosworth*, 443 F.3d at 741. Only if extraordinary circumstances were present would the Forest Service be required to perform further analysis in the form of an EA. *Id. See also Native Ecosystems Council v. Marten*, 2018 WL 6480709 *16 (D. Mont. Dec. 10, 2018) *aff'd*, 800 F. App'x 543 (9th

Cir. 2020) ("[I]f the Forest Service has satisfied its obligation to consider extraordinary circumstances, no further cumulative effects analysis is needed."); *Lands Council v. Packard*, No. CV05-210-N-EJL, 2005 WL 1353899, at *7 (D. Idaho June 3, 2005) ("detailed cumulative effects analysis Plaintiffs seek to apply to this case does not apply since the project falls under [a] categorical exclusion….").

Although the court in *Salazar* ultimately engaged in a cumulative impact analysis, it did so because the BLM regulations at issue required a finding of extraordinary circumstances when a proposed action would "'[h]ave a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects.'" *See Ctr. for Biological Diversity v. Salazar*, 706 F.3d at 1097 (alteration in original) (citing BLM NEPA Handbook App'x at 5, § 2.6; 43 C.F.R. § 46215(f)) ("Though not required to do so by section 1508.25, under BLM's own regulations, this 'extraordinary circumstances' analysis required BLM to consider whether issuance of the gravel permit would '[h]ave a direct relationship to other actions with individually insignificant but cumulative significant environmental effects.'").

In contrast to the BLM's regulations, the Forest Service's regulations do not require a cumulative impact analysis as part of its consideration of extraordinary circumstances, and Plaintiffs point to no applicable regulations requiring one. *See* 36

C.F.R. § 220.6(b).[44] In the absence of a clear obligation that the Forest Service consider cumulative impacts in its categorical exclusion analysis, the Court declines to require that it do so. *Conservation Cong. v. U.S. Forest Serv*., No. CIV. 2:12-02416 WBS, 2013 WL 2457481, at *10 (E.D. Cal. June 6, 2013). As discussed above, Plaintiffs have not sufficiently shown that extraordinary circumstances were present to require preparation of either an EA or an EIS. Because the Stanley Redfish Trail fell within the CE, the Court finds the Forest Service did not act arbitrarily or capriciously by not conducting a cumulative impact analysis.

The Court is satisfied that the Forest Service considered the relevant factors when determining that no extraordinary circumstances existed requiring preparation of either an EA or EIS. Accordingly, Plaintiffs have failed to establish that the Forest Service violated NEPA, and the Court will grant the Forest Service's motion for summary judgment on Claims Five and Six.

---

[44] Nor do the authorities Plaintiffs cite in support of their argument compel a different result. *Washington Trail Assoc. v. U.S. Forest Service*, 935 F.Supp.1117 (W.D. Wash. 1996) concerned the development of motorized trails within a roadless area. The court reversed the Forest Service's decision to invoke a CE with respect to development of two ORV trails, and found that the Forest Service acted arbitrarily and capriciously when it failed to consider the environmental impact of the two ORV trails in conjunction with other proposed ORV trail developments in the area. *Id.* at 1123. There, however, the increased use resulting from the development of a comprehensive ORV trail network within a roadless area was environmentally significant. In contrast, Plaintiffs have not identified any environmentally significant impact resulting from the construction or intended use of the Stanley Redfish Trail other than their own inconvenience. *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998) concerned the failure of the Forest Service to evaluate five interrelated timber salvage projects in a single EIS in the same watershed, and did not involve application of a CE. *Thomas v. Peterson*, 753 F.2d 754 (9th Cir. 1985), considered a challenge to several EAs prepared separately for a proposed gravel road that would, in turn, provide access to several areas of timber sales that the road was designed to facilitate. Like *Blue Mountains*, *Thomas* did not involve application of a CE.

**MEMORANDUM DECISION AND ORDER  - 76**

E.    **Federal Highway Administration - Claim Seven**

Plaintiffs' NEPA claim against the Federal Highway Administration is entirely

derivative of Claims Five and Six asserted against the Forest Service. Plaintiffs argue the

Forest Service's administrative record should have raised "red flags" to Federal Highway

Administration employees authorizing construction of the Trail, because the record did

not demonstrate compliance with the ESA, CWA, SNRA,[45] NFMA, and NEPA..

The Federal Highway Administration proceeded under its own categorical

exclusion for the development of bicycle and pedestrian lanes, paths, and facilities. 23

C.F.R. § 771.117(c)(3). (FHWA AR 126 – 130.) Plaintiffs do not contest that the CE

applies. Application of 23 C.F.R. 771.117(c)(3) clearly did not require further NEPA

documentation by the Federal Highway Administration. *West v. Sec'y of Dep't of Transp*.,

206 F.3d 920, 927 (9th Cir. 2000).

The Federal Highway Administration entered into an interagency agreement with

the Forest Service for construction of the Stanley Redfish Trail. (FHWA AR 087 – 110.)

In reliance upon the Forest Service's record, the Federal Highway Administration

determined the Trail Project would not involve "unusual circumstances" precluding use

of the CE. (FHWA AR 127.) In light of the Court's determination that the Forest

Service's conclusions were not arbitrary or capricious with respect to its evaluation of the

environmental impacts of the Trail Project under the ESA, CWA, SNRA, NFMA, and

NEPA, there was no requirement that the Federal Highway Administration conduct its

---

[45] Plaintiffs' claim under the SNRA is discussed in the next section.

own independent analysis. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 644–45 (9th Cir. 2014) ("[I]it makes little sense to have two agencies prepare separate NEPA documents for the same agency action.").

The Court therefore finds the Federal Highway Administration Decision (FHWA AR 128 – 132) was reasonable, and summary judgment on Claim Seven will be entered in favor of Defendants.

## 7.   Sawtooth National Recreation Area Act (SNRA) - Claim Three

The SNRA was established to "assure the preservation and protection of the natural, scenic, historic, pastoral, and fish and wildlife values and to provide for the enhancement of the recreational values associated therewith." 16 U.S.C. § 460aa. The SNRA is to be administered "in accordance with the laws, rules and regulations applicable to the national forests in such manner as will best provide (1) the protection and conservation of the salmon and other fisheries; (2) the conservation and development of scenic, natural, historic, pastoral, wildlife, and other values, contributing to and available for public recreation and enjoyment…." 16 U.S.C. § 460aa-1(a).

> The use, management and utilization of natural resources on the Federal lands in the Sawtooth National Recreation Area (SNRA) are subject to the General Management Plan and the laws, rules, and regulations pertaining to the National Forests with the exception that part 252 of this chapter does not apply to these resources. No use or disposal of such resources shall be authorized which will result in substantial impairment of the natural values of the Recreation Area.

36 C.F.R. § 292.17(a). "Substantial impairment means that level of disturbance of the values of the SNRA which is incompatible with the standards of the General

**MEMORANDUM DECISION AND ORDER  - 78**

Management Plan. The proposed activities will be evaluated as to: (i) The period of impact, (ii) The area affected, and (iii) The importance of the impact on the SNRA values." 36 C.F.R. § 292.17(a)(10).

The Forest Service undertook a Substantial Impairment Review and compiled its findings in a checklist based upon the "Sawtooth FLRMP – Appendix I direction," which provides "process guidance for determining substantial impairment of each of the key values identified in Public Law 92-400." (AR 0273 – 0279.)

Plaintiffs contend the Forest Service violated the SNRA because it failed to meet the standards of the Forest Plan, conduct a proper NEPA analysis, and consult under Section 7 of the ESA for listed species and critical habitat. Pls.' Opening Brief at 41. (Dkt. 114-5.)  In other words, Plaintiffs' argument that the Forest Service violated the SNRA is derivative of their arguments that the Forest Service violated NFMA, NEPA, and the ESA.[46] For the reasons discussed above, the Court finds Plaintiffs' claim lacks merit, and that the Forest Service has demonstrated compliance with the applicable environmental laws.

In their reply, Plaintiffs shift gears, arguing that the Forest Service violated the SNRA because it failed to analyze the reasonably foreseeable cumulative impact that the Trail Project would have on the values of the SNRA. Pls.' Response at 28. (Dkt. 117.) Plaintiffs insist the Forest Service should have analyzed the cumulative impacts of both

---

[46] Plaintiffs' reply concedes as much, stating that, if the Forest Service "fails to demonstrate compliance with any of the other environmental laws at issue in this case, then by default, it has also violated the SNRA Act." Pls.' Response at 28. (Dkt. 117.) The Court notes that Plaintiffs did not mention the CWA in the section of their briefs pertaining to the SNRA.

**MEMORANDUM DECISION AND ORDER  - 79**

the Trail Project and the Redfish Lake Trail project as part of its substantial impairment analysis. The Forest Service counters that the guidance applicable for determining substantial impairment provides that it must consider the "area and intensity of direct, indirect, and cumulative effects" only for federal actions requiring an EA or an EIS, and because the Forest Service proceeded pursuant to a CE, no such analysis was required.

The Court finds the Forest Service correctly applied the guidance contained in the Forest Plan. The Forest Plan indicates that the "scale of the natural substantial impairment analyses will be SNRA-wide…[and] will describe the area and intensity of direct, indirect, and cumulative effects." (AR 1848.) The same is true for all of the SNRA values, as each value (natural, scenic, historic, fisheries, wildlife, recreation, pastoral) must be evaluated in the context of the entire SNRA. (AR 1850, 1852, 1853, 1855, 1858, 1859.) Further, the Forest Plan makes clear that the analysis should be invoked during "the effects analysis for any federal action requiring an environmental analysis or environmental impact statement." (AR 1849, 1851, 1852, 1854, 1856, 1858, 1860.)

The Trail Project proceeded under a CE for which no EA or EIS was required. Further, the record reflects the impacts of the Trail, which is only 4.4 miles in length, were evaluated in the context of the entire 756,000-acre SNRA. (AR 0273 – indicating the scope and scale was "all NFS lands."). With respect to wildlife values, again, the record reflects that the scale of the wildlife substantial impairment analyses was "SNRA-wide," and that a risk assessment for terrestrial wildlife species was conducted. (AR 0277.) The same was done for fisheries values. (AR 0278.)

**MEMORANDUM DECISION AND ORDER  - 80**

The Court therefore finds the Forest Service did not act in contravention of the applicable Forest Plan standards when it evaluated the impact of the Trail Project on SNRA values. Summary judgment will be granted to Defendants on Claim Three.

## CONCLUSION

Plaintiffs' overarching theme is that the Forest Service ignored or overlooked environmental conditions when it applied the environmental statutes at issue here. But, when the Court reviewed the record, the Court was confronted with a multitude of environmental analyses, which considered soils, terrestrial wildlife, aquatic species, wetlands, and the values which make the Sawtooth National Recreation Area awe inspiring to all who visit. Critically for the Court's determination, Plaintiffs generally do not attack the substance of the analyses, or claim they were faulty in some way – only that certain aspects of the required analyses were not performed at all. But Plaintiffs have failed to support their contentions with support from the administrative records.

In summary, the Court concludes Plaintiffs have not met their burden of proof on any of their environmental claims. Defendants, on the other hand, with support from the administrative records, have established a rational connection between the facts found and the conclusions made, and their determination to construct the Trail under the auspices of the agencies' respective trail CEs was not implausible. The Court finds that neither the Forest Service's decision nor the Federal Highway Administration's decision was arbitrary and capricious.

**MEMORANDUM DECISION AND ORDER  - 81**

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)     Plaintiffs' Motion for Summary Judgment on Claims Three through Nine of the Second Amended Complaint (Dkt. 114) is **DENIED**.

2)     Defendants' Motion for Summary Judgment on Claims Three through Nine of the Second Amended Complaint (Dkt. 116) is **GRANTED**.

3)     Based upon the Court's simultaneous Memorandum Decision and Order denying Plaintiffs' Motion for Summary Judgment and granting Defendants' Motion for Summary Judgment on Claims One and Two of the Second Amended Complaint (Dkt. 132), Judgment will be entered in favor of Defendants.

DATED: February 24, 2022

Candy W. Dale
Chief U.S. Magistrate Judge